FILED
2013 May-07  AM 09:44
U.S. DISTRICT COURT
N.D. OF ALABAMA

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## NORTHEASTERN DIVISION

| | |
|---|---|
| **UNITED STATES OF AMERICA EX REL. PHILIP MARSTELLER and ROBERT SWISHER** <br><br> **Plaintiffs,** <br> **vs.** <br><br> **LYNN TILTON, PATRIARCH PARTNERS, LLC, MD HELICOPTERS, INC., and NORBERT VERGEZ,** <br><br> **Defendants.** | Civil Action No.: <br><br> **FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)** <br><br> **JURY DEMAND** |

## QUI TAM COMPLAINT FOR VIOLATION OF THE FALSE CLAIMS ACT

COMES NOW, *qui tam* plaintiffs Philip Marsteller and Robert Swisher, on behalf of the United States and on their own behalf and state and allege as follows:

## INTRODUCTION

1.     This is a *qui tam* action for civil damages and penalties brought pursuant to 31 U.S.C. § 3730(b) for a fraudulent course of conduct connected to the inflated pricing of government contracts in violation of the federal False Claims Act, 31 U.S.C. § 3729 *et seq.* The False Claims Act "is intended to reach all types of fraud, without qualification, that might result

in financial loss to the Government." *United States v. Neifert- White Co.,* 390 U.S. 228, 232 (1968). The fraudulent course of conduct alleged herein includes the intentional corruption of the impartiality of a senior Army officer with project authority through various inducements, promises of employment and cash gifts, causing a lapse in contract pricing oversight by the assigned government contracting office, and the concurrent inflation and misrepresentation of commercial pricing by a government contractor under the control and micro-management of a New York investment banker and her private equity investment firm.

### JURISDICTION AND VENUE

2.      This Court has subject matter jurisdiction pursuant to 31 U.S.C. § 3730(a) and 28 U.S.C. § 1331. This case is not based upon the prior public disclosures of allegations or transactions as defined by 31 U.S.C. § 3730(e)(4)(A). If any such public disclosures have occurred, the *qui tam* plaintiffs qualify as "original sources" pursuant to 31 U.S.C. § 3730(e)(4)(B). The Court has personal jurisdiction over the defendants because the defendants transact business in this district and certain of the acts complained of occurred in this district. Venue is proper in this district under 31 U.S.C. § 3732(a) because certain of the acts complained of occurred in this district.

### PARTIES

3.      *Qui Tam* Plaintiff Philip Marsteller ("Marsteller") resides in Arizona and is currently the Director of Sales and Marketing for defendant MD Helicopters, Inc. Marsteller is a former U.S. Army helicopter pilot who holds a B.S. degree in Professional Aeronautics from Embry-Riddle Aeronautical University and a Masters Degree in International Management from the Thunderbird School of Global Management.

4.      *Qui Tam* Plaintiff Robert Swisher ("Swisher") resides in Arizona and is currently the director of Military Business Development for Defendant MD Helicopters, Inc. Swisher

serves part time as an Aviation Brigade Logistics Officer holding the rank of Major in the Arizona National Guard and has formerly served on active duty as an Army Aviator qualified to pilot the Sikorsky UH-60 Black Hawk. Swisher is a graduate of the U.S. Military Academy at West Point and holds an MBA from Arizona State University.

5.     Defendant Lynn Tilton ("Tilton") is the Chief Executive Officer of Defendants Patriarch Partners, LLC, and MD Helicopters, Inc. Tilton is believed to reside in both New York and Florida.

6.     Defendant Patriarch Partners, LLC, ("Patriarch") is a for-profit debt and equity investment company incorporated in Delaware and headquartered in New York (New York foreign corporate filing number 2514252).  Patriarch was founded and is owned by Tilton. As Patriarch's owner and CEO, Tilton controls its day to day operations. Patriarch's corporate headquarters is located at 1 Broadway, 5th Floor, New York, NY 10004.

7.     Defendant MD Helicopters, Inc., ("MD") is a for-profit company incorporated in Arizona (filing number 08635334). MD's principal place of business is located at 4555 E. McDowell Road, Mesa, Arizona, where it operates a helicopter manufacturing facility. Patriarch holds a controlling interest in MD. As CEO of both Patriarch and MD, Tilton has exercised day to day control over MD's operations at all times alleged in this Complaint.

8.     Defendant Norbert Vergez ("Vergez") is a retired Army Colonel who was formerly the project manager for the United States Army's Non-Standard Rotary Wing Aircraft Project Office (NSRWA) in Huntsville, Alabama. Vergez is employed by defendant Patriarch at defendant MD's facilities in Mesa, Arizona, and currently resides in Arizona.

