## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## NORTHEASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ex. rel. PHILIP MARSTELLER and ) | |
| ROBERT SWISHER, ) | |
| ) | |
| **Plaintiffs/Relators,** ) | Civil Action Number |
| ) | **5:13-cv-830-AKK** |
| v. ) | |
| ) | |
| LYNN TILTON, et al., ) | |
| ) | |
| **Defendants.** ) | |

## <u>MEMORANDUM OPINION</u>

Relators Phillip Marsteller and Robert Swisher pursue this action pursuant to the False Claims Act ("FCA"), 31 U.S.C. § 3729 *et seq.*, alleging that their former employer, MD Helicopters, Inc., and its Chief Executive Officer, Lynn Tilton, submitted false claims and made materially false statements in the process of obtaining government contracts for the manufacture of helicopters for the United States Army's Non-Standard Rotary Aircraft Project Office ("NSWRA"). In a nutshell, Relators allege that Tilton offered gratuities and employment to Norbert Vergez—the project manager in charge of NSWRA—in violation of federal laws incorporated in the contracts. Vergez purportedly accepted these offers, including an offer of employment at MD and Patriarch Partners, LLC ("Patriarch"), a debt and equity investment and management company that Tilton founded and

manages. According to Relators, in exchange for the gratuities and offer of employment, Vergez facilitated MD Helicopters Inc.'s ("MD") submission of inflated pricing information in its bids with NSWRA, and later, MD purportedly withheld information about its relationship with Vergez when it submitted claims for payment. These actions purportedly constitute violations of 31 U.S.C. § 3729(a)(1)(A) and (B) on the part of MD, Tilton, and Patriarch (collectively "Defendants") (Counts I-V). Doc. 57. Finally, Relators assert that MD, Tilton, Vergez, and Patriarch conspired to defraud the government in violation of 31 U.S.C. § 3729(a)(1)(C) (Count VI). *Id*. In the present motion, Defendants move to dismiss the action on the grounds that Relators' claims do not meet the pleading requirements of Federal Rule of Civil Procedure 12(b)(6).[1] Doc. 65 (*SEALED*). For the reasons below, the motion is due to be granted.

## I. STANDARD OF REVIEW

Federal Rule of Civil Procedure 8(a) requires that a pleading stating a claim for relief provide "a short and plain statement of the claim showing that the pleader is entitled to relief." Where a complaint fails to make such a statement, Federal Rule of Civil Procedure 12(b)(6) permits dismissal. To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted

---

[1] Vergez has joined the motion and moved to dismiss the claims against him. *See* doc. 63. The court agrees with Vergez that "nowhere in the Complaint is it alleged that [he] submitted, facilitated or prepared any false claim to the Government. . . [n]or does the Complaint allege that [he] made any false statement to the Government in support of a false claim." Doc. 63 at 2. Therefore, Vergez's motion is due to be granted.

as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 677 (2009) (citations and internal quotation marks omitted). A complaint states a facially plausible claim for relief "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. (citation omitted). The complaint must establish "more than a sheer possibility that a defendant has acted unlawfully." *Id.*; *see also Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) ("Factual allegations must be enough to raise a right to relief above the speculative level . . . ." (citation omitted)). The Eleventh Circuit instructs that Rule 12(b)(6) "'does not impose a probability requirement at the pleading stage,' but instead 'simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of' the necessary element[s]." *Watts v. Fla. Int'l Univ.*, 495 F.3d 1289, 1295-96 (11th Cir. 2007) (quoting *Twombly*, 550 U.S. at 555). Ultimately, this inquiry is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 678. While the court accepts all factual allegations in the complaint as true, legal conclusions unsupported by factual allegations are not entitled to that assumption of truth. *Id.*

Further, because it is "'well settled' and 'self-evident' that the FCA is 'a fraud statute,'" a claim under the FCA must meet the heightened pleading standard of Federal Rule 9(b). *U.S. ex rel. Clausen v. Lab. Corp. of Am.*, 290 F.3d 1301,

1309 (11th Cir. 2002). Rule 9(b) provides that a claimant must plead fraud with

"particularity":

> In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge, and other condition of mind of a person may be averred generally.

