## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## NORTHEASTERN DIVISION

| | |
|---|---|
| **UNITED STATES OF AMERICA,** ) | |
| **ex. rel. PHILIP MARSTELLER** ) | |
| **and ROBERT SWISHER,** ) | |
| ) | |
| **Plaintiffs/Relators,** ) | |
| ) | |
| ) | **Civil Action Number** |
| **v.** ) | **5:13-cv-00830-AKK** |
| ) | |
| **LYNN TILTON, et al.,** ) | |
| ) | |
| **Defendants.** ) | |

## <u>MEMORANDUM OPINION AND ORDER</u>

Relators Philip Marsteller and Robert Swisher filed this qui tam action under the False Claims Act (the "FCA"), 31 U.S.C. §§ 3729 *et seq.*, against their former employer, MD Helicopters, Inc.; Patriarch Partners, LLC; Lynn Tilton, MD's and Patriarch's Chief Executive Officer;[1] and Col. Norbert Vergez, alleging that MD submitted false claims and made materially false statements in the process of obtaining five different government contracts for the manufacture and sale of military helicopters for the United States Army's Non-Standard Rotary Aircraft Project Office ("NSWRA"). The Relators also allege that the Defendants conspired

---

[1] MD, Patriarch, and Tilton are referred to collectively as the "MD Defendants."

to violate the FCA. After the Government declined intervention, doc. 17, and the court unsealed the complaint, Tilton, Patriarch, and MD moved to dismiss, doc. 65, and Col. Vergez joined the motion, doc. 63. This court granted the motion and dismissed the case without prejudice based in part on the court's conclusion that, as to the implied certification theory, the Relators did not adequately allege that the Defendants violated an express condition of payment. Docs. 77, 78. The Relators appealed, and during the pendency of the appeal, the Supreme Court decided *Universal Health Servs., Inc. v. United States ex rel. Escobar*, 136 S. Ct. 1989 (2016), which rejected the contention that the implied certification theory only applies when a government contract expressly designates a requirement as a condition of payment. In light of *Escobar*, the Eleventh Circuit vacated this court's judgment and remanded for further proceedings. Doc. 85-1.

This case is currently before the court on the Defendants' renewed motions to dismiss, docs. 106 and 107, which are fully briefed and ripe for review, docs. 106; 107; 109; 112; 113; 116; 117. The court finds that the Relators adequately plead FCA claims based on fraudulent inducement. As a result, the MD Defendants' motion to dismiss is due to be granted as to the FCA claims against MD (Counts I-V) based on the implied certification theory and the conspiracy claims (Count VI) against Patriarch, and denied in all other respects, and Col. Vergez's motion is due to be denied. In lieu of dismissing the Relators' FCA claims based on the implied

certification theory, however, the court will allow the Relators to amend their complaint to replead the claims.

## I.    STANDARD OF REVIEW

Rule 8(a) of the Federal Rules of Civil Procedure requires that a pleading stating a claim for relief provide "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a).  Where a complaint fails to make such a statement, Rule 12(b)(6) permits dismissal. To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 677 (2009) (citations and internal quotation marks omitted).  A complaint states a facially plausible claim for relief "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. (citation omitted).  The complaint must establish "more than a sheer possibility that a defendant has acted unlawfully." *Id. See also Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citation omitted). The Eleventh Circuit instructs that Rule 12(b)(6) "'does not impose a probability requirement at the pleading stage,' but instead 'simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of' the necessary element[s]." *Watts v. Fla. Int'l Univ.*, 495 F.3d 1289, 1295-96 (11th Cir. 2007) (quoting *Twombly*, 550 U.S. at 555).  Ultimately, this inquiry is a "context-specific

task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 678. While the court accepts all factual allegations in the complaint as true, legal conclusions unsupported by factual allegations are not entitled to that assumption of truth. *Id.*

Further, because it is "'well settled' and 'self-evident' that the [FCA] is 'a fraud statute,'" a claim under the FCA must meet the heightened pleading standard of Rule 9(b). *U.S. ex rel. Clausen v. Lab. Corp. of Am.*, 290 F.3d 1301, 1309 (11th Cir. 2002) (citation omitted). Rule 9(b) mandates that a plaintiff must plead fraud with "particularity." Fed. R. Civ. P. 9(b). Significantly, an FCA complaint satisfies Rule 9(b) if it sets forth "facts as to time, place, and substance of the defendant's alleged fraud, specifically the details of the defendants' allegedly fraudulent acts, when they occurred, and who engaged in them." *Hopper v. Solvay Pharm., Inc.*, 588 F.3d 1318, 1324 (11th Cir. 2009) (citations and internal quotation marks omitted).

## II.   RELEVANT FACTUAL BACKGROUND

NSRWA is "[a] major defense acquisition program" headquartered at the Redstone Arsenal in Huntsville, Alabama. Doc. 57 at 13. NSRWA's mission is to "consolidate under a single service-level Project Management Office the procurement, sustainment and technical support of non-standard rotorcraft for the Department of Defense, allied countries under foreign military sales (FMS) contracts[,] or as directed by the Office of the Secretary of Defense." *Id.* at 13.

During the events alleged in the First Amended Complaint, Col. Vergez served as the Project Manager for NSRWA. *Id.* at 3, 13-14. As such, Col. Vergez "was personally and substantially involved in managing the process of issuing, selecting, negotiating, pricing, and awarding all of the FMS contracts obtained by MD that are at issue in this [action]." *Id.* at 14.