## APPLICABLE STATUTES AND REGULATIONS

9.     **The False Claims Act.** The False Claims Act provides, in pertinent part, that any person who

    (A)    knowingly presents, or causes to be presented, a false or
                fraudulent claim for payment or approval; [or]

3

(B)  knowingly makes, uses, or causes to be made or used, a
false record or statement material to a false or fraudulent
claim . . .

\*\*\*

is liable to the United States Government [for statutory damages
and such penalties as are allowed by law].

31 U.S.C. §§ 3729(a)(1)(A)-(B).

10.  **Contract Pricing.** The Truth in Negotiations Act provides, in pertinent part, that

(a) Required cost or pricing data; truth in negotiations

(1) The head of an agency shall require offerors [and] contractors . . .
to make cost or pricing data available as follows:

(A) An offeror for a prime contract under this chapter to be
entered into using procedures other than sealed-bid procedures
shall be required to submit cost or pricing data before the
award of the contract if–

(I)   in the case of a prime contract entered into after
December 5, 1990, the price of the contract to the
United States is expected to exceed $500,000;

\*\*\*

(3) Cost or pricing data required to be submitted under paragraph (1)
. . . shall be submitted–

(A) in the case of a submission by a prime contractor (or an
offeror for a prime contract), to the contracting officer
for the contract (or to a designated representative of the
contracting officer);

\*\*\*

(d) Submission of other information.

(1) Authority to require submission. When certified cost or pricing data
are not required to be submitted under this section for a contract . . ., the
contracting officer shall require submission of data other than certified
cost or pricing data to the extent necessary to determine the reasonableness
of the price of the contract . . . . [T]he contracting officer shall require that
the data submitted include, *at a minimum, appropriate information on the
prices at which the item or similar items have previously been sold* that is
adequate for evaluating the reasonableness of the price for the
procurement. (Emphasis added.)

10 U.S.C. § 2306a; See also 41 U.S.C. § 3502 et seq.

11.  Pursuant to formal written policy guidelines issued by Office of the Secretary of

Defense, obtaining sufficient pricing data from an offeror is particularly critical in situations

4

where an item is determined to be a commercial item in accordance with the section 2.101 of the Federal Acquisition Regulation ("FAR") (48 C.F.R. 2.101) and the contract is being awarded on a sole source basis. DFARS/PGI 251.402- 251.403. The obligation to request and provide sales data rests with both the contracting officer and the offeror. Contracting officers are specifically instructed in situations involving the award of a sole source contract for a commercial item to obtain prior non-governmental sales data to ensure price reasonableness and are required to request that offerors provide such data. PGI 215.403-3.  In accordance with FAR section 15.403-3(a) (48 C.F.R. 15.403-3(a)), the offeror has an equal duty to provide data on the prices at which the same or similar items have previously been sold, adequate for determining the reasonableness of the price.

12.  **Ethics in Contracting.**  "Government business shall be conducted in a manner above reproach, . . . with complete impartiality and with preferential treatment for none. Transactions relating to the expenditure of public funds require the highest degree of public trust and an impeccable standard of conduct. The general rule is to avoid strictly any conflict of interest or even the appearance of a conflict of interest in Government-contractor relationships." 48 C.F.R. 3.101-1.

13.  "As a rule, no government employee may solicit or accept, directly or indirectly, any gratuity, gift, favor, entertainment, loan, or anything of monetary value from anyone who (a) has or is seeking to obtain Government business with the employee's agency, (b) conducts activities that are regulated by the employee's agency, or © has interests that may be substantially affected by the performance or nonperformance of the employee's official duties." 48 C.F.R. 3.101-2. "Money appropriated to the Department of Defense may not be spent under a contract . . . unless that contract provides that– the United States may, by written notice to the contractor, terminate the right of the contractor to proceed under the contract if the Secretary concerned or his designee finds, after notice and hearing, that the contractor, or his agent or representative, offered or gave any gratuity, such as entertainment or a gift, to an officer, official, or employee of the United States to obtain a contract or favorable treatment in the awarding, amending, or making of determinations concerning the performance, of a contract." 10 U.S.C. § 2207.