Fed. R. Civ. P. 9(b). Requiring particularity under Rule 9(b) "serves an important

purpose in fraud actions by alerting defendants to the precise misconduct with

which they are charged and protecting defendants against spurious charges of

immoral and fraudulent behavior." *Ziemba v. Cascade Int'l, Inc.*, 256 F.3d 1194,

1202 (11th Cir. 2001) (quoting *Durham v. Bus. Management Assocs.,* 847 F.2d

1505, 1511 (11th Cir.1988)) (citation and internal quotation marks omitted).

Significantly, a FCA complaint satisfies Rule 9(b) if it sets forth "facts as to time,

place, and substance of the defendant's alleged fraud, specifically the details of the

defendants' allegedly fraudulent acts, when they occurred, and who engaged in

them." *Hopper v. Solvay Pharm., Inc.*, 588 F.3d 1318, 1324 (11th Cir. 2009)

(citations and internal quotation marks omitted).

## II. FACTUAL BACKGROUND

NSWRA is headquartered at the Redstone Arsenal in Huntsville, Alabama as

part of the U.S. Army Aviation and Missile Command ("AMCOM"). Doc. 57 at

13. As a major defense acquisition program, NSWRA's mission is to "consolidate

under a single service-level Project Management Office the procurement,

sustainment, and technical support of non-standard rotorcraft for the Department of Defense, allied countries under foreign military sales (FMS) contracts[,] or as directed by the Office of the Secretary of Defense." *Id*. Relators' allegations are related to five FMS contracts for the manufacture of helicopters for allied countries: the Afghani Air Force in March and September 2011 (Counts I and II), the El Salvadorian Air Force in December 2011 (Count III), the Saudi Arabian National Guard in June 2012 (Count IV), and the Costa Rican government in December 2012 (Count V). *Id*. When MD submitted proposals to NSWRA for these contracts, Vergez served as NSWRA's Project Manager. *Id*. at 13-14. In that capacity, Vergez  purportedly was "personally and substantially involved in managing the process of issuing, selecting, negotiating, pricing, and awarding all of the FMS contracts obtained by MD that are at issue in this [action]." *Id*. at 14. Allegedly, Tilton, MD's CEO, offered employment and transportation on Tilton's private jet "to influence Vergez to act in MD's favor as NSWRA's program manager." *Id*.

From April 2011 onward, "it was commonly known among several MD employees that Tilton intended to hire Vergez upon his Army retirement." *Id*. Consistent with Tilton's plan, between April 2011 and the spring of 2012, Tilton and Vergez at various times "discussed the subject of Vergez'[s] employment to begin . . . following Vergez's anticipated retirement." Doc. 57 at 16. By spring

2012, Vergez and Tilton purportedly "reached an . . . understanding . . . that Vergez would be hired by either MD or Patriarch to work for . . . MD's facility in Mesa, Arizona" at "a beginning salary that was more than twice what Vergez was receiving as his active duty base pay." *Id*. By that summer, Vergez had purportedly signed an employment agreement with Patriarch to direct MD's Civil and Military Programs. *Id*. at 27. In December 2012, Tilton purportedly announced to MD's employees at a plant-wide meeting at MD's Mesa, Arizona facilities that "a very special person who had been very influential in MD's receipt of Army contracts would be joining the MD team." *Id*. at 29. Shortly thereafter, "MD issued a revised Organizational Chart showing Vergez as the head of all MD Programs." *Id*. However, "to obscure Vergez'[s] employment arrangement at MD, Tilton created the illusion on paper that Vergez was a Patriarch employee, with a Patriarch title, based out of Patriarch's offices in New York." *Id*. at 30.

In addition to the job offer, Tilton purportedly "provided free private transportation to Vergez aboard her jet" while negotiations for the El Salvador contract were ongoing. *Id*. at 19. Relators allege that Tilton's behavior constituted bribery and that MD had an obligation to disclose these unethical acts, and that such disclosures were a "material condition" of each of the contracts. *See* docs. 31, 34, 37, 40, 43. By failing to make these disclosures, Defendants allegedly submitted false claims to the government (Counts I-V). *See id*. Also, in conjunction

with the El Salvador, Saudi, and Costa Rican contracts, MD allegedly failed to provide accurate pricing information in compliance with the Truth in Negotiations Act (Counts III-V). *Id*. at 37, 40, 43. Finally, Defendants allegedly conspired to defraud the Government (Count VI). *Id*. at 44.