This action relates to five FMS contracts for the manufacture of military helicopters for allied countries: the Afghani Air Force in March and September 2011 (Count I and II), the El Salvadoran Air Force in December 2011 (Count III), the Saudi Arabian National Guard in June 2012 (Count IV), and the Costa Rican government in December 2011 (Count V). MD obtained the first contract for the Afghani Air Force through a competitive bid process, and the remaining four were "sole source" contracts, meaning the Army solicited a bid only from MD. *See id.*

## A.     The Afghanistan Air Force Contract

In December 2010, the US Army Aviation and Missile Command ("AMCOM"), on behalf of the NSRWA, issued a public request for contractors to submit proposals for the Army's FMS purchase of six new "Commercial Off the Shelf" (COTS) rotary wing primary trainers for the Afghanistan Air Force (the "Afghan Contract"). Doc. 57 at 14. In response, MD submitted a formal proposal to the AMCOM for the sale of six of its MD 530F model helicopters. *Id.* at 15. According to the Relators, "[a]t Tilton's direction, MD misrepresented to the Army

that its base commercial price for each of its MD 530F Standard Helicopters was [$2.5 million]. In fact, MD's actual base commercial price for the helicopters, per unit, was hundreds of thousands of dollars less." *Id.* The Relators also allege Brian Fifer, MD's Chief Financial Officer, sent Tilton a draft financial statement before MD submitted its proposal, listing the base price of a generic 530F helicopter at $2.1 million, and Tilton told Fifer that the price was "way too low," and that "[w]e are charging $2.5 [million] to the army." *Id.*

On March 3, 2011, Col. Vergez informed Tilton that the Army would award MD the Afghan Contract. *Id.* Thereafter, Tilton traveled regularly to Huntsville to meet with Col. Vergez, allegedly "to 'groom' [Col.] Vergez as a future employee and to influence [Col.] Vergez to act in MD's favor as NSRWA's program manager by offering [Col.] Vergez a lucrative job well before his retirement." *Id.* Allegedly, Col. Vergez knew that Tilton intended to hire him. *Id.*

After the Army formally awarded the Afghan Contract to MD, and Tilton told MD employees "that Vergez 'got us this Afghan contract, . . . and he will drive our Army business." *Id.* at 15-16. Under the Contract, the Army agreed to pay $2.3 million for each of the six MD 530F helicopters, but in the months thereafter, MD sold the same model helicopter to three different commercial customers for the base price of $1.9, $1.9 and $1.55 million. *Id.* at 16.

## B.  The Afghan CLS Contract

In April 2011, AMCOM, on behalf of the NSWRA, issued a sole source solicitation to MD for the purchase of Contractor Logistics Support ("CLS") for the Afghan Contract, including the operations and maintenance training for Flight Training Devices ("FTDs").  *Id.*  at 16-17.  And, MD in turn formally submitted its pricing for the CLS contract, "representing that its price of $14,153,170 was based on 'commercial pricing.'"  *Id.* at 18.  Thereafter, the Army awarded the CLS contract to MD at the contract price.  *Id.*  The Relators allege that as of the award date, "[Col.] Vergez had already begun to actively promote MD to the Army and informed Tilton on that date that he had set up a meeting for her to meet with then Deputy Assistant Secretary of Defense Gary Reid."  *Id.*  During the meeting, Ms. Tilton gave Assistant Secretary Reid a model of an MD Afghan trainer worth hundreds of dollars, and Col. Vergez directed MD to prepare a false invoice showing that the model was valued at $12.99.  *Id.*

## C.  The El Salvador Air Force Contract

On September 26, 2011, AMCOM, on behalf of the NSRWA, issued another sole source solicitation to MD for 3 MD 500E helicopters for the El Salvador Air Force.  *Id.* at 18.  The solicitation requested "that MD provide a sales history (*i.e.* information on the prices at which the same or similar items had previously been sold to other commercial customers)."  *Id.*  In response, MD only disclosed an

7

October 2011 sale to the Columbus, Ohio Police Department for the base price of approximately $1.8 million, and left out other prior sales, including one in May of a new MD 500E helicopter for $1.55 million. *Id.* Allegedly, the incomplete disclosure prevented the Army from effectively negotiating "a reasonable and lower price," resulting in the Army agreeing to an inflated price of over $7.2 million for the three helicopters, ground support equipment, tools, and spares. *Id.* at 18-19. Ultimately, the El Salvador Air Force Contract required the Army to pay a base price of $1.8 million per helicopter with additional payment conditions imposed by MD. *Id.* at 19.

While negotiations for El Salvador Air Force Contract were ongoing, "Tilton provided free private transportation to [Col.] Vergez aboard her jet." *Id.* at 19. On February 15, 2012, approximately two months after the Contract was finalized, "[Col.] Vergez notified the Army for the first time that he was disqualified from engaging in procurement activities involving MD because of an offer of employment." *Id.* at 21.

### D. The Costa Rica Contract

On December 7, 2011, the Army Command-Redstone Arsenal, on behalf of the NSRWA, issued a Request for Information "to identify potential contractors to produce and deliver two new COTS rotary wing aircraft to be delivered to the

Government of Costa Rica." *Id.* at 20. Allegedly, MD misrepresented in its proposal that the base price of a MD 600N helicopter was $2.35 million. *Id.* at 20-21.