5

14.     Each of the contracts that are the subject of this Complaint include the following contract terms and conditions: "The contractor agrees to comply with . . . [FAR] 52.203-3, Gratuities (Apr 1984) (10 U.S.C. 2207)." FAR 52.203-3 (48 C.F.R. 52.203-3), incorporated by reference in each of the contracts that are the subject of this Complaint, provides in pertinent part that

> (a) The right of the Contractor to proceed may be terminated by written notice if, after notice and hearing, the agency head or a designee determines that the Contractor, its agent, or another representative–
>
> > (1) Offered or gave a gratuity (e.g. an entertainment or gift) to an officer, official, or employee of the Government; and
> >
> > (2) Intended, by the gratuity, to obtain a contract or favorable treatment under a contract.

15.     The obligation of Government employees to avoid scrupulously conflicts of interest or the misuse of Government employment for an improper purpose extends to activities in anticipation of employment after Government service and post-employment activities. Accordingly, federal law, in pertinent part, provides as follows:

> (a) Permanent Bar. A former Government employee is restricted from acting as a representative before an agency as to a particular matter involving a specific party if the employee participated personally and substantially in that matter as a Government employee. The government employee is also restricted from making any oral or written communication to an agency with the intent to influence on behalf of another person as to a particular matter involving a specific party if the former Government employee participated personally and substantially in that matter as a Government employee.
>
> (b) Two Year Bar. A former Government employee is restricted for two years from acting as a representative before an agency as to a particular matter involving a specific party if the employee had official responsibility for that matter. The former Government employee is also restricted for two years from making any oral or written communication to any agency with the intent to influence on behalf of another person as to a particular matter involving a specific party if the employee had official responsibility for that matter.

5 C.F.R. § 1304.4605. Additionally,

6

(a) Actions required. An agency official participating personally and substantially in a federal agency procurement . . . who contacts or is contacted by a person who is a bidder or offeror in that Federal agency procurement regarding possible non-Federal employment for that official shall—

    (1) promptly report the contact in writing to the official's supervisor and to the designated agency ethics official (or designee) of the agency in which the official is employed ; and

    (2)    (A) reject the possibility of non-Federal employment; or

        (B) disqualify himself or herself from further personal and substantial participation in that Federal agency procurement until the agency authorizes the official to resume participation in the procurement . . . on the grounds that– (I) the person is no longer a bidder or offeror in that federal agency procurement; or (ii) all discussions with the bidder or offeror regarding possible non-Federal employment have terminated without an agreement or arrangement for employment.

41 U.S.C. § 2103.

(a) Prohibition. A former official of a Federal agency may not accept compensation from a contractor as an employee, . . . or consultant of the contractor within one year after the official–

    (1) served, when the contractor was selected or awarded a contract, as . . . the source selection authority, a member of the source selection evaluation board, or the chief of a financial or technical evaluation team in a procurement in which that contractor was selected for an award of a contract in excess of $10,000,000;

    (2) served as the program manager . . . for a contract in excess of $10,000,000 awarded to that contractor; or

    (3) personally made for the Federal agency a decision to (A) award a contract . . . in excess of $10,000,000 to that contractor.

41 U.S.C. § 2104.

## FACTUAL BACKGROUND

16.    In January 2010, the Under Secretary of Defense for Acquisition, Technology and Logistics directed the establishment of the United States Army's Non-Standard Rotary Wing Aircraft Project Office (NSRWA), which was then formed and headquartered at the Redstone Arsenal in Huntsville, Alabama, as part of the US Army Aviation and Missile Command

(AMCOM). A major defense acquisition program, the purpose of NSRWA was to consolidate under a single service-level Project Management Office the procurement, sustainment and technical support of non-standard rotorcraft for the Department of Defense, allied countries under foreign military sales (FMS) contracts or as directed by the Office of the Secretary of Defense. Vergez, then an active duty Colonel in the United States Army was selected as the Project Manager in charge of NSRWA.

17.     In December 2010, on behalf of NSRWA, the US Army Aviation and Missile Command (AMCOM) issued Solicitation No. W58RGZ-11-0060 (Subsequently modified as Solicitation No. W58RGZ-11-0070) for the FMS purchase of several new Commercial Off The Shelf (COTS) rotary wing primary trainers for the Afghanistan Air Force. MD, a competitor for NSRWA's Afghan FMS contract, began to prepare its formal response to the solicitation.

18.     On December 30, 2010, Brian Fifer, MD's Chief Financial Officer e-mailed Tilton a draft MD income statement for her review prior to submitting it to AMCOM as part of MD's response to the Afghan FMS Solicitation. The draft Financial Statement listed the approximate average unit price (without options or "base price") of a generic MD 500F helicopter for 2011 at $2,100,000. On January 3, 2011, Tilton responded by e-mail, telling Fifer, "On the 500s–you have the (sic) way too low. We are charging $2.5mm to the army. This is a red flag."