### III. ANALYSIS

Defendants contend that dismissal is warranted on all claims. The court addresses each claim in turn.

### A. False claims under Section 3729(a)(1)(A) and (B)— (Counts I-V)

Sections 3729(a)(1)(A) and (B) create a cause of action against "any person who . . . (A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval; [or] (B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim." Relevant here, Relators contend that their complaint properly alleges that Defendants submitted false claims to the government under an "implied certification" theory.[2] Doc. 71 at 20.

---

[2] In their brief opposing the motion to dismiss, Relators also argue a "fraud in the inducement" theory. Doc. 71 at 33. Allegedly, Defendants "fraudulently induced the Government to enter into sole-source contracts for commercial items by concealing the fact [that] its prices . . . were [inflated] . . . and by falsely agreeing to comply with the contracting ethics." *Id*. Relators further contend that "[c]ommon sense counsels that the government would never enter into a contract if the contractor truthfully announced that it had not, and did not intend to, comply with the mandatory Contractor Code of Business Ethics set forth in FAR 52.203-13." *Id*. at 34. This claim fails because the Amended Complaint does not plead a fraud in the inducement theory. *See generally* doc. 57; *St. George v. Pinellas County,* 285 F.3d 1334, 1337 (11th Cir. 2002) (In a motion to dismiss, "the scope of the review must be limited to the four corners of the complaint."). Moreover, the arguments advanced by Relators in support of this theory are similar to those they make for their implied certification and TINA claims, and, as such, fail for the same reasons stated below. *See infra* III.A. Finally, as outlined in their brief, *see* doc. 71 at 33–34, Relators' fraud in the inducement claim fails to meet the particularity standard of Fed. R. Civ. P. 9(b).

*1. Implied certification*

Under this theory, "the FCA is violated where compliance with a law, rule, or regulation is a prerequisite to payment but a claim is made when a participant has engaged in a knowing violation." *U.S. ex rel. Keeler v. Eisai, Inc.*, 568 F. App'x 783, 799 (11th Cir. 2014); *see also McNutt v. Haleyville Medical Supplies, Inc.,* 423 F.3d 1256, 1259-60 (11th Cir. 2005) (allegations of kickbacks can create FCA liability where compliance with the Anti–Kickback Statute is a prerequisite for payment under the Medicare Program)[3]; *U.S. ex rel. Compton v. Circle B Enterprises, Inc.*, No. CIV.A 7:07-CV-32(HL), 2010 WL 942293, at *7 (M.D. Ga. Mar. 11, 2010) ("If the payee submits an invoice for payment while knowingly violating a contractual provision, statute, or regulation, then he may have submitted a false claim."). The relevant laws here for Relators' implied certifications of compliance theory are 48 C.F.R. §52.203-13 (Contractor Code of Business Ethics and Conduct) and 10 U.S.C. §2306a (Truth in Negotiations Act).

a. Contractor Code of Business Ethics and Conduct, 48 C.F.R. §52.203-13

Relevant to Counts I-V, the parties agree that all of the FMS contracts at issue incorporated 48 C.F.R. §52.203-13, which requires contractors to disclose

---

[3] In *McNutt*, the Government identified with particularity alleged kickbacks that disqualified defendants' claims from reimbursement under the Medicare Program—but, the defendants nevertheless submitted the disqualified claims for reimbursement. 423 F.3d at 1257-1259. The court concluded that "[w]hen a violator of government regulations is ineligible to participate in a government program and that violator persists in presenting claims for payment that the violator knows the government does not owe, that violator is liable, under the [FCA], for its submission of those false claims." *Id.* at 1259.

any "credible evidence that a principal, employee, [or] agent . . . had committed . . . a violation of Federal criminal law involving fraud, conflict of interest, bribery, or gratuity violations found in Title 18 of the United States Code." 48 C.F.R. § 52.203-13(b)(3)(i)(A). Based on this provision, Relators allege that Defendants violated 18 U.S.C. § 201 by bribing a public official in conjunction with each of the FMS contracts, and by failing to disclose evidence of the purportedly unethical conduct pursuant to § 52.203-13. Allegedly, § 52.203-13 was a "material contractual requirement" and a condition to payment under the FMS contracts, and Defendants purportedly violated §52.203-13 by submitting false claims under an implied certification theory.