After MD submitted its proposal, Carl Schopfer, MD's Chief Operating Officer and President, advised Tilton that Costa Rica had decided that, in lieu of purchasing the two helicopters through an FMS contract with the Army, it wanted to purchase them directly from MD. *Id.* at 22. In an e-mail about the prospective purchase, Schopfer wrote: "Costa Rica has the Army bid and it will be hard to change prices at this point. The up side is that we bid 2,350,000 for the base price and not the 2,315,000 current commercial price . . . ." *Id.* Tilton then directed MD personnel to tell the Costa Rica officials that if Costa Rica purchased the helicopters through the Army, instead of directly from MD, it could have a "finished contract in 30 days" if it was a sole source contract. *Id.* The Relators allege that Tilton wanted to keep the Costa Rica deal an FMS contract through the NSRWA to conceal the actual commercial price of the helicopters. *Id.*

Because the FMS sale of the two helicopters took several more months than originally promised, the President of Costa Rica wrote to the U.S. Embassy inquiring about the progress of the sale. *Id.* at 26. For her part, Tilton asked Col. Vergez to remedy the delay, and he "promised to remove the obstacle" and told Tilton "that MD would have the Costa Rica FMS contract no later than July 31, with delivery by mid-August." *Id.* However, the Army did not execute the contract to supply the

two helicopters until August.  *Id.* at 27.  MD did not submit its formal FMS pricing proposal to the NSRWA for the Costa Rica FMS contract until October 2012, and the proposal included MD's inflated base price of $2.35 million per helicopter.  *Id.* at 28.  Allegedly, MD "cherry-picked" higher priced commercial purchases to provide to the Army for its price evaluation, and "failed to disclose all the pricing data that the Army contracting officer had requested . . . ."  *Id.*  Relying on this "incomplete disclosure," the Army accepted MD's inflated pricing.  *Id.* at 28-29. The Relators allege that the Army "was deprived of its ability to effectively negotiate a reasonable and lower price," which caused the Army to agree to pay the inflated price for the two MD 600N helicopters for Costa Rica.  *Id.* at 29.

### E.    The Saudi Arabian National Guard Contract

On March 9, 2012, the Army, on behalf of the NSRWA, issued a sole source FMS solicitation to MD to supply 12 MD 530F helicopters to the Saudi Arabian National Guard.  *Id.* at 21.  Schopfer advised Tilton that the base commercial price of the MD 530F was $2.15 million per helicopter, and Schopfer suggested that MD quote the Army a base price of $2.178 million.  *Id*. at 23.  In an email responding to that suggestion, Tilton wrote, "Why is this not Army pricing?", which prompted Schopfer to inflate the recommended base price quote to $2.3 million.  *Id.*

Concerned about Tilton's approval of the inflated price, Marsteller told Ben Weiser, MD's Executive Vice President for Business Development and Sales, that

MD had to provide the government with the best price and inflating the prices is "criminal." *Id.* at 23-24. Weiser then wrote the following email to Tilton:

> Lynn, I was made aware this morning of the pending increase of our base price for the 530F from $2.15M to $2.3M for [the Saudi contract]. This means that we will have to increase our commercial list price by $150,000 less than two and a half months after we published our approved 2012 price list. . . . At our 1/31 meeting we showed you a 20.8% net margin at this price. . . . I will of course accept your decision, but I would ask that you reconsider.

*Id.* at 24. Tilton responded by stating, "This is my decision," and "this is not about the money but about consistency with the Army." *Id.*

Thereafter, MD submitted its cost and pricing proposal for the Saudi contract to NSRWA, representing that the commercial base price for its MD 530F helicopters was $2.3 million. *Id.* The Relators allege that "MD did not provide all the historical commercial pricing data that was necessary for the Army to effectively evaluate price reasonableness," and the Army overlooked this failure because of the close interaction between Col. Vergez and Tilton. *Id.* at 24-25. The Army awarded the Contract to MD according to MD's terms, including a favorable modification to the payment terms of the contract. *Id.*

## F. Col. Vergez's Employment with MD

In the Summer of 2012, while he worked to help finalize the FMS contract with Costa Rica, Col. Vergez signed a contract with Patriarch to direct MD's Civil and Military Programs. *Id.* at 27. Col. Vergez retired from the Army in November

2012. *Id.* at 29. One month later, Tilton announced to employees at MD's Mesa, Arizona facility that a very special person "who had been very influential in MD's receipt of Army contracts would be joining the MD team and that he would be instrumental in growing MD's Army business." *Id.* at 29. Col. Vergez subsequently joined MD's Mesa facility, and participated directly in MD's helicopter business and programs, including eventually informing Swisher that "everything on the military programs had to go through him." *Id.* at 29-30.

## III. ANALYSIS

The FCA imposes significant penalties on any person who defrauds the government by "knowingly present[ing], or caus[ing] to be presented, a false or fraudulent claim for payment or approval," or "knowingly mak[ing], us[ing], or caus[ing] to be made or used, a false record or statement material to a false or fraudulent claim[.]" 31 U.S.C. § 3729(a)(1)(A)-(B). "Liability under the [FCA] arises from the submission of a fraudulent claim to the government . . . ." *Corsello v. Lincare, Inc.*, 428 F.3d 1008, 1012 (11th Cir. 2005). "Indeed, the 'central question' regarding whether a relator's allegations state a claim [] is, did the defendant present (or cause to be presented) to the government a false or fraudulent claim for payment?" *Urquilla-Diaz v. Kaplan Univ.*, 780 F.3d 1039, 1052 (11th Cir. 2015) (quotation omitted). "'Because it is the submission of a fraudulent claim that gives rise to liability under the [FCA], that submission must be pleaded with

particularity and not inferred from the circumstances.'" *U.S. ex rel Chase v. HPC Healthcare, Inc.*, 723 F. App'x 783, 789 (11th Cir. 2018) (quoting *Corsello*, 428 F.3d at 1013).  But, satisfying that standard does not require a relator to allege the details of false claims by providing specific billing information, and "[t]he key inquiry is whether the complaint includes 'some indicia of reliability' to support the allegations that an actual false claim was submitted." *Id.* (quoting *Clausen*, 290 F.3d at 1311).