19.     MD submitted its formal response and offer for the Afghan Air Force primary trainer to the Army on January 13, 2011. At Tilton's direction, MD misrepresented to the Army that its base commercial price for each of its MD 530F Standard Helicopters was $2,500,000. In fact, MD's actual base commercial price for the helicopters, per unit, was hundreds of thousands of dollars less.

20.     On or about March 3, 2011, Colonel Vergez met Tilton at MD's booth at the Heli-Expo in Orlando, Florida, and informed her that MD would be awarded the Afghan Air Force primary trainer contract.

21.     On March 10, 2011, the Army awarded the Afghan Air Force primary trainer contract to M.D., agreeing to pay MD the inflated base price of $2,300,000 each for 6 MD 530F

Standard Helicopters. Fully configured, the Army agreed to pay MD $16,430,688 for the six helicopters, $1,076,250 for two flight training devices (FTDs) and $2,415,000 for spares with an option to purchase 48 additional helicopters, 5 additional FTDs and additional critical spares for total optional follow on purchases under the contract of more than $166,000,000. Willis Epps, an Army contracting officer under Vergez' direction, signed the contract for the United States.

22.     On March 18, 2011, MD sold a new MD 530F helicopter to a commercial customer, Blue Sky Air, for the base price of $1,900,000. On April 18, 2011, MD sold a new MD 530F helicopter to a commercial customer, Helicentro, for $1,900,000. On May 20, 2011, MD sold a new MD 500E helicopter to Fuchs Helikopter for the base price of $1,550,000.

23.     As a follow on to the award to MD of Contract No. W58RGZ-11-0070, on or about April 20, 2011, AMCOM, on behalf of NSWRA, issued Solicitation No. W58RGZ-11-R-0302 on a sole source basis to MD which covered the purchase of Contractor Logistics Support (CLS) for the Afghan Air Force primary trainer contract, including the operations and maintenance training for the Flight Training Devices (FTDs). In sole sourcing the solicitation to MD, the presolicitation synopsis prepared by NSWRA stated that MD was the Original Equipment Manufacturer (OEM) and the only qualified source of support of the solicited effort. It further found that only MD has access to the critical spares, consumables, technical data, special tools, and test equipment and could provide them within the timeline required to meet the training start date, that only MD maintained the technical data necessary for the cognizant engineering airworthiness authority to determine which potential modifications would or would not measurably affect the airworthiness of an aircraft system, that MD was the only company with the engineering data required to provide a comprehensive Configuration Management program, and that because the MD 530F was solely produced by MD, MD was the only firm that had the knowledge, expertise, and technical data required to support and sustain the system in the unique conditions and environment in which the aircraft were expected to operate. The synopsis stated that only MD could ensure that the appropriate spares, consumables and support equipment were in place in time to perform CLS immediately upon arrival of the first FTD.

9

24.     During the evening of June 28, 2011, a day before NSRWA's Industry Day for Worldwide Logistics in Huntsville, Tilton and Vergez secretly met at Vergez' home with Pavel Borisov from Avia Baltika, an international helicopter maintenance, logistics and sales company headquartered in Lithuania.

25.     During July and August 2011, MD prepared its pricing for the Afghan Air Force primary trainer CLS contract (Army Solicitation No. W58RGZ-11-R-0302), which MD formally submitted on August 26, 2011,  representing that its price of $14,153,170 was based on "commercial pricing." On September 1, 2011, upon NSWRA's recommendation, the Army awarded the Contract (No. W58RGZ-11-R-0302) to MD at the contract price of $14,237,169.

26.     On September 26, 2011, AMCOM, on behalf of NSRWA, issued sole source FMS Solicitation No. W58RGZ-11-R-0455 for 3 MD 500E helicopters for the El Salvador Air Force. MD, at Tilton's direction, misrepresented to the Army that the base commercial price was $1,800,000 per unit when in fact the approximate base price that MD charged its commercial customers for an MD 500E helicopter was at least $100,000 less. One of MD's commercial customers had even paid $250,000 less than the price MD gave to the Army. The total price MD gave to the Army, which included the inflated prices for the three helicopters and pricing for ground support equipment, tools and spares, totaled $7,259,821.75. At NSRWA's direction, MD's inflated price was accepted by the Army on December 12, 2011.