### i. Whether compliance with § 52.203-13 is a express prerequisite to payment under the contracts

Defendants counter that—even if they failed to disclose the so-called unethical conduct—compliance with § 52.203-13 is not an express "prerequisite to payment" under the FMS contracts because the contracts do not expressly condition payment on compliance. To support their position, Defendants direct the court to caselaw holding that noncompliance with the statute or regulation may form the basis of an FCA claim under an implied certification theory only where the government expressly conditioned payment on compliance with a statute or regulation. *See U.S. ex. rel. Ortolano v. Amin Radiology*, No. 5:10–cv–583–Oc–PRL, 2015 WL 403221 at *8 (M.D. Fla January 28, 2015) (citing *United States ex*

*rel. Steury v. Cardinal Health, Inc.,* 735 F.3d 202, 207 n. 3 (5th Cir. 2013); *Mikes v. Straus*, 274 F.3d 687, 700 (2d Cir. 2001)). Under this approach, to establish that compliance with a statute or regulation is "condition of payment," Relators are "required to plead that the government . . . would have necessarily terminated the Contract [or withheld payment] based on [MD's] violations of FAR [§ 52.203-13]." *Circle B*, 2010 WL 942293, at *8.[4] The United States take issue with the express condition approach and notes that recent cases have rejected the *Mikes v. Strauss* line of cases and asks this court not to adopt this approach. *See* doc. 70 at 5–7. The court declines the Government's invitation because it is contrary to case law. Specifically, in *U.S. ex rel. Keeler v. Eisai, Inc.,* 568 F. App'x 783, 799 (11th Cir. 2014), the Relator alleged that Defendants submitted reimbursement claims to the government that falsely certified compliance with federal law. *Id.* at 798. In evaluating this claim, the Eleventh Circuit discussed implied certification and articulated that: "an implied certification theory . . . recognizes that the FCA is

---

[4] In *Circle B*, which is particularly instructive, the Middle District of Georgia addressed whether a government contract that incorporated a Financial Acquisition Regulation conditioned payment on compliance with that regulation. *Id.* at *8. After reviewing the contract and the regulation at issue, the court noted the lack of any "express language in the [c]ontract" prohibiting government payment in the event of noncompliance. *Id.* at *9. Similarly, the court found that the regulation "[did] not contain any express prohibition of government payment based on noncompliance," or any provision that "expressly requires a contractor to comply with [the regulation] in order to be paid." *Id.* at *10. As a result, the court concluded that compliance with regulation was not a condition of payment. *Id.* In contrast, the court reached a different conclusion regarding the Anti-Kickback Statute ("AKA"), which also applied to the contracts in that case, and which the court found "expressly" conditioned payment on compliance:

> The AKA expressly states that [it] is illegal for a person to include any kickback in a claim for payment to the government. It is clear that the statute prohibits government payment for a kickback . . . [and] allows the government to refuse to pay the kickback . . . . It follows then that an invoice submitted for payment which includes the cost of a kickback constitutes a false claim because the government is prohibited from paying the amount of the kickback.

*Id.*

violated where compliance with a law, rule, or regulation is *a prerequisite to payment* but a claim is made when a participant has engaged in a knowing violation." *Id.* at 799 (emphasis added).