The First Amended Complaint pleads that the Defendants' conduct with respect to the five contracts at issue violates the FCA based on two theories of liability:  implied certification and fraudulent inducement.  Doc. 57.  In its order remanding this case, the Eleventh Circuit noted that "[d]uring the pendency of this appeal, the Supreme Court has examined the implied certification theory in *Universal Health Services, Inc. v. United States ex rel. Escobar*, 136 S. Ct. 1989 (2016)," and directed this court to "revisit whether the relators alleged facts sufficient to support a theory of implied certification as articulated in *Escobar*." Doc. 85-1 at 3.  The Circuit also found that the Complaint pleads fraud in the inducement, and directed this court to "reexamine the allegations relating to that theory." *Id.*  The court reexamines this case in accordance with these directives.

**A.    Whether the Relators Adequately Plead Claims Based on the Implied Certification Theory**

"Under the implied false certification theory . . . , a defendant's act of submitting a claim for payment 'impliedly certifies compliance with all conditions of payment.'"  *U.S. ex rel. Kelly v. Serco, Inc.*, 846 F.3d 325, 330 (9th Cir. 2017) (quoting *Escobar*, 136 S. Ct. at 1995).  "[T]he implied certification theory can be a basis for liability, at least where two conditions are satisfied:  first, the claim does not merely request payment, but also makes specific representations about the goods or services provided; and second, the defendant's failure to disclose noncompliance with material statutory, regulatory, or contractual requirements makes those representations misleading half-truths."  *Escobar,* 136 S. Ct. at 2001.  But, "a misrepresentation about compliance with a statutory, regulatory, or contractual requirement must be material to the Government's payment decision in order to be actionable under the [FCA]."  *Id.* at 2002.

Here, the Relators plead that each of the contracts incorporated Federal Acquisition Regulations ("FAR") §§ 52.203-03 and 13, and that, in violation of those provisions, MD concealed credible evidence of violations of federal law and failed to make disclosures required by the FAR.  Doc. 57 at 11-12, 30-44.  The Defendants argue that these claims are not plausible under an implied certification theory because the Relators did not allege a false certification under the two-part test set forth in *Escobar* and did not meet the materiality requirement.  Doc. 106 at 17.

The Defendants argue first that the First Amended Complaint does not allege any representations MD made as part of a claim that were impliedly false, or sufficiently allege that the Defendants violated the applicable regulations. Doc. 106 at 16. Before addressing those arguments, the court turns to the Relators' contention regarding *Escobar*'s two-part test. Based on the language in the opinion that "the implied certification theory can be a basis for liability *at least where* two conditions are satisfied . . . ," *Escobar*, 136 S. Ct. at 2001 (emphasis added), the Relators argue that *Escobar* does not set forth mandatory requirements that must be satisfied, but instead represents just one way a plaintiff may plead plausible claims, doc. 110 at 25, 27, n.17. Allegedly, by using the phrase "at least where," the Court did not mean "only." Doc. 110 at 27, n.17. And, as the Relators point out, the Court left open "whether all claims for payment implicitly represent that the billing party is legally entitled to payment." *Escobar*, 136 S. Ct. at 2000. Given that the circuit courts that have addressed the issue have held that a complaint must satisfy the two-part test to plausibly allege claims under the implied certification theory,[2] the court will assume that the Relators must satisfy *Escobar*'s two-part test.

---

[2] *See United States v. Sanford-Brown, Ltd.*, 840 F.3d 445, 447 (7th Cir. 2016); *U.S. ex rel. Whatley v. Eastwick College*, 657 F. App'x 89, 94 (3rd Cir. 2016).

1. <u>Whether the Relators alleged specific representations MD made in a claim for payment</u>

Turning now to the specific contentions, the MD Defendants argue that the Relators' allegations are not sufficient because the Relators purportedly failed to allege that MD made any specific misrepresentations in a claim for payment or that MD submitted any invoices or other payment requests. Doc. 106 at 18. But, allegations regarding specific invoices and payment requests are not required to state a plausible FCA claim, and a complaint may satisfy the requirements of Rule 9(b) when "the relator alleged direct knowledge of the defendants' submission of false claims based on her own experiences and on information she learned in the course of her employment." *Chase*, 723 F. App'x at 789 (citing *U.S. ex rel. Walker v. R&F Props. Of Lake Cty., Inc.*, 433 F.3d 1349, 1360 (11th Cir. 2005)). Here, the two Relators are MD's former Director of Sales and Marketing and Director of Military Business Development, and they allege that the Army awarded MD specific contracts for defined amounts, and MD received payments pursuant to the contracts. Doc. 57 at 2, 14, 16-21, 24, 28, 30-43. These allegations provide a factual basis to support a reasonable inference that MD submitted a claim for payment under the contracts. Thus, the Complaint includes the requisite "'indicia of reliability' to support the allegation than an actual false claim was submitted." *Chase*, 723 F. App'x at 789 (quoting *Clausen*, 290 F.3d at 1311). As a result, and because courts in this Circuit are "more tolerant toward complaints that leave out some

particularities of the submissions of a false claim if the complaint also alleges personal knowledge or participation in the fraudulent conduct," *U.S. ex rel. Matheny v. Medco Health Solutions, Inc.*, 671 F.3d 1217, 1230 (11th Cir. 2012) (citation omitted), the Relators have plausibly alleged the submission of a false claim.