27.     Between approximately March 3, 2011 and February 15, 2012, at various times, Tilton and Vergez discussed the subject of Vergez' employment following Vergez' anticipated retirement near the end of 2012 from active federal military service, at some point reaching an agreement that Vergez would be hired by either MD or Patriarch.

28.     In approximately October of 2011, Vergez suggested to Tilton that MD should enter an upcoming competition for the Army's Armed Aerial Scout (AAS) with a derivative model of its MD 530F helicopter (the MD 540F). The lucrative AAS program was designed to replace the Army's aging fleet of OH-58D Kiowa Warrior helicopters. Following Vergez' instructions, in or about November 2011, MD personnel, including Tilton and Carl Schopfer, MD's Chief Operating Officer, traveled to Israel to visit Elbit Systems, an Israeli defense

10

contractor and manufacturer of aerial weapons management systems. At Elbit Systems, Tilton

met with Ben Weiser, an Elbit sales executive, to discuss a partnership with Elbit on the MD

540F for the AAS competition. During the course of Tilton's discussions with Weiser, on

Vergez' recommendation, Weiser was recruited by Tilton for a position at MD.

29.     In response to a sole source FMS solicitation issued by the Army to MD on behalf

of NSRWA for three MD 500E helicopters for the El Salvador Air Force, in approximately the

first half of October 2011, MD submitted its formal proposal to the Army which misrepresented

the base price of the three helicopters by at least $100,000 each. MD falsely represented that the

commercial price of its MD 500E helicopters was $1.8 million when it fact MD was selling it in

the commercial sector for $1.7 million and, in some circumstances, significantly less.

30.     The contract between the Army and MD for the three helicopters destined for the

El Salvador Air Force was signed on or about December 9, 2011, at the inflated base price of

$1.8 million per aircraft with additional payment conditions imposed by MD. MD proposed a 12

month delivery schedule to allow for lead time on getting three ARC-164 radios from Raytheon,

but did not want to wait for the delivery of the fully configured aircraft to get paid. Vergez and

Tilton came up with an alternative payment plan. They agreed that NSRWA would accept

delivery of the helicopters, triggering payment, without the radios. The radios would then be

installed before the aircraft were delivered to El Salvador.

31.     On December 7, 2011, the Army Command-Redstone Arsenal, on behalf of

NSRWA, issued Request for Information No. W58RGZ-12-R-0135 to identify potential

contractors to produce and deliver two new COTS rotary wing aircraft to be delivered to the

Government of Costa Rica. The Request for Information required responding contractors to

break out pricing for the aircraft by separately pricing optional equipment.

32.     MD submitted its response to Request for Information No. W58RGZ-12-R-0135

for the proposed Costa Rica FMS delivery on January 13, 2012. In its response, MD

misrepresented that the base price of 2 MD 600N helicopters, matching the requirements listed in

the Army's Request for Information, was $2,350,000 each. In fact, MD's actual commercial price

for each aircraft was $35,000 less.

11

33.     Tilton hired Ben Weiser in approximately early January 2012 as MD's Executive Vice-President for Business Development and Sales. Thereafter, on January 26, 2012, Vergez gave Tilton two competition sensitive power point slides and a print out of an Army white board brainstorming session which provided details regarding the Army's anticipated but unreleased solicitation for competing helicopter proposals for the Armed Aerial Scout (AAS).

34.     In approximately February 2012, MD agreed to grant a subcontract to Elbit Systems for Elbit's helmet display and tracking system (HDTS) and mission computer as part of reconfiguring MD's 530F into the MD 540F to compete for the lucrative AAS contract.

35.     In addition to Weiser, Tilton also followed Vergez' recommendation to hire Andy Pillado, an active duty Army warrant officer nearing retirement who was a friend of Vergez. Even though Pillado remained on active duty in the Army until the Summer of 2012, in February 2012, both Pillado and Vergez loitered at MD's booth at the 2012 Heli-Expo in Dallas. Vergez was seen dining with Tilton at the Heli-Expo.

36.     In approximately February 2012, Vergez formally notified the Army that he was disqualified from engaging in procurement activities involving MD because of an offer of employment.

37.     On March 9, 2012, the Army Contracting Command, on behalf of NSRWA, issued a sole source FMS solicitation to MD (Solicitation No. W58RGZ-12-R-0172) to supply 12 MD 530F helicopters to the Saudi Arabian National Guard (SANG).