Turning to the specific contentions in this case, the court notes that Relators are generally correct that § 52.203-13 is mandatory in "subcontracts that have a value in excess of $5.5 million and performance period of more than 120 days." 48 C.F.R. § 52.203-13(d); doc. 71 at 27. However, as Defendants correctly point out, Relators overlook that no provision in § 52.203-13 expressly conditions payment upon compliance with the regulation; rather, § 52.203-13 merely sets forth minimum standards for requiring contractors to "[e]xercise due diligence to prevent and detect criminal conduct" and "[o]therwise promote an organizational culture that encourages ethical conduct and a commitment to compliance with the law." 48 C.F.R. § 52.203-13. Moreover, having carefully reviewed the March 2011 Afghani contract, December 2011 El Salvador contract, the June 2012 Saudi contract, and the December 2012 Costa Rica contract, the court notes that there is no provision in any of them that prohibits payment in the event of noncompliance with § 52.203-13.[5] *See* docs. 65-2, 65-4, 65-6, 65-8 (*SEALED*). With respect to the September 2011 Afghani contract, while the court does not have the contract

---

[5] The court may review these contracts in deciding the motion because Plaintiffs reference it in the complaint and it is "central to the plaintiff's claim." *Brooks v. Blue Cross and Blue Shield of Fla., Inc.*, 116 F.3d 1364, 1369 (11th Cir. 1997) (citing *Venture Assocs. Corp. v. Zenith Data Sys. Corp.*, 987 F.2d 429, 431 (7th Cir. 1993)).

before it, Relators' complaint contains no allegation establishing that the contract expressly made compliance with § 52.203-13 a condition to payment. Thus, under the "express condition of payment" approach, Relators' claim under § 3729(a) would fail under an implied certification theory. *See Circle B,* 2010 WL 942293, at *10.

### ii. Whether compliance with § 52.203-13 is a material contractual requirement

Even if the court does not adopt the "express condition of payment" approach, the Relators' implied certification claim still fails due to their failure to show that compliance with § 52.203-13 was a "material contractual requirement." Doc. 57 at 31, 34, 37, 38, 41. While "[t]he existence of express contractual language specifically linking compliance to eligibility for payment may well constitute dispositive evidence" that compliance is a prerequisite to payment, express language "is not . . . a necessary condition" to sustain an allegation of false claims under an implied certification theory. *United States v. Sci. Applications Int'l Corp.*, 626 F.3d 1257, 1269 (D.C. Cir. 2010); *see also United States v. Triple Canopy, Inc.*, 775 F.3d 628, 636 (4th Cir. 2015). Instead, "to establish the existence of a 'false or fraudulent' claim on the basis of implied certification of a contractual condition, the FCA plaintiff . . . must show that the contractor withheld information about its noncompliance with *material contractual requirements.*" *Sci. Applications Int'l Corp.,* 626 F.3d at 1269 (emphasis added). To meet this burden,

an FCA plaintiff must allege the implied certification "had a natural tendency to influence, or be capable of influencing, the Government's decision to pay." *Triple Canopy, Inc.*, 775 F.3d at 637. For example, "materiality may be established . . . through testimony demonstrating that both parties to the contract understood that payment was conditional on compliance with the requirement at issue." *Id.* (quoting *SAIC,* 626 F.3d at 1269) (internal quotation marks omitted).

Relators' claims fail under the "material contractual requirement" because aside from the conclusory allegations that Defendants violated "material contractual requirements," Relators have not pleaded any particularized facts tending to show the existence of "objective requirements" in the contract that MD "failed to provide," or that MD "continued to bill the Government with the knowledge that it was not providing the contract's requirements." 775 F.3d at 638. An example from the District of Columbia Circuit of the types of claims that fall under the "material contractual requirement" approach is instructive:

> Consider a company that contracts with the government to supply gasoline with an octane rating of ninety-one or higher. The contract provides that the government will pay the contractor on a monthly basis but nowhere states that supplying gasoline of the specified octane is a precondition of payment. Notwithstanding the contract's ninety-one octane requirement, the company knowingly supplies gasoline that has an octane rating of only eighty-seven and fails to disclose this discrepancy to the government. The company then submits pre-printed monthly invoice forms supplied by the government-forms that ask the contractor to specify the amount of gasoline supplied during the month but nowhere require it to certify that the

> gasoline is at least ninety-one octane. So long as the government can show that supplying gasoline at the specified octane level was a material requirement of the contract, no one would doubt that the monthly invoice qualifies as a false claim under the FCA despite the fact that neither the contract nor the invoice expressly stated that monthly payments were conditioned on complying with the required octane level.