The Defendants argue still that the Complaint fails to meet the requirements of *Escobar* because the Relators did not allege any specific representations MD made in a claim for payment. Docs. 106 at 18; 113 at 6-7. In *Escobar*, the defendant operated a mental health facility that employed practitioners who were not licensed to provide mental health counseling, but submitted claims for payment to Medicaid using payment codes corresponding to specific counseling services and National Provider Identification numbers corresponding to specific job titles. 136 S. Ct. at 1997, 2000. The Court found that the use of those codes and numbers without disclosing the violations of basic staff and licensing requirements constituted representations that rendered the claims misleading "half-truths[, i.e.] representations that state the truth only so far as it goes, while omitting critical qualifying information . . . ." *Id.* at 2000.

The MD Defendants argue that, unlike the relators in *Escobar*, the Relators here do not allege that MD "made any specific representations—about its helicopters or anything else—in requesting [] payments" under the contracts. Doc. 106 at 18. The Relators counter that "every invoice for payment would have referenced MD[]'s

contractor number and the government's contract number, which was inherently a representation that MD[] met all requirements for payment under the contract," and "that representation was a half-truth because it omitted and failed to disclose that MD[]/Tilton had violated certain statutory and/or contractual provisions bearing on the essence of the government's bargains." Doc. 110 at 27. Missing from the Complaint, however, is any allegation that MD submitted such invoices. *See* doc. 57. Consequently, the Relators do not plead that MD made any representations in its claim for payment. In lieu of dismissal, because the Relators request leave to amend, *see* doc. 110 at 38, and assuming the amendment is not futile, the court will allow the Relators to amend their complaint to replead their allegations relating to the implied certification theory. To ensure an amendment will not be futile, the court will consider the Defendants' remaining arguments for dismissal.

2. <u>Whether the Relators sufficiently alleged violations of FAR</u>

The MD Defendants argue that the Relators failed to adequately allege a violation of § 52.203-13. Doc. 106 at 19-20. FAR § 52.203-13 requires contractors to, among other things, "promote an organizational culture that encourages ethical conduct and a commitment to compliance with the law," and to disclose to the government if the contractor has "credible evidence that a principal, employee, agent, or subcontractor of the Contractor has committed [] [a] violation of Federal criminal law involving fraud, conflict of interest, bribery, or gratuity violations

18

found in Title 18 of the United States Code . . . ."[3]  48 C.F.R. § 52.203-13(b)(2)-(3).

Focusing on Col. Vergez, and based on their contentions that no conflict of interest existed because Col. Vergez was not an MD employee at the relevant time and that "failing to disclose single instances of allegedly providing transportation or paying post-retirement relocation expenses to Col. Vergez, or the alleged gift of a model helicopter" do not rise to violations of the FAR, the MD Defendants contend that the Relators did not plausibly allege a violation of the FAR provisions.  Doc. 106 at 19-20.  This contention ignores the Relators' allegations that (1) MD, through Tilton, offered Col. Vergez lucrative employment with MD "to influence Vergez to act in MD's favor," (2) Col. Vergez knew Tilton intended to hire him, and (3) Tilton purportedly told MD employees, Col. Vergez "got us this Afghan contract."  Doc. 57 at 15-16.  In addition, the Relators allege that MD knowingly submitted inflated pricing information and bids, *id.* at 15, 18, 21-24, 28, which could be materially false statements in violation of 18 U.S.C. § 1001.  Contrary to the MD defendants' contention, these allegations do more than simply "[c]ast a negative light on business dealings."  *See* doc. 106 at 20.  Rather, when viewed in the light most favorable to

---

[3] The First Amended Complaint identifies applicable provisions of Title 18, including § 201, which prohibits bribery of public officials, and § 1001, which provides that "whoever, in any matter within the jurisdiction of the executive, legislative, or judicial branch of the Government of the United States, knowingly and willfully (1) falsifies, conceals, or covers up by any trick, scheme, or device a material facts; [or] (2) makes any materially false, fictitious, or fraudulent statement or representation . . . shall be fined under this title, [or] imprisoned not more than 5 years."

the Relators, these allegations plausibly allege violations of FAR § 52.203-13 in connection with the contracts and alleged payments at issue.

3. Materiality

The Defendants also argue that the claims based on the implied-certification theory fail because the Relators do not adequately plead that the alleged violations of contractual and regulatory requirements were material to the Army's payment decision. Doc. 106 at 21-25. "[A] misrepresentation about compliance with a statutory, regulatory, or contractual requirement must be material to the Government's payment decision in order to be actionable under the [FCA]." *Escobar*, 136 S. Ct. at 2002. The FCA defines "material" as "having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property," 31 U.S.C. § 3729(b)(4), "a definition 'descended from common-law antecedents.'" *Marsteller*, 880 F.3d at 1313 (quoting *Escobar*, 136 S. Ct. 2002) (alteration in original omitted). Materiality is a "rigorous" requirement for an FCA claim, and "looks to the effect on the likely or actual behavior of the recipient of the alleged misrepresentation." *Escobar*, 136 S. Ct. 2002 (citation and alteration omitted). To determine whether the materiality standard is met, "*Escobar* instructs courts to consider whether noncompliance is 'minor or insubstantial' and amount to 'garden-variety breaches of contract or regulatory violations,' or, conversely, whether the Government would have attached importance to the violation in

determining whether to pay the claim." *Marsteller*, 830 F.3d at 1313. Other relevant factors include "[w]hether a provision is labeled a condition of payment" and "evidence that the defendant knows that the Government consistently refuses to pay claims in the mine run of cases based on noncompliance with the particular statutory, regulatory, or contractual requirement." *Escobar*, 136 S. Ct. at 2001, 2003.