38.     In March 2012, Vergez and Tilton met on approximately three different occasions to discuss doing business with AAL Group Limited, a Middle East based flight training, maintenance and helicopter vendor. On March 13, 2012, at a dinner with the AAL representatives to discuss expanding MD's presence in the Middle East, Tilton responded to a comment made by Vergez with the verbal caution, "you're speaking to your future boss here." During the dinner, it was agreed that the AAL personnel would extend their stay to allow for a demonstration flight in an MD 902 helicopter. Both Vergez and Tilton were pressuring the AAL representatives for an MD 902 sale. On March 14, 2012, Vergez toured the MD plant in Mesa, Arizona, with AAL representatives from Russia and the U.S., signing the log-in sheet in his

12

capacity as a Colonel in the U.S. Army.

39.     On March 21, 2012, Tilton was advised by Schopfer that the Government of Costa Rica had decided to purchase two MD 600N helicopters directly from MD rather than purchasing the COTS rotary wing aircraft through an FMS contract with the U.S. Army. In an e-mail Shopfer stated, "Costa Rica has the Army bid and it will be hard to change prices at this point. The up side is that we bid 2,350,000 for the base price and not the 2,315,000 current commercial price, . . ." Tilton immediately contacted Vergez who informed her that MD personnel had scuttled the Costa Rican FMS sale by telling the Costa Ricans, who were interested in a prompt transaction, that the FMS process would take too long. Tilton then directed MD personnel to communicate to the Government of Costa Rica that FMS was still an option and if Costa Rica purchased the MD 600N helicopters through the U.S. Army, instead of directly from MD, it could have a "finished contract in 30 days" so long as it was sole sourced. Tilton was motivated to keep the sale processed as an FMS sale through NSRWA in order to continue to conceal the actual commercial price of the aircraft and to have the MD 600N listed as an aircraft in NSRWA's inventory leading to future FMS sales of the MD 600N at the inflated price MD was charging the Army.

40.     On March 22, 2012, Schopfer informed Costa Rica's Vice-Minister of Security, Marcella Chacon, whose agency was purchasing the two MD 600N helicopters, that the sale would be conducted through the FMS process. The following day, on March 23, 2012, Tilton asked MD personnel if its pricing and availability for the two MD 600N helicopters was "done and ready to roll."

41.     On April 6, 2012, Schopfer advised Tilton that the base commercial price of the MD 530F that MD planned to sell to the Army for the Saudi Arabia National Guard (SANG) FMS contract was $2,150,000 per aircraft, although MD had made a prior commercial sale in 2011 even lower at $1,900,000.  Schopfer suggested a base price of $2,178,000 per aircraft as its price to the Army. In a reply e-mail sent to Schopfer the same day, Tilton rhetorically asked, "Why is this not Army pricing?" Schopfer responded to Tilton on April 9, 2012, by inflating the recommended base price per aircraft to be quoted to the Army for the Saudi Arabia FMS contract

13

to $2,300,000. Tilton immediately approved. Earlier, in February 2012, Swisher had provided a price analysis of the 530F to Weiser which showed a commercial base price of $2,137,934.

42.     Tilton's approval of the inflated price for the MD 530F helicopters destined for the Saudi Arabia FMS contract concerned Marsteller. When Marsteller addressed it to Weiser, Weiser initially reacted by stating, "It's just a little fine." When Masteller then told him that the government had to have the best price and "it's criminal," Weiser then wrote an e-mail to Tilton. Weiser wrote the following, "Lynn, I was made aware this morning of the pending increase of our base price for the 530F from $2.15M to $2.3M for SANG. This means that we will have to increase our commercial list price by $150,000 less than two and a half months after we published our approved 2012 price list." "At our 1/31 meeting we showed you a 20.8% net margin at this price . . . ." "I will of course accept your decision, but I would ask that you reconsider." In an e-mail, Tilton responded, "This is my decision." "And this is not about the money but about consistency with the Army." Vergez and Tilton were later overheard at a dinner discussing Weiser's imminent termination.

43.     Completing the sale of the two MD 600N helicopters to Costa Rica through the FMS process took several more months than originally promised, prompting inquiries from the highest levels of the Costa Rican government. By mid-May, 2012, the President of Costa Rica had sent a letter to the U.S. Embassy asking about the progress of the sale. Tilton asked Vergez to remedy the delay. In an e-mail dated May 30, 2012, Tilton wrote, "I spoke to Colonel Vergez last week (as promised) and he found the bottle neck (one person) at USSOCAM [US Special Operations Command] and promised to remove the obstacle." On June 15, 2012, Vergez assured Tilton that MD would have the Costa Rica FMS contract no later than July 31 with delivery by mid-August. On June 22, 2012, Tilton again spoke to Vergez repeating her request that he assist in expediting the contract.