*SAIC,* 626 F.3d at 1270. Along the same lines, the Fourth Circuit in *Triple Canopy* addressed a government contract for providing security on a military base in an active combat zone where the contract required that security officers undergo weapons training prior to serving as a security officer on a military base ("the marksmanship requirement"). *Triple Canopy,* 775 F.3d at 632. The complaint alleged that the contracts referred to the marksmanship requirement as a "responsibility" that the defendant must fulfill under the contract. *Id.* at 637. The complaint also contained "an abundance of allegations that [the contractor] did not satisfy [the marksmanship] requirement, and, instead, undertook a fraudulent scheme that included falsifying records to obscure its failure." *Id.* The court concluded that the complaint sufficiently alleged that compliance with this contractual requirement was a prerequisite to payment because "common sense strongly suggests that the Government's decision to pay a contractor for providing base security in an active combat zone would be influenced by knowledge that the guards could not, for lack of a better term, shoot straight." *Id.* at 637–38.

In the case of the FMS contracts at issue here, Relators have not alleged facts demonstrating that compliance with § 52.203-13 was material to the agreements under circumstances similar to *Triple Canopy* or *SAIC*. Therefore, with respect to the allegations surrounding § 52.203-13, the court concludes that Relators do not adequately plead their § 3729(a)(1) claims under an implied certification theory using either the "express condition of payment" or the "material requirement" approaches.[6]

### b. Truth in Negotiations Act ("TINA")

In Counts III, IV, and V, Relators allege that MD failed to provide accurate pricing data pursuant to the TINA in conjunction with the El Salvador, Saudi, and Costa Rica contracts. Doc. 57 at 35, 38, 41. The parties generally agree that the FMS contracts are commercial, *see* doc. 71 at 30-31, meaning that under TINA, "certified cost or pricing data are not required to be submitted." 10 U.S.C. § 2306a(d)(1). Nonetheless, for commercial contracts, the Government's "contracting officer shall require submission of data other than certified cost or pricing data to the extent necessary to determine the reasonableness of the price of

---

[6] Relators also generally base their implied certification theory claims on Defendants' alleged violations of numerous other regulations and statutes, including 48 C.F.R. §§ 52.203-03 (Gratuities), 52.212-4 (Contract Terms and Conditions—Commercial Items), and 41 U.S.C. §§ 2103 and 2104. The court has reviewed these provisions and finds that none of them condition payment on compliance. Furthermore, none of the FMS contracts make compliance with these provisions an express condition of payment. *See Circle B*, 2010 WL 942293 at *9. Moreover, Relators' complaint does not state a plausible claim under *Triple Canopy* or *SAIC* by demonstrating that the provisions relate to a material requirement of the contract. As other courts have cautioned, the "material contractual requirement" articulation of the implied certification theory "is prone to abuse" by parties seeking "to turn the violation of minor contractual provisions into an FCA action." *SAIC*, 626 F.3d at 1270; *see also Triple Canopy*, 775 F.3d at 637.

the contract." *Id*. With the goal of "plac[ing] government and private contractors in roughly equal positions during contract negotiations[,] . . . TINA prevents contractors from withholding cost or pricing information from the government." *Aerojet Solid Propulsion Co. v. White*, 291 F.3d 1328, 1330 (Fed. Cir. 2002). Since 1986, TINA has included an express definition of "cost and pricing data": "all facts that . . . a prudent buyer or seller would reasonably expect to affect price negotiations significantly." 10 U.S.C. § 2306a(h)(1).

In this case, Relators contend that they "have knowledge . . . that the contracting officer for one or more of the contracts at issue required such non-certified cost and pricing data," and that MD, in submitting its proposals, provided the officer with inflated prices, "thereby misleading the officer." Doc. 71 at 32. In particular, with respect to the El Salvador contract, Relators indeed allege that "AMCOM requested that MD provide a sales history (i.e., information on the prices at which the same or similar items had previously been sold to other commercial customers)," and that MD allegedly "only provided the Army [with] information" regarding "October 11, 2011 sale of an MD 500E to the Columbus, Ohio Police Department for the base price of $1,802,282, but did not disclose any prior sales" of helicopters, including one for a lower base price of $1,550,000. Doc. 57 at 18. Along the same lines, for the Costa Rica contract, MD's Chief Operating Officer allegedly "'cherry-picked' higher priced commercial purchase