The MD Defendants argue that the Relators failed to plead materiality because they do not allege "that the government 'consistently refuses to pay claims' in comparable circumstances," or that that government took any action against MD, stopped paying MD on the contracts after learning of the alleged violations, or ceased doing business with MD. Doc. 106 at 22-23. Although those factors are relevant, they are not required for a finding of materiality. *See Escobar*, 136 S. Ct. at 2001, 2003-04. Rather, the court must take "'a holistic approach to determining materiality in connection with a payment decision,'" *U.S. ex. rel. Brady v. Comstor Corp.*, 308 F. Supp. 3d 56, (D.D.C. 2018) (quoting *U.S. ex. rel. Escobar v. Univ. Health. Servs., Inc. (Escobar II)*, 842 F.3d 103, 109 (1st Cir. 2016). To that end, as the Relators note, the alleged violations go to the essence of the bargain, and compliance with the laws and the relevant provisions are a condition of payment, doc. 110 at 30-36, and districts courts have found that "price is an unambiguously material condition under the FCA," *U.S. ex rel. Bierman v. Orthofix Int'l, N.V.*, 177 F. Supp. 3d 712, 715 (D. Mass. 2016) (citing *U.S. ex rel. Shemesh v. CA, Inc.*, 89 F.

Supp. 3d 36, 51 (D.D.C. 2015)).  Moreover, the government's decision to pursue criminal charges against Col. Vergez indicates that the alleged violations relating to Tilton's and MD's relationship with Col. Vergez are material to the government. For those reasons, the court finds that the Relators have plausibly pleaded materiality.

The MD Defendants contend, however, that the government's continued payments under the contracts and its decision to exercise an option under the Afghan Contract to obtain more MD 530F helicopters undermines this finding.  Docs. 57 at 18, n. 5; 106 at 23 (citing U.S. Dep't of Defense Contracts, Release No: CR-172-17 (Sept. 5, 2017), https://dod.defense.gov/News/Contracts/Contract-View/Article/ 1299955/).[4]  The MD Defendants are generally correct that the government's continued payment under the contracts despite actual knowledge of violations of the provisions and regulations is "very strong evidence that those [violations] are not material."  *Escobar*, 136 S. Ct. at 2003.  But, knowledge of allegations of wrongdoing is not the same as "actual knowledge" that MD violated applicable regulations and contract provisions.  *See Escobar II*, 842 F.3d at 112.  Moreover, proof of actual knowledge is not dispositive, *see Escobar*, 136 S. Ct. at 2003, and the court must consider the continued payments in context, *U.S. ex rel. Mei Ling v.*

---

[4] The court may take judicial notice of this contract.  *Rich v. Sec'y, Fla. Dept. of Corr.*, 716 F.3d 525, 534 (11th Cir. 2013).

*City of Los Angeles*, 389 F. Supp. 3d 744, 757 (C.D. Cal. 2019). Based on the allegations in the First Amended Complaint, MD had already delivered some of the helicopters when the Army learned of the alleged violations, *see* doc. 57, and the extent to which the government could have ceased payments under such circumstances is not clear. And, with respect to the option the Government exercised for the additional helicopters, the parties have not cited evidence regarding the price per helicopter, or whether MD and the government may have negotiated a different, lower price than they agreed to in the initial contract. Thus, whether the government's continued payments under the contracts establishes that the alleged violations are not material requires factual development that precludes the court from deciding the issue at this juncture.

In summary, the Relators have plausibly pleaded that MD submitted false claims for payment under the contract and that MD's alleged violations of regulatory or contractual requirements were material to the government's payment decision. But, the Relators failed to plead that MD made specific representations about the goods and services provided in a claim for payment. Rather than dismissing the FCA claim based on the implied false certification theory, however, the court will give the Relators an opportunity to amend.

## B. Whether the Relators Adequately Plead Claims Based on Fraud in the Inducement

The Relators also pursue a theory of fraudulent inducement, doc. 57 at 30-44,[5] which is a viable theory of liability under the FCA, *e.g., U.S. ex rel. Marcus v. Hess*, 317 U.S. 537 (1943); *Marsteller*, 880 F.3d at 1314. Fraudulent inducement is based on the idea that "the original fraud that influenced the Government's decision to enter into a particular contract at a particular price 'pressed ever to the ultimate goal—payment of government money to persons who had caused it to be defrauded.'" *Marsteller*, 880 F.3d at 1314 (quoting *Marcus*, 317 U.S. at 543-44). "Under [the] theory, every claim submitted under a fraudulently induced contract constitutes a 'false claim' within the meaning of the Act (i.e., is automatically tainted), even without proof that the claims were fraudulent in themselves." *U.S. ex rel. Bettis v. Odebrecht Contractors of Cal., Inc.*, 393 F.3d 1321, 1323 (D.C. Cir. 2005). Thus, "a claim alleging fraud in the inducement of a government contract [] focus[es] on the false or fraudulent statements which induced the government to enter into the contract at the outset." *In re Baycol Products Litigation*, 732 F.3d 869, 877 (8th Cir. 2013).