44.     On May 30, 2012, MD submitted its cost and pricing proposal for the SANG FMS contract to NSRWA. For each of the 12 MD 530F helicopters quoted to the Army, MD misrepresented that its basic commercial price was $2,300,000. On June 26, 2012, Tilton sent several e-mails to her MD staff reporting on "tough as nails" conversations lasting hours with

14

Vergez regarding the terms and conditions of the SANG FMS contract. The Army subsequently awarded the SANG FMS contract to MD on June 29, 2012 on MD's pricing terms, which totaled $40.7 million and included the highly unusual agreement, based on Vergez' influence, to pay 90% of the purchase price to MD upon issuance of the certificates of airworthiness at the end of production, instead of at delivery. NSRWA employee Jim Wilson, Vergez' subordinate, called Swisher to say "Merry Christmas" as an expression of his dissatisfaction with the payment terms. Even though Wilson had been NSRWA's technical lead on the contract whose job was to analyze earned value and the completion of milestones, he was never consulted regarding the early payment terms promised to MD, especially given the Army's previously expressed concerns about MD's liquidity.

45.     The level of Colonel Vergez' subservience to Tilton and his continuing involvement in MD's Army contracts concerned Marsteller and Swisher. On July 1, 2012, Marsteller met with Schopfer and told him that the addition of Vergez to the MD team would be a violation of law which, combined with MD's apparent overcharging on its FMS contracts and preferential treatment from NSRWA, could be detrimental to MD. Marsteller asked that the information be passed on to Tilton so the issues could be corrected. In the Fall of 2012, Swisher told Schopfer that hiring Vergez violated federal regulations.

46.     Neither Marsteller's nor Swisher's expressed concerns had any impact on the continued level of Vergez' NSRWA involvement in MD's Army contracts while Vergez awaited the employment promised him by Tilton nor did it deter Tilton from her promise to Vergez that he would have a high paying job upon his retirement from the Army.

47.     On July 25, 2012, Tilton advised Schopfer that Vergez had assigned Jim Wilson to push the Costa Rica deal forward, which included directing Wilson to set up a call with the US Army Security Assistance Command representative at the US Embassy in Costa Rica. Tilton wanted MD and the Army on the "same page" in dealing with Costa Rica. On July 27, Vergez spoke directly with Vice-Minister Chacon. Vergez' call to Chacon was made from MD's facilities in Mesa, Arizona. Unbeknownst to Chacon, Tilton secretly listened in on the call from a separate location. On July 28, 2012, Tilton wrote in an email sent to Schopfer regarding Vergez'

15

call to Chacon that, "this will move the LOA (Letter of Offer and Acceptance) stage very quickly now. COL Vergez has offered to send someone from his office to Costa Rica to shepherd the process, if necessary. They do not want us to look bad here and will do all they can to find out who is holding up the documents. Marcella is a class act and with COL Vergez in direct contact with her, I am confident the noise will go away."

48.     During the Summer of 2012, Vergez is believed to have signed a written employment contract with Patriarch to direct MD's Civil and Military Programs, even though Vergez' retirement from the Army was still several months away. Tilton is believed to have promised to pay Vergez a beginning salary that was more than twice what Vergez was receiving as his active duty base pay at his O-6 pay grade. In conversations between Swisher and Wilson, Swisher voiced his concerns over the closeness between Tilton and Vergez. Wilson replied that he "hated" the relationship and the problems it was causing, but that the only way to solve it was to wait it out.

49.     It took the Army until August 29, 2012 to finally execute its Letter of Offer and Acceptance to supply the two MD 600N helicopters to the Costa Rican government. The contract called for a total price of $7,742,733, including spares, accessories, technical assistance and two FLIR systems which added approximately $700,000 to the price MD had given NSRWA in its response to Request for Information No. W58RGZ-12-R-0135. NSRWA's final price to Costa Rica was approximately $1 million more than the already inflated price that MD would have sold the aircraft to Costa Rica if it had sold them direct.

50.     On October 21, 2012, Tilton advised MD that she had received a call from Vergez asking for MD's proposal to the Army for the Costa Rica FMS contract.

51.     MD submitted its formal FMS pricing proposal to NSRWA on October 22, 2012, maintaining its inflated base price of $2,350,000 each for the two MD 600N helicopters.

52.     On or about October 21, 2012, Patriarch or MD paid Vergez $30,000 ostensibly for his "moving expenses" from Alabama to Arizona even though, as a retiring Army Colonel, Vergez was entitled to be reimbursed by the Government for moving expenses.