agreements between MD and its commercial customers to provide to the Army for its price evaluation, specifically failing to disclose an original purchase agreement for [a particular aircraft] and substituting it with a purchase agreement for the same aircraft that showed a higher price."[7] *Id*. at 28. Finally, with respect to the Saudi contract, Relators generally allege that "MD did not provide all the historical commercial pricing data that was necessary for the Army to effectively evaluate price reasonableness."[8] *Id*. at 24. In light of MD's failure to provide accurate pricing information for these three contracts, Relators allege that the Army "was deprived of its ability to effectively negotiate a reasonable and lower price[,] which caused the agreed base price for each aircraft to be higher than it would have been if MD had fully complied with the Army's request for pricing data." *Id*. at 18-19.

Accepting these allegations as true, the court concludes Relators have not sufficiently alleged that compliance with TINA is a prerequisite to payment as required to sustain their implied certification theory. Specifically, the alleged

---

[7] For the Costa Rican contract, Relators generally state that MD failed to provide pricing information for approximately eleven previous helicopter sales that were the "same or similar," doc. 57 at 28, but the complaint does not allege any particular information about any of these previous sales, when they occurred, or the base price for each. Moreover, Relators' allegation that MD failed "to disclose an original purchase agreement for a Helicentro replacement aircraft SN RN083" and substituted the purchase agreement with one "for the same aircraft that showed a higher price," *id*., does not support their purported misrepresentations because even assuming that the Government requested pricing information for previous sales of "same or similar" helicopters, as pleaded, Relators' allegations regarding a "Helicentro replacement aircraft SN RN083" do not tend to show a misrepresentation regarding the different aircraft in the Costa Rican contract—two "MD 600N" helicopters. *See id*.

[8] Because TINA states that the Government's "contracting officer shall require submission of data . . . to the extent necessary to determine the reasonableness of the price of the contract. . .," 10 U.S.C. § 2306a(d)(1), Relators' failure to allege that the Government actually requested pricing data for this contract dooms their claim. *See* doc. 57 at 25 (stating only that the Government "overlooked" obtaining the pricing information).

TINA violations do not satisfy the express condition of payment approach and Relators' complaint does not demonstrate that the pricing requirements of TINA were material to the contracts. *See United States v. Triple Canopy, Inc.*, 775 F.3d 628, 636 (4th Cir. 2015); *United States v. Sci. Applications Int'l Corp.*, 626 F.3d 1257, 1269 (D.C. Cir. 2010).

For all of these reasons, the court concludes that Relators' allegations fail to state a plausible claim under an implied certification theory.

### B. Section 3729(a)(1)(C)—Conspiracy (Count VI)

In light of the decision to grant the motion to dismiss the other claims, the motion to dismiss count VI is also due to be granted. *See U.S. ex rel. Potra v. Jacobson Companies, Inc.*, No. 1:12-CV-01600-WSD, 2014 WL 1275501, at *4 (N.D. Ga. Mar. 27, 2014) (where relators' allegations of false claims fail, "their claim that the Defendants conspired to violate the FCA necessarily fails").

### IV. CONCLUSION

For all these reasons, the court finds that the motion to dismiss is due to be granted. [9] A separate order will be entered in accordance with this opinion.

---

[9] At the end of their brief, Relators request leave to amend if the court "grants some or all of the Defendants' motions to dismiss. . ." Doc. 71 at 35. "[T]here is no rule that every request to amend must be granted," *Panther Partners Inc. v. Ikanos Communications, Inc.*, 347 F. App'x 617, 620 (2d Cir. 2009), and "[i]t is within the court's discretion to deny leave to amend. . . when [as here] leave is requested informally in a brief filed in opposition to a motion to dismiss," *Chechele v. Scheetz*, 466 F. App'x 39, 41 (2d Cir. 2012). Although Relators' first amended complaint, in response to Defendants' initial motion to dismiss, failed to cure the deficiencies and there is

**DONE** the 31st day of March, 2016.

ABDUL K. KALLON
UNITED STATES DISTRICT JUDGE

---

no reason for the court to expect that a second amended complaint would cure these pleading defects, the court will reserve making a decision until after a motion is filed and it has had an opportunity to review the proposed amendment.