---

[5] The MD Defendants contend that Count I, which relates to the Afghan Contract, does not allege fraudulent inducement. Doc. 106 at 26. This contention is belied by the allegations in Count I, which include an allegation that when MD entered into the contract, it agreed to comply with FAR § 52.203-13 and that a failure or refusal to agreement to that provision "would have made MD's proposal unacceptable and ineligible for a contract award." Doc. 57 at 30-31. While not a model of clarity, these allegations are sufficient to put MD on notice that the Relators plead an FCA claim related to the Afghan Contract based on a theory of fraudulent inducement.

The Eleventh Circuit found that the First Amended Complaint "could support multiple theories of fraud in the inducement." *Marsteller*, 880 F.3d at 1314. As the Circuit found, "the allegations can be read to support the view that the prospective promise to comply with various provisions of law, including the Contractor Code of Ethics and the Truth in Negotiations Act were false when made." *Id.* Moreover, the allegations support a finding that the allegedly incomplete pricing data MD submitted "induced the Government to enter contracts on terms more favorable to MD than it would have had the pricing data been complete." *Id.* at 1315. In a nutshell, the First Amended Complaint explicitly alleges that MD provided the Army with misleadingly incomplete pricing information with respect to some of the contracts. Doc. 57 at 18-21, 35. *See also Marsteller*, 880 F.3d at 1315. In particular, with respect to the El Salvador Contract (Count III), the Relators allege that, in response to the Army's request for pricing information, MD disclosed the sale of a single helicopter at a base price of over $1.8 million and concealed another recent sale at lower price. Doc. 57 at 18, 35. With respect to the Saudi and Costa Rica Contracts (Counts IV and V), the Relators allege that MD knowingly submitted false pricing information that gave inflated base prices for the helicopters, and failed to disclose all of the pricing data the Army requested for the Costa Rica Contract. *Id.* at 20-24, 28. Similarly, with respect to the Afghan Contract (Count I), the Relators allege that MD knowingly submitted an inflated bid that misrepresented the base

price for its helicopters. *Id.* at 15-16. Viewing these allegations in the light most favorable to the Relators, the court finds that the First Amended Complaint plausibly pleads that MD knowingly made a false statement or engaged in a fraudulent course of conduct that induced the government to agree to pay more than it otherwise would have with respect to the contracts at issue.

In addition to the allegations regarding pricing data, the Relators plead fraud in the inducement based on MD's alleged violations of FAR § 52.203-13. Allegedly, MD knew its agreement to comply with that provision was material to the government's payment decision under the contracts, that a refusal to comply would have rendered MD's bid or proposal ineligible for a contract award, and that MD had no intent of complying with the FAR provision. Doc. 57. The MD Defendants argue that these allegations are not sufficient to state fraudulent inducement claims because the Relators cannot plausibly plead that MD actually violated § 52.203-13, and the Relators did not plead facts showing that MD intended to violate the provision. Doc. 106 at 27. The court disagrees.

To begin, as discussed above, the Relators allegations are sufficient at this juncture to plead the MD violated FAR § 52.203-13. *See* pp. 18-20, *supra*. Next, while MD is correct that its alleged violations of § 52.203-13 are not sufficient to establish that it never intended not to comply with the provision when it entered into

the contracts,[6] MD overlooks that the Relators also allege that (1) MD knowingly submitted inflated bids or prices and incomplete pricing information to the Army; (2) Tilton "groomed" Col. Vergez as a future employee to influence him to act in MD's favor; (3) Tilton told MD employees that Col. Vergez "got us this Afghan contract;" (4) Col. Vergez actively promoted MD to the Army; and (5) with Col. Vergez's help, MD acted to keep the Costa Rica Contract an FMS sale in order to conceal the actual commercial price of the helicopters. Doc. 57 at 15-24. Viewed in the light most favorable to the Relators, these allegations are sufficient to give rise to a plausible inference that MD intended not to comply with § 52.203-13 when it entered into the contracts at issue.

Finally, as to the MD Defendants' contention that the Relators did not adequately allege that compliance with § 52.203-13 and MD's submission of allegedly incomplete or false pricing information were material, doc. 106 at 27-28, 32-33, as discussed previously, the Relators have plausibly alleged materiality at this juncture in the case. *See* pp. 20-23, *supra*.

To close, the Relators plead plausible FCA claims against MD based on the theory of fraud in the inducement.

---

[6]*See* doc. 106 at 26-27. *See also United States v. Shah*, 44 F.3d 285, 293 n.14 (5th Cir. 1995) (citation omitted); *U.S. ex rel. Graves v. ITT Educ. Servs., Inc.*, 284 F. Supp. 2d 487, 503 (S.D. Tex. 2003).

### C. Whether the Relators Adequately Allege MD Knowingly Violated the FCA

The MD Defendants argue next that the Relators did not adequately allege that MD knowingly violated the FCA. Docs. 106 at 33-34; 113 at 16-17. To hold a defendant liable under the FCA, "the relator must show that the defendant acted 'knowingly,' which the Act defines as either 'actual knowledge,' 'deliberate ignorance,' or 'reckless disregard.'" *Urquilla-Diaz v. Kaplan Univ.*, 780 F.3d 1039, 1058 (2015)). This requirement is "rigorous" and is strictly enforced. *Escobar*, 136 S. Ct. at 2002.