53.     On November 20, 2012. The Army accepted MD's inflated FMS pricing for the

two MD 600N helicopters destined for Costa Rica. Following the delivery of the first of the two helicopters to the Government of Costa Rica on December 21, 2012, articles and comments appeared in the Costa Rican press scolding the Costa Rican government for purchasing the aircraft through the FMS process rather than direct and overpaying the U.S. by an amount that could have been better spent on worthier social projects.

54.     Vergez retired from the Army in November 2012, but remained on active duty on terminal leave status until May 1, 2013. By December 2012, Vergez was already providing advice to MD as Patriarch's new employee and began working at MD's Mesa facility on February 1, 2013. Since he began his Patriarch/MD employment, Vergez has participated in resolving contract issues between NSRWA and MD.

## FIRST CAUSE OF ACTION FOR VIOLATION OF THE
## FALSE CLAIMS ACT (31 U.S.C. §§ 3729(a)(1)(A) & (b))

55.     Plaintiffs re-allege and incorporate by reference the allegations in paragraphs 1 through 54.

56.     MD's receipt of FMS contracts managed by NSRWA at inflated prices and its entitlement to submit claims for payment to the United States under its price inflated FMS contracts were induced by a fraudulent course of conduct set in motion by the defendants which corrupted the Army's FMS contract award process. This conduct included MD's knowing submission of false and inflated prices which were accepted by the Army as a result of an unethical relationship between the CEO of MD/Patriarch and the Army's NSRWA program manager which caused the Army to fail in its obligation to confirm the reasonableness of MD's contract pricing.

57.     The defendants' corruption of the contracting process combined with MD's false pricing were material to the Government's decision to pay out money to MD under its FMS contracts because the statutory and regulatory pricing, bribery and conflict of interest violations applicable to the defendants' conduct, if known to the Government, gave the Government the

17

right to either terminate the awards to MD of the tainted FMS contracts and/or to readjust the pricing.

58.     As a result of the defendants' fraudulent course of conduct, between approximately the 2010 and the present, the Government has awarded FMS contracts to MD for commercial helicopters at inflated prices. By virtue of this course of conduct, defendants MD, Tilton, Patriarch and Vergez have knowingly presented or caused to be presented false or fraudulent claims for payment or approval to the United States in violation of 31 U.S.C. § 3729(a)(1)(A) and the defendants have knowingly made, used, or caused to be made or used, false records or statements to get false or fraudulent claims paid or approved in violation of 31 U.S.C. § 3729(a)(1)(B). The United States has incurred damages as a result of the defendants' unlawful scheme in an amount to be determined at trial.

## SECOND CAUSE OF ACTION FOR VIOLATION OF THE
## FALSE CLAIMS ACT (31 U.S.C. §§ 3729(a)(1)©)

59.     Plaintiffs re-allege and incorporate by reference the allegations in paragraphs 1 through 58

60.     By virtue of the above-described acts, at all times relevant to this Complaint the defendants, and each of them, conspired with each other to commit violations of 31 U.S.C. §§ 3729(a)(1)(A) and (B) and had actual knowledge, or acted in deliberate ignorance or reckless disregard, of the fact that their individual conduct as part of the conspiracy and the conduct of their co-conspirators would cause and did cause the submission of false claims for payment or approval to the United States and that such claims were false. Upon information and belief, the United States has incurred damages as a result of the defendants' unlawful scheme in an amount to be determined at trial.

## PRAYER

**WHEREFORE,** Plaintiffs pray that judgment be entered as followed:

    A.    In an amount equal to three times the amount of damages the United States has sustained because of the defendants' false or fraudulent claims  and civil penalties up to the maximum permitted by law, for the maximum *qui tam* percentage share allowed pursuant to 31 U.S.C. § 3730(d) and for attorney's fees, costs and reasonable expenses; and

    B.    For any and all other relief to which the plaintiffs may be entitled.

**JURY DEMAND**

Plaintiffs request trial by jury.

Respectfully Submitted this 1st day of May, 2013.

                **WARREN ■ BENSON Law Group**

By:              
PHILLIP E. BENSON
MN Attorney I.D. #0394772

333 Washington Ave. North,  Ste 300
Minneapolis, Minnesota 55401
Telephone: (952) 955-3688
philbenson@warrenbensonlaw.com

Attorney for *Qui Tam* Plaintiffs
Philip Marsteller and Robert Swisher

19