The Relators sufficiently plead facts to show that MD acted knowingly. Among other things, the Relators allege that (1) Tilton told another MD employee that the average price per helicopter listed in a draft financial statement for the Afghan Contract was "way too low" because it failed to reflect MD's upcharge of $400,000 more per helicopter for the Army; (2) MD worked to keep the Costa Rica Contract as an FMS sale in order to conceal the actual commercial price of the helicopters; (3) MD misrepresented its base price for helicopters before obtaining the Saudi contract; (4) Tilton intended to "'groom' [Col.] Vergez as a future employee and to influence [Col.] Vergez to act in MD's favor . . . by offering [him] a lucrative job well before his retirement;" and (5) Tilton contacted Col. Vergez to seek his assistance with the Costa Rica and Saudi contracts even after he informed the Army about his conflict because of the offer of employment. Doc. 57 at 15, 21-

24, 26-27. As discussed above, these allegations plausibly show that MD violated 18 U.S.C. §§ 201 and 1001 regarding bribery and false statements, and FAR § 52.203-13 by not disclosing the violations. Moreover, viewed in the light most favorable to the Relators, the allegations are sufficient to give rise to a plausible inference that MD knowingly violated the FCA by submitting false pricing information to induce the government to enter into certain contracts and by failing to comply with § 52.203-13.

### D.   Whether the Relators Adequately Allege the Defendants Conspired to Violate the FCA

To state a conspiracy claim under the FCA, the Relators "must show '(1) that the defendant conspired with one or more persons to get a false or fraudulent claim paid by the United States; (2) that one or more of the conspirators performed any act to effect the object of the conspiracy; and (3) that the United States suffered damages as a result of the false or fraudulent claim.'" *Corsello*, 428 F.3d at 1014 (quoting *U.S. ex rel. Stinson v. Provident Life & Accident Ins. Co.*, 721 F. Supp. 1247, 1259 (S.D. Fla. 1989)). The heightened pleading standard of Rule 9(b) applies to FCA conspiracy claims. *Chase*, 723 F. App'x at 791 (citing *Corsello*, 428 F.3d at 1014).

The MD Defendants and Col. Vergez challenge the conspiracy claims on two primary grounds: (1) the Relators do not to allege that Patriarch, Tilton, and Col. Vergez agreed with MD to defraud the government, and (2) Tilton, as the CEO of

MD, could not conspire with MD. Docs. 106 at 35; 107 at 4.[7] As an initial matter, the Relators do not allege that Patriarch had any involvement with the contracts at issue, or the submission of any claim under the contracts. *See* doc. 57. And, the only substantive allegation relating to Patriarch is that it employed Col. Vergez to conceal his employment at MD. *Id.* at 30. That allegation, however, does not show that Patriarch conspired with MD or Col. Vergez to get a false claim paid by the government. As a result, the Relators have not pleaded a plausible conspiracy claim against Patriarch.

As for the other alleged conspirators, as an initial matter, while the MD Defendants are correct that "a corporation's employees, acting as agents of the corporation, are deemed incapable of conspiring among themselves or with the corporation," *Dickerson v. Alachua Cty. Comm'n*, 200 F.3d 761, 767 (11th Cir. 2000); *see also* doc. 106 at 35, in this case, the Relators allege that Tilton and MD conspired with Col. Vergez while he was still with the Army. Thus, the alleged conspirators here do not constitute a single legal entity to dismiss the conspiracy claim against Tilton.

The motion also fails because the Relators have pleaded sufficient facts. According to the Relators, the conspiracy between Col. Vergez, Tilton, and MD

---

[7] The Defendants also argue that the conspiracy claims fail because the Relators did not state an underlying FCA claim. Docs. 106 at 35; 107 at 4. But, as discussed above, the court finds that the Relators plead plausible FCA claims based on the theory of fraudulent inducement.

began at least by March 2011 when Col. Vergez told Tilton that MD would be awarded the Afghan Contract, and Tilton then informed MD employees that Col. Vergez "got us this [] contract . . . ." Docs. 109 at 27; 57 at 15. As mentioned, the Relators allege that Tilton intended to induce Col. Vergez to act on MD's behalf with respect to obtaining contracts with the Army by offering him employment, and Col. Vergez knew Tilton intended to hire him but did not disclose that conflict of interest for approximately one year. Doc. 57 at 15-16, 21. And, even after Col. Vergez disclosed the conflict and informed the Army he was disqualified from participating in procurement activities involving MD, Tilton continued to call and meet with him regarding the Costa Rica and Saudi contracts, and Col. Vergez worked to help MD finalize those contracts. Doc. 57 at 21-22, 24-27. Moreover, at a meeting between Tilton, Col. Vergez, and Swisher regarding a request from El Salvador to modify the El Salvador Contract, "[Col.] Vergez recommended to Tilton that MD 'make it painful' by charging a high price for the contract modification." *Id.* at 24. Taken together, these allegations are sufficient to create a plausible inference that MD, Tilton, and Col. Vergez agreed to conceal Col. Vergez's conflict of interest, to ignore his disqualification from working on procurement activities involving MD, to have MD violate FAR § 52.203-13 by failing to report the conflict, and to have MD submit false or fraudulent claims under the contracts at issue.

## IV. CONCLUSION AND ORDER

For the reasons discussed above, the MD Defendants' motion to dismiss, doc. 106, is **GRANTED** as to the FCA claims based on the implied certification theory and the conspiracy claim against Patriarch, and Col. Vergez's motion to dismiss, doc. 107, is **DENIED**. The conspiracy claim against Patriarch is **DISMISSED WITHOUT PREJUDICE**, and the Relators may amend their complaint to replead their FCA claims based on the implied certification theory by filing a third amended complaint by **October 10, 2019**.

**DONE** the 30th day of September, 2019.

_____
**ABDUL K. KALLON**
UNITED STATES DISTRICT JUDGE