FILED

2021 Aug-23  AM 09:42
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### NORTHEASTERN DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| **ex rel. PHILIP MARSTELLER and** | ) | |
| **ROBERT SWISHER,** | ) | |
| | ) | |
| **Plaintiffs/Relators,** | ) | **Civil Action No.** |
| | ) | **5:13-cv-00830-AKK** |
| **vs.** | ) | |
| | ) | |
| **LYNN TILTON and MD** | ) | |
| **HELICOPTERS, INC.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## MEMORANDUM OPINION AND ORDER

This case concerns an alleged attempt to defraud the Government in violation

of the False Claims Act, 31 U.S.C. § 3729 *et seq.*, which "imposes significant

penalties" on would-be fraudsters. *Universal Health Servs., Inc. v. U.S. ex rel.*

*Escobar*, 136 S. Ct. 1989, 1995 (2016). Relators Phillip Marsteller and Robert

Swisher filed this *qui tam* action against their former employer, MD Helicopters,

Inc. and its CEO, Lynn Tilton.[1] Doc. 57. Allegedly, the defendants (1) fraudulently

induced the Government into contracting by falsely representing that they intended

to comply with applicable federal regulations; (2) fraudulently induced the

---

[1] The court previously dismissed the relators' claims against Patriarch Partners, LLC and Col.
Norbert Vergez. *See* doc. 120 at 32 and docs. 132–134, respectively.

Government into paying inflated prices by submitting incomplete pricing information; and (3) conspired to violate the False Claims Act. *Id.* The defendants move for summary judgment on all claims.[2]  Doc. 171.  For the reasons explained below, except as to the FAR-based theory of fraudulent inducement related to the El Salvador (Count III), Saudi Arabia (Count IV), and Costa Rica (Count V) contracts, the motion is due to be granted in all other respects.

## I.

## A.

MD Helicopters manufactures "superbly built helicopters that excel in warfighting conditions."  Doc. 172-1 at ¶ 51.  Thousands of its aircraft are in service with military forces and police departments around the world.  *Id.* at ¶ 50.  Between 2011 and 2020, MD Helicopters' CEO was Lynn Tilton.  Doc. 191-3 at 27.  She also indirectly owned MD Helicopters.  Doc. 125 at 3.  As CEO, Tilton had final say over decisions committing MD Helicopters to long-term contracts, leases, and financing arrangements.  Doc. 191-3 at 42.  While she led MD Helicopters, Tilton also owned and served as CEO of Patriarch Partners, LLC ("Patriarch Partners") and Patriarch Partners Management Group ("PPMG").  *Id.* at 15–16.  These closely affiliated

---

[2] Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56.  A genuine dispute of material fact exists if a "reasonable jury could return a verdict for the nonmoving party" under the governing law.  *Bowen v. Manheim Remarketing, Inc.*, 882 F.3d 1358, 1362 (11th Cir. 2018) (quotation omitted).  When resolving a motion for summary judgment, the court must construe the evidence in the light most favorable to the nonmoving party.  *Id.*

companies provide management services to the several dozen portfolio companies that Tilton owns, *id.* at 15, 28, including MD Helicopters, doc. 191-5 at 39.

The relators, Swisher and Marsteller, are United States Army veterans who worked for MD Helicopters until 2013.  Docs. 177-1 at 72–73; 191-10 at 35.  MD Helicopters hired Swisher in 2006, and he eventually became its Director of Military Programs.  Doc. 177-1 at 72–73, 76–77.  Marsteller joined MD Helicopters in 2012 as its Director of Sales and Marketing, and he worked there for about nineteen months.  Doc. 191-10 at 35–36, 50–51.  Around September 2012, Marsteller began expressing concerns to the Government about allegedly illegal conduct he observed at MD Helicopters.  Doc. 177-36 at 254.  In early 2013, after speaking with Government investigators, Marsteller and Swisher started discussing a potential lawsuit against MD Helicopters.  Doc. 177-1 at 355–356.  They retained counsel a few months later.  *Id.* at 356–357.

The relators believed that the defendants' behavior regarding five of its contracts with the Army and their relationship with an Army officer, Colonel Norbert Vergez, was potentially unlawful.  *See* docs. 177-1 at 32–33; 177-36 at 254–255.  At the time, Col. Vergez was the Program Manager for the Army's Program Management Office for Non-Standard Rotary Wing Aircraft ("NSRWA").  Doc. 177-11 at 231.  NSRWA supports the development and procurement of non-standard rotorcraft for U.S. allies, including by providing aircraft and support services to

3

foreign governments through the Foreign Military Sales ("FMS") program.  Doc. 172-14 at ¶¶ 2, 8.  Under the FMS program, allied countries, using the Government as an intermediary, purchase defense articles produced by U.S. contractors, sometimes directing the purchase of specific items or services from specific contractors.  *Id.* at ¶ 3.  As NSRWA's Program Manager, Col. Vergez was responsible for building and maintaining working relationships with contractors.  *Id.* at ¶¶ 5–6, 9.  Because MD Helicopters' aircraft are not standard in the U.S. military's inventory, the company fell under NSWRA's, and therefore Col. Vergez's, jurisdiction.  *See* doc. 177-3 at 25.

Contractors who participate in the FMS program must comply with certain rules and regulations.  *See* doc. 177-9 at 185–186.  Among these are the Federal Acquisition Regulations ("FAR"), which establish the rules for Government procurement and are codified at Title 48 of the Code of Federal Regulations.  48 C.F.R. § 1.  FAR § 52.203-13, also known as the "Contractor Code of Business Ethics and Conduct," requires a contractor to, among other things, "[e]xercise due diligence to prevent and detect criminal conduct."  48 C.F.R. § 52.203-13(b)(2).  A contractor must also timely disclose to the Government "whenever, in connection with the award, performance, or closeout of [the relevant] contract," the contractor has "credible evidence that a principal, employee, agent, or subcontractor of the Contractor has committed . . . [a] violation of Federal criminal law involving fraud,

conflict of interest, bribery, or gratuity violations found in Title 18 of the United States Code." *Id.* § 52.203-13(b)(3)(i).   FAR § 52.203-13 is referentially incorporated into all Government contracts exceeding a certain monetary threshold and featuring a performance period of 120 days or more. *See* 48 C.F.R. §§ 3.1004, 570.701(i).

## B.

This action concerns five FMS contracts and contract modifications that the Army awarded to MD Helicopters between 2011 and 2012.  Doc. 57.  Under these agreements, MD Helicopters provided (1) six primary trainer helicopters to the Afghanistan Air Force, (2) logistical support to the Afghanistan Air Force, (3) three helicopters to the El Salvador Air Force, (4) two helicopters to the Government of Costa Rica, and (5) twelve helicopters to the Saudi Arabia National Guard. *Id.*  It is undisputed that each of these contracts incorporated FAR § 52.203-13.

## 1.

In November 2010, the Army issued a request for proposals to obtain, among other things, six new primary trainer helicopters for the Afghanistan Air Force.  Doc. 172-1 at ¶ 3.  MD Helicopters competed with three other companies for the contract, with MD Helicopters submitting the lowest bid.  Doc. 177-9 at 81–89.  While the Army was finalizing its selection for this contract, Col. Vergez met Tilton for the first time at an industry conference in early March 2011.  Doc. 177-2 at 73.  Col.

Vergez, who was then Program Manager at NSRWA, informed Tilton in a private meeting that MD Helicopters would receive the Afghanistan contract.  *Id.* at 77.  On March 10, 2011, the Army officially awarded the contract to MD Helicopters.  Doc. 172-1 at ¶ 4.  Under the agreement, MD Helicopters provided the Afghanistan Air Force with six MD 530F helicopters with an option to purchase up to an additional forty-eight helicopters.  *Id.*  The price for each of the original six helicopters was $2,738,448.  Doc. 172-1 at ¶ 5.  The optional aircraft were priced higher.  *Id.*  On September 1, 2011, the Army modified the contract to include contractor logistical support ("CLS") for the Afghanistan Air Force's fleet of MD 530F helicopters.  Doc. 172-1 at ¶ 7.

Col. Vergez, as NSRWA's Program Manager, continued developing a relationship with MD Helicopters' leadership following the award of the Afghanistan primary trainer contract and CLS modification.  Building relationships with industry through regular interactions with contractors is "[o]ne of the primary responsibilities of a program manager."  Doc. 172-14 at ¶ 6.  To build a relationship with MD Helicopters, Col. Vergez met Tilton and other company affiliates at various industry and social events, including a private dinner at Col. Vergez's home and over drinks.  *See, e.g.*, docs. 177-2 at 99–104, 123; 191-36 at 2.

**2.**

In March 2010, the El Salvador Air Force, using the FMS program, sought to purchase three MD 500E helicopters from MD Helicopters to supplement its existing fleet of MD aircraft. Docs. 177-3 at 190; 177-1 at 316. And in September 2011, the Army solicited from MD Helicopters a proposal for two standard MD 500E helicopters, one command MD 500E helicopter, and supporting materials and services. Docs. 177-6 at 182–184; 177-1 at 320. MD Helicopters proposed to price the aircrafts without any options at $1.8 million each. Doc. 177-1 at 327–328. After further negotiations and after MD Helicopters provided additional information to the Army, the El Salvador contract was "on the verge of completion" by late 2011. Doc. 191-47 at 4. In December 2011, Tilton reviewed the proposed contract and requested revised payment terms to account for certain delays and upfront costs MD Helicopters had incurred. *Id.* at 2–4. Tilton worked with Col. Vergez to secure this revision. *See id.*; *see also* docs. 191-46 at 2; 177-2 at 149–151. On December 9, 2011, MD Helicopters and the Army executed the El Salvador contract with Tilton's proposed changes. Docs. 177-6 at 208; 177-2 at 151; 191-47 at 2.

**3.**

Meanwhile, in November 2011, the Saudi Arabia National Guard entered an agreement with the Government to purchase twelve MD 530F helicopters. Doc. 177-20 at 2. King Abdullah of the Kingdom of Saudi Arabia had previously

submitted a request to purchase those aircraft in April 2010. *Id.* In March 2012, the Army approved a noncompetitive procurement of the aircraft, intending to award the contract to MD Helicopters as the sole provider of the MD 530F helicopter. Doc. 177-21 at ¶ 6. MD Helicopters submitted a final proposal for the procurement on May 30, 2012, listing the price for twelve "MDHI 530F Basic Aircraft" as $27,600,000. Doc. 177-24 at 44.

To meet the Army's deadlines, MD Helicopters started producing the aircraft before the Army finalized the contract. Doc. 172-23 at ¶ 4. For that reason, MD Helicopters sought to include milestone payments in the contract. *Id.* In late May 2012, Tilton told others at MD Helicopters that she "made it clear" to Col. Vergez that the company "need[ed] a large payment in June." Doc. 191-81 at 2. A few weeks later, Col. Vergez sent Tilton an email explaining that he would "push hard" to get the milestone payments "locked in" by late June. Doc. 191-85 at 2. On June 15, 2012, the Army drafted a version of the contract that provided for milestone payments. Doc. 177-6 at 122–124. Later, Army lawyers expressed concerns about the contract's payment schedule. Doc. 177-10 at 130–132. Around this time, Tilton complained to Col. Vergez about the delay, and Col. Vergez replied that he was "personally working this [with] the lawyer" and that he was "[t]rying to get it kicked out." Doc. 191-87 at 2. MD Helicopters ultimately agreed to address milestone payments as a modification instead of an original contract term. Doc. 177-10 at 132.

The Army and MD Helicopters executed the Saudi Arabia contract on June 29, 2012. Docs. 177-6 at 124–125; 172-1 at ¶ 8. Under the contract, MD Helicopters agreed to provide the MD 530F helicopters for $2,300,000 each. Doc. 172-1 at ¶ 9. On July 3, 2012, the Army modified the contract to address the milestone payments. Doc. 177-6 at 149. Under the modified contract, MD Helicopters would receive three milestone payments: (1) an initial payment of just over $8,000,000, representing the costs MD Helicopters had already incurred, docs. 177-6 at 131–133; 177-31 at 149–150; (2) a $22,600,000 payment after the Federal Aviation Administration certified all twelve aircraft as airworthy, doc. 177-6 at 132, 137; and (3) a $3,400,000 payment upon final acceptance, *id.* at 132. After the execution of this modification, the Army proposed a second modification to accommodate the Saudi Arabia National Guard's request for accelerated delivery. *Id.* at 157–158. Unlike the first modification, the second made MD Helicopters eligible to receive milestone payments whenever the FAA certified an individual helicopter as airworthy, as opposed to waiting for certification of all twelve aircraft. *Id.* at 158–159.

### 4.

While negotiations for the Saudi Arabia contract were ongoing, MD Helicopters was also following business leads in Costa Rica. *See* doc. 177-1 at 299–300. Earlier, in December 2011, the Army issued to MD Helicopters a request for

information related to a potential Costa Rican procurement. *Id.* at 293. The FMS contract that followed was thus source-directed to MD Helicopters because the Costa Rican government specifically wanted to purchase two MD 600N helicopters. *See* docs. 177-6 at 212–213; 177-1 at 303. Costa Rica already had one MD 500 helicopter in its inventory. Doc. 177-1 at 303. In October 2012, MD Helicopters proposed to provide two MD 600N helicopters to Costa Rica for $2,350,000 each. *Id.* at 306–307.

Col. Vergez greased the wheels of the contracting process for this procurement. During the summer and fall of 2012, Col. Vergez kept Tilton updated on his efforts to speed things along. *See, e.g.*, docs. 177-38; 177-39. In July 2012, Tilton reported to her colleagues that Col. Vergez had spoken directly with a Costa Rican official and that she was therefore "hopeful that now all obstacles, bottlenecks and disinformation will be removed." Doc. 191-105 at 2. Evidence indicates that Col. Vergez made that call from MD Helicopters' facility in Arizona and that Tilton and other representatives from MD Helicopters secretly listened in on the conversation. Doc. 177-36 at 165–166. Afterwards, Col. Vergez called one of his subordinates and again secretly included Tilton and other representatives from MD Helicopters. Doc. 177-3 at 66–69. Around the same time, Col. Vergez installed another Army official, Jim Wilson, as Program Manager for the Costa Rica contract, presumably because he planned to retire soon. *See* doc. 172-45 at 2-3. The Army

ultimately awarded the Costa Rica contract to MD Helicopters in December 2012, doc. 177-1 at 315, a month after Col. Vergez retired, doc. 177-11 at 318.

## C.

Sometime in 2012, Col. Vergez decided to retire from the Army and seek industry employment rather than deploy overseas again.  *See* doc. 177-11 at 253–256.  In February 2012, Col. Vergez's commanding officer informed Tilton about Col. Vergez's plan to retire and suggested that Tilton hire him.  Docs. 172-14 at ¶¶ 12, 14; 177-2 at 179–180.  Tilton responded that Col. Vergez should reach out to Patriarch Partners' Managing Director, Randy Jones.  Doc. 177-2 at 180.  Tilton had previously remarked to Swisher that Col. Vergez would make a good Director of Military Programs at MD Helicopters.  Doc. 177-1 at 192–193.  And, as early as August 2011, Tilton told her pilot that she hoped to hire Col. Vergez after he retired.  Doc. 191-32 at 37.

In February 2012, Col. Vergez met Jones at a conference and told Jones that he planned to retire and explore private sector employment soon.  Doc. 172-4 at ¶ 4.  The next month, Col. Vergez and Jones spoke about the steps Col. Vergez would need to take to apply for a position with MD Helicopters.  *Id.* at ¶ 7.  In April 2012, Col. Vergez received a disqualification statement from the Army ethics office, which cleared him to receive employment offers from certain private companies including MD Helicopters and Patriarch Partners.  *See* docs. 177-42; 177-43.  In light of the

11

clearance, Jones and Tilton agreed to offer Col. Vergez a job at MD Helicopters, doc. 172-4 at ¶ 9, and Jones transmitted an offer letter on April 14, 2012, docs. 177-44; 172-4 at ¶ 12.  That offer included a $50,000 relocation allowance, in addition to other terms.  *Id.* at ¶ 10.  In response, Col. Vergez proposed to swap the relocation allowance for a $30,000 signing bonus, which Tilton eventually approved with the understanding that Col. Vergez would apply the money toward the down payment on a house near MD Helicopter's facility in Mesa, Arizona.  *Id.* at ¶¶ 14, 21.

Five weeks after the offer, Col. Vergez received a letter from the Army ethics office that further explained his post-employment restrictions.  Doc. 177-45.  After receiving the letter, Col. Vergez informed Jones that he could not work for MD Helicopters for one year after leaving the Army.  Doc. 172-4 at ¶ 15.  Nor could Col. Vergez appear before the Army on MD Helicopters' behalf.  *Id.*  Col. Vergez explained that he could, however, work for an affiliate of MD Helicopters and provide supporting services to MD Helicopters.  *Id.*  Jones attested that, considering these restrictions, Col. Vergez's offer from MD Helicopters "was no longer possible" and that, as of May 22, 2012, Col. Vergez no longer had "an active employment offer."  *Id.*  Tilton and Col. Vergez similarly testified that the Army's letter rendered defunct the offer from MD Helicopters.  Docs. 177-2 at 248–249; 177-11 at 323–324.

Eventually, after receiving further confirmation from the Army that Col. Vergez could work for an affiliate of MD Helicopters, Tilton approved a position for him with PPMG. Doc. 172-4 at ¶¶ 17–19. Jones sent Col. Vergez a new offer letter in September 2012, *id.* at ¶ 21, which he signed and returned three days later, doc. 191-112 at 2–3. But because this offer letter incorrectly identified Patriarch Partners as Col. Vergez's employer, Jones sent Col. Vergez a third offer letter on December 3, 2012 from PPMG. Doc. 172-4 at ¶ 24. Col. Vergez retired from the Army in November 2012. Doc. 177-11 at 318. He began working for PPMG in February 2013, doc. 177-71 at 2, and he moved over to MD Helicopters in November 2013, doc. 177-72 at 2, after receiving approval from the Army, docs. 177-73; 177-11 at 351–354.

### D.

The relators filed this *qui tam* action under seal on May 3, 2013. Doc. 1. In November 2014, the Government declined to intervene, doc. 17, and this court ordered that the complaint be unsealed and served on the defendants, doc. 18. The relators later filed an amended complaint, doc. 57, which the defendants jointly moved to dismiss, doc. 61. The court granted the motion in March 2016. Doc. 78. Two years later, the Eleventh Circuit vacated the dismissal and remanded for further proceedings in light of an intervening Supreme Court decision that clarified the law governing part of the relators' FCA claim. Doc. 85. On remand, the defendants

separately moved to dismiss, docs. 106 & 107, and the court partially granted their motions, doc. 120. Thereafter, following the completion of discovery, the defendants filed this motion for summary judgment. Doc. 171.

## II.

The relators assert claims under the FCA, which makes civilly liable to the Government anyone who either "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval" or "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim." 31 U.S.C. § 3729(a)(1)(A)–(B). Those who conspire to violate the FCA are also civilly liable. *Id.* § 3729(a)(1)(C).

The relators plead five main counts under the FCA—one count for each of the five contracts at issue: Afghanistan primary trainer (Count I); Afghanistan CLS modification (Count II); El Salvador (Count III); Saudi Arabia (Count IV); and Costa Rica (Count V). The FCA claims are based on a fraudulent inducement theory, also known as "promissory fraud" or "fraud-in-the-inducement." *E.g.*, *U.S. ex rel. Hendow v. Univ. of Phoenix*, 461 F.3d 1166, 1173 (9th Cir. 2006). In particular, the relators allege that the defendants falsely represented that they intended to comply with FAR § 52.203-13, which the court addresses in subsection A(1), and that the defendants induced the Government into paying inflated prices, which is addressed in A(2).

14

## A.

"Although the text of the FCA prohibits only false or fraudulent claims, the [Supreme] Court has placed a common law gloss on the statute, interpreting it to also prohibit fraudulent inducement." *U.S. ex rel. Cimino v. Int'l Bus. Machines Corp.*, 3 F.4th 412, 417 (D.C. Cir. 2021).  Thus, an FCA violation "occurs when a person fraudulently induces the government to enter a contract and later submits claims for payment under that contract." *Id.*  In other words, when "a contractor's ultimate claims for payment" are grounded in fraud, then all "subsequent claims are false 'because of an *original fraud* (whether a certification or otherwise).'" *U.S. ex rel. Marsteller v. Tilton*, 880 F.3d 1302, 1314 (11th Cir. 2018) (quoting *Hendow*, 461 F.3d at 1173 (emphasis in original)).  "[T]he Eleventh Circuit recognizes a fraud in the inducement theory of liability under the FCA." *U.S. ex rel. Lorona v. Infilaw Corp.*, No. 3:15-CV-959-J-34PDB, 2019 WL 3778389, at *17 (M.D. Fla. Aug. 12, 2019) (citing *Marsteller*, 880 F.3d at 1314–15).

For an FCA claim based on fraudulent inducement to prevail, the relators must show "(1) a false statement or fraudulent course of conduct, (2) made with scienter, (3) that was material, causing (4) the government to pay out money or forfeit moneys due." *Hendow*, 461 F.3d at 1174.[3]  As these elements imply, and as the D.C. Circuit

---

[3] Apart from the Eleventh Circuit's opinion remanding this case for further consideration, the parties do not cite, and the court is not aware of, any Eleventh Circuit cases addressing fraudulent inducement under the FCA.  *See U.S. ex rel. Reeves v. Mercer Transportation Co., Inc.*, 253 F.

recently stated, "causation is a necessary element of fraudulent inducement." *Cimino*, 3 F.4th at 418-19.   Accordingly, the relators must "show that a false statement, omission, or misrepresentation 'caused' or 'induced' the government to enter into a contract, such that but for the misrepresentations, the government would not have awarded the contract and would not have paid the claim." *U.S. ex rel. Reeves v. Mercer Transportation Co., Inc.*, 253 F. Supp. 3d 1242, 1252 (M.D. Ga. 2017) (quoting *U.S. ex rel. Thomas v. Siemens AG*, 991 F. Supp. 2d 540, 569 (E.D. Pa. 2014) (internal quotation marks omitted)).

"[A] palpably false statement, known to be a lie when it is made, is required for a party to be found liable under the False Claims Act." *Hendow*, 461 F.3d at 1172.   The scienter requirement is "nuanced," requiring the relator to show that the defendant acted "knowingly." *Urquilla-Diaz v. Kaplan Univ.*, 780 F.3d 1039, 1058 (11th Cir. 2015) (quoting *United States v. King–Vassel*, 728 F.3d 707, 712 (7th Cir. 2013)).   The FCA defines "knowing" and "knowingly" to include "actual knowledge," "deliberate ignorance," or "reckless disregard of the truth or falsity of the information." 31 U.S.C. § 3729(b)(1).   "[P]roof of specific intent to defraud" is unnecessary. *Id.* § 3729(b)(1)(B).   Yet the FCA's "language makes plain that

_____

Supp. 3d 1242, 1252 (M.D. Ga. 2017) (observing that "[t]he Eleventh Circuit has not addressed the fraudulent inducement theory of liability" under the FCA).   The Circuit has, however, applied the four elements from *Hendow*, quoted above, while addressing the false certification theory of FCA liability. *Urquilla-Diaz v. Kaplan Univ.*, 780 F.3d 1039, 1052 (11th Cir. 2015). *Hendow*, in turn, observed that "under either the false certification theory or the promissory fraud theory, the essential elements of False Claims Act liability remain the same." 461 F.3d at 1174.

liability does not attach to innocent mistakes or simple negligence." *Urquilla-Diaz*, 780 F.3d at 1058 (quoting *King–Vassel*, 728 F.3d at 712). The requirement of scienter is thus "rigorous." *Escobar*, 136 S. Ct. at 2002.

In addition to falsity and scienter, "[f]raudulent inducement requires materiality and causation, separate elements that [the court] cannot conflate." *Cimino*, 3 F.4th at 419. Materiality, as used in the FCA, "means having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." 31 U.S.C. § 3729(b)(4). As the Supreme Court explained recently in *Escobar*, "[t]he materiality standard is demanding" and "rigorous." 136 S. Ct. at 2002–03. The inquiry focuses on "the effect on the likely or actual behavior of the recipient of the alleged misrepresentation." *Id.* at 2002 (quotation omitted). Thus, the Government's "designation of a statutory, regulatory, or contractual provision as a condition of payment is 'relevant, but not automatically dispositive.'" *Marsteller*, 880 F.3d at 1312 (quoting *Escobar*, 136 S. Ct. at 2003).

Causation, in contrast, refers to "whether fraud in fact caused the government to enter into a contract." *Cimino*, 3 F.4th at 419. In other words, "the defendant's conduct must cause the government to make a payment or to forfeit money owed." *D'Agostino v. ev3, Inc.*, 845 F.3d 1, 8 (1st Cir. 2016).[4] Thus, although "both

---

[4] *See also Marsteller*, 880 F.3d at 1314–15 (observing that "the relators' complaint could support multiple theories of fraud in the inducement" where "[t]he Government would not have entered into [certain contracts] had it known of the defendants' unwillingness to comply with [applicable]

materiality and causation require considering the effect of a defendant's fraud on the government's decision to enter a contract," the two differ in that "a statement could be material—that is, capable of influencing the government's decision to enter a contract—without causing the government to do so." *Cimino*, 3 F.4th at 419.

Lastly, the relators must show that the defendants submitted a claim to the Government. *Id*. at 417. As to this requirement, to the extent it differs from the causation or inducement element, "[a]ll that matters is whether the false statement or course of conduct causes the government to 'pay out money or to forfeit moneys due.'" *Hendow*, 461 F.3d at 1177 (quoting *Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 788 (4th Cir. 1999)).

The relators allege that the defendants (1) fraudulently induced the Government into contracting by falsely representing that they intended to comply with FAR § 52.203-13 and (2) fraudulently induced the Government into paying inflated prices by providing the Government with incomplete pricing information.[5]

---

rules" and where the defendants' alleged submission of "incomplete data induced the Government to enter contracts on terms more favorable to MD than it would have had the pricing data been complete").

[5] The defendants argue throughout their main brief that they could not have fraudulently induced any contracts based on Col. Vergez's conduct because Col. Vergez "lacked the authority to award contracts in his position as Program Manager for NSRWA." Doc. 178 at 8. The relators contend that this argument "attack[s] a strawman" because the court did not recognize that theory. Doc. 191-1 at 6. The court agrees. The amended complaint did not survive dismissal on a fraudulent inducement theory as the defendants have framed it. Rather, the court permitted the amended complaint to proceed based on plausible allegations that MD Helicopters (1) "knowingly made a false statement or engaged in a fraudulent course of conduct that induced the government to agree to pay more than it otherwise would have with respect to the contracts at issue" and (2) "intended

The court will consider, in turn, whether any genuine issues of material fact remain as to these allegations.

**1.**

The court begins with the relators' allegation that the defendants fraudulently induced FMS contracts by falsely representing that they intended to comply with FAR § 52.203-13. As the Eleventh Circuit observed at the motion to dismiss stage, the allegations in the amended complaint "support[ed] the view that" the defendants' "prospective promise[s] to comply with" FAR § 52.203-13 "were false when made" and that the Government would not have contracted with the defendants had it known of their alleged "unwillingness to comply with these rules." *Marsteller*, 880 F.3d at 1314–15. At this juncture, the relators identify evidence purportedly establishing that the defendants, through their relationship with Col. Vergez, willfully ignored FAR § 52.203-13, such that all of the contracts at issue were fraudulently induced. *See* doc. 191-1 at 56–57.

**a.**

The relators argue, and offer evidence establishing, that the Army finds FAR § 52.203-13 material. Doc. 191-1 at 53. One Army contracting officer testified that the Army automatically incorporates FAR § 52.203-13 into appropriate contracts,

---

not to comply with [FAR] § 52.203-13 when it entered into the contracts at issue." Doc. 120 at 26–27.

that the provision is not waivable, and that refusal to comply with the provision "could be [a] basis for not awarding a contract."  Doc. 177-6 at 263–265.  That official's executive supervisor likewise testified that she had never seen FAR § 52.203-13 waived and that, in her experience, the provision was "not something we would waive" because it "is established in law."  Doc. 177-9 at 182–184.  She also testified that, in her opinion, the Army would not waive FAR § 52.203-13 because "it is critically important that contractors act ethically and that their conduct is above reproach and that we can trust contractors and industry."  *Id.* at 183.  Moreover, the defendants do not explicitly argue that this provision is immaterial.  *See generally* docs. 178 & 190.[6]  The court thus concludes that noncompliance with FAR § 52.203-13 is material because "the Government would have attached importance to the violation in determining whether to pay the claim" and because noncompliance is neither "minor or insubstantial" nor "amounts to [a] 'garden-

---

[6] Although the defendants subsequently raised the issue of materiality in their reply, doc. 197 at 27–28, the argument is untimely.  "An argument not made is waived."  *Cont'l Tech. Servs., Inc. v. Rockwell Int'l Corp.*, 927 F.2d 1198, 1199 (11th Cir. 1991).  Moreover, even if the defendants had timely raised the argument, an issue of fact would remain as to materiality.  To be sure, the record contains evidence showing that the defendants' "relationship with the Government has not been affected by the Complaint filed by Relators Marsteller and Swisher."  Doc. 172-1 at ¶ 43.  And "if the Government regularly pays a particular type of claim in full despite actual knowledge that certain requirements were violated, and has signaled no change in position, that is strong evidence that the requirements are not material."  *Escobar*, 136 S. Ct. at 2003–04.  But as the relators observe, the probative value of this evidence is diminished because the final payments on most of the contracts at issue here were paid either before or soon after the relators filed suit.  *See* doc. 191-1 at 48–49.  Moreover, "the Government's decision to expressly identify a provision as a condition of payment is relevant" as well.  *Escobar,* 136 S. Ct. at 2003.  The relators' evidence establishing that the Army considers compliance with FAR § 52.203-13 legally mandatory and "critically important" therefore at least raises an issue of fact about materiality.

variety breach[] of contract or regulatory violations.'" *Marsteller*, 880 F.3d at 1313 (citing *Escobar*, 136 S. Ct. at 2002-03).[7]  Nor is there any dispute that the Army paid claims under the defendants' FMS contracts, which all incorporated FAR § 52.203-13.  *See* doc. 191-1 at 48-49.

It follows that the relators FAR-based fraudulent inducement theory turns on whether, despite their prospective promises to comply with FAR § 52.203-13, the defendants promptly failed to disclose credible evidence of an enumerated criminal violation, thereby demonstrating falsity, and whether, as to scienter, the defendants' "prospective promise to comply with" that provision was "false when made." *Marsteller*, 880 F.3d at 1314.  Stated differently, the court must determine whether the defendants engaged in "a false or fraudulent course of conduct, made with scienter." *Hendow*, 461 F.3d at 1174.

Focusing on the Saudi Arabia contract and the defendants' relationship with Col. Vergez, the defendants argue that FAR § 52.203-13 does not impose a reporting obligation regarding Col. Vergez's conduct and that MD Helicopters' failure to disclose that conduct does not amount to an "objective falsity," which they contend the FCA requires.  Doc. 178 at 52.  To support their position, the defendants emphasize that FAR § 52.203-13's reporting obligation applies only to the conduct

---

[7] *See also Marsteller*, 880 F.3d at 1314–15 (noting at the motion to dismiss stage that "[t]he Government would not have entered into those [contracts] had it known of the defendants' unwillingness to comply with" FAR § 52.203-13).

of a "principal, employee, agent, or subcontractor of the Contractor . . . in connection with the award, performance, or closeout" of a specific contract. *Id.* (quotation omitted). Because Col. Vergez worked for the Army and his conduct regarding the Saudi Arabia contract concerned a contract modification (as opposed to the award, performance, or closeout of a contract), the defendants argue FAR § 52.203-13 does not apply. *Id.* at 52–53. Second, the defendants contend that "subjective determinations" about whether conduct triggers a reporting obligation cannot give rise to an FCA claim. *Id.* at 53.

In response, the relators cite evidence purportedly showing that the defendants "provided illegal bribes and gratuities" to Col. Vergez both before and after the execution of the El Salvador, Saudi Arabia, and Costa Rica contracts. Doc. 191-1 at 56. They contend further that, given this alleged pattern of noncompliance, the court should conclude that the defendants also falsely promised to comply with FAR § 52.203-13 under the Afghanistan primary trainer contract and CLS modification. *Id.* at 57. Although the relators essentially concede that no reporting obligation existed under FAR § 52.203-13 for Col. Vergez's conduct, they argue that the defendants "themselves committed substantive conflict of interest crimes" that required reporting. *Id.* The defendants purportedly violated 18 U.S.C. § 2, which renders "punishable as a principal" anyone who either "aids, abets, counsels, commands, induces or procures" the commission of "an offense against the United

States" or "willfully causes an act to be done which if directly performed by him or another would be an offense against the United States."  Allegedly, the defendants aided and abetted Col. Vergez's criminal violation of 18 U.S.C. § 208, which bars Government employees from participating in Government contracts in which they have a financial conflict of interest.  Doc. 191-1 at 57–58.[8]

### b.

As an initial matter, the court notes that mere nonperformance of a promise is generally not enough to establish an "inference of fraudulent intent not to perform." *U.S. ex rel. Bettis v. Odebrecht Contractors of Cal., Inc.*, 393 F.3d 1321, 1329–30 (D.C. Cir. 2005) (quoting *U.S. ex rel. Willard v. Humana Health Plan of Texas Inc.*, 336 F.3d 375, 386 (5th Cir. 2003)).  But if "substantial nonperformance is coupled with other probative factors, such as 'where only a short time elapses between the making of the promise and the refusal to perform it, and there is no change in the circumstances,' an intent not to perform when the promise was made may, in appropriate circumstances, be properly inferred."  *Willard*, 336 F.3d at 386 (quoting *United States v. Shah*, 44 F.3d 285, 293 n.14 (5th Cir. 1995)).  "Therefore, the requisite intent must be coupled with prompt, substantial nonperformance to demonstrate fraud in the inducement."  *Id.*

---

[8] Col. Vergez pleaded guilty to violating 18 U.S.C. § 208 in April 2015.  Doc. 191-126 at 2.

The relators have proffered evidence showing that MD Helicopters failed to disclose credible evidence of enumerated criminal violations—namely, alleged bribes and gratuities that Tilton offered Col. Vergez—thereby demonstrating prompt nonperformance and an intent not to perform at the time of contracting. Within weeks of the Army awarding MD Helicopters the El Salvador contract, Tilton offered Col. Vergez tickets to a prestigious awards ceremony. Doc. 177-2 at 163–167. Col. Vergez considered the invitation inappropriate, and he declined because it was not "acceptable for him to accept that invitation given his position." *Id.* at 166–167. Around a month later, MD Helicopters hired, based on Col. Vergez's recommendation to Tilton, a military contractor named Ben Weiser. *Id.* at 175–176, 178; doc. 177-11 at 71–72. Soon after, MD Helicopters began recruiting and ultimately hired Col. Vergez' friend, Andy Pillado, whom Col. Vergez also recommended to Tilton, docs. 177-11 at 72–73; 191-73 at 2; 191-75 at 2; 191-121 at 2, and Tilton admitted that she hired Pillado as a "favor" to Col. Vergez, docs. 191-31 at 2; 191-32 at 54–55.

After these and other favors, Col. Vergez helped MD Helicopters secure favorable terms for the Saudi Arabia and Costa Rica contracts in 2012. Meanwhile, evidence shows that Tilton's pilot believed that Tilton started taking steps to hire Col. Vergez as early as October 2011 and that by November 2011 there was an "offer

on the table." Doc. 191-32 at 41–44, 49–50.[9]  Tilton subsequently hired Col. Vergez to work for one of MD Helicopters' affiliates, PPMG, and later for MD Helicopters itself.  Col. Vergez later pleaded guilty to a criminal conflict of interest violation for conduct "relate[d] to his involvement in negotiating favorable payment terms for MD in the Saudi Arabian National Guard contract after he had accepted an offer with" PPMG.  *Marsteller*, 880 F.3d at 1306 n.12.

Of course, the court does not opine on whether this evidence would suffice to sustain criminal convictions for bribery or gratuity violations against Tilton or anyone else at MD Helicopters.  Indeed, although a Government investigator concluded that "probable cause existed to believe Lynn Tilton committed the listed offense of" bribery under 18 U.S.C. § 201, doc. 191-138 at 5, the Government has not charged the defendants with any criminal violations related to their relationship with Col. Vergez.  *See* doc. 178 at 39–41.  But this evidence at least raises a factual dispute as to whether, "in connection with the award, performance, or closeout of [a

---

[9] The defendants note that Tilton's pilot testified that his belief that Tilton was taking steps to hire Col. Vergez in October 2011 was based only on his "speculation."  Doc. 190 at 13 (quoting doc. 191-32 at 160–161).  Citing this court's opinion in *U.S. ex rel. Hutchins v. Safety-kleen Systems, Inc.*, No. 2:10-CV-01525-AKK, 2014 WL 12594169, at *9 n.13 (N.D. Ala. Dec. 17, 2014), the defendants contend that "[s]peculation does not create a genuine issue of fact."  Doc. 190 at 14.  That case is inapposite, however, because the speculation at issue there involved statements by counsel in an opposition brief, not evidence in the form of deposition testimony.  *Hutchins*, 2014 WL 12594169, at *9 n.13.  In any event, this is just one piece of the evidence.  The defendants do not dispute the pilot's contention that Tilton informed him as early as August 2011 that she hoped to hire Col. Vergez, doc. 191-32 at 37, or the pilot's contention that there was at least an informal offer on the table, *id.* at 49-50, regardless of when Col. Vergez entered formal employment discussions with the defendants.

relevant] contract," MD Helicopters had "credible evidence that a principal, employee, agent, or subcontractor of the Contractor has committed . . . [a] violation of Federal criminal law involving . . . bribery or gratuity violations."  48 C.F.R. § 52.203-13(b)(3)(i).[10]  That is particularly so when the defendants' only rebuttal evidence shows that MD Helicopters "prominently displayed posters encouraging employees to report [legal and ethical] concerns" and trained its employees on a business ethics policy and manual.  Doc. 178 at 53.

## i.

The defendants, however, contend that they cannot be subject to FCA liability unless MD Helicopters' failure to report allegedly criminal conduct amounted to "objective falsity."  Doc. 178 at 52–53.  This argument centers on the Eleventh

---

[10] The defendants argue that MD Helicopters had no duty to report any alleged criminal activity because such conduct was not done "in connection with the award performance or closeout of [a] contract," as FAR § 52.203-13(b)(3)(i) requires.  Doc. 190 at 15.  They say that any criminal conduct was not "in connection with" a contract unless it "actually impacted a contract award." *Id.*  Apparently, "[t]hat is what the word 'connection' means." *Id.*  But although the defendants cite a dictionary defining "connection" to mean "a causal or logical relation or sequence," doc. 190 at 15, the same dictionary also defines "connection" to mean a "relationship in fact," such as someone who is "wanted in *connection* with a robbery."  Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/connection (last visited Aug. 20, 2021) (emphasis in original).  Moreover, the Eleventh Circuit recently recognized, albeit in a different context, that "[d]ictionaries have adopted broad definitions of both" "the phrase 'in connection with' and its cognate word, 'connection.'"  *Hunstein v. Preferred Collection & Mgmt. Servs., Inc.*, 994 F.3d 1341, 1349 (11th Cir. 2021) ("Webster's Third defines 'connection' to mean 'relationship or association.' [A]nd the Oxford Dictionary of English defines the key phrase 'in connection with' to mean 'with reference to [or] concerning[.]'") (citations omitted).  In still other contexts, the Circuit has similarly "give[n] the phrase 'in connection with' its ordinary meaning and give[n] it an expansive interpretation."  *United States v. Smith*, 362 F. App'x 980, 983 (11th Cir. 2010) (citing *United States v. Rhind*, 289 F.3d 690, 695 (11th Cir. 2002)).  Accordingly, it is enough for the relators to show that the alleged criminal activity "concerned," was "with reference to," and bore a "relationship [or] association" to the contracts at issue.  *See Hunstein*, 994 F.3d at 1349.

Circuit's opinion in *United States v. AseraCare, Inc.*, which "consider[ed] the circumstances under which a claim for hospice treatment under Medicare may be deemed 'false' for purposes of the federal False Claims Act." 938 F.3d 1278, 1281 (11th Cir. 2019). *AseraCare* held that when a hospice provider certifies in a claim that a patient is terminally ill based on a physician's clinical judgment, "the claim cannot be 'false'—and thus cannot trigger FCA liability—if the underlying clinical judgment does not reflect an objective falsehood." *Id.* at 1296–97. Instead, "in order to show objective falsity as to a claim for hospice benefits, the Government must show something more than the mere difference of reasonable opinion concerning the prognosis of a patient's likely longevity." *Id.* at 1297.

Even assuming *AseraCare*'s "objective falsity" test applies beyond its factual and procedural context,[11] it is distinguishable from the present matter. Unlike *AseraCare*, evidence does not establish that this case involves a "mere difference of reasonable opinion concerning" whether the defendants had a reporting obligation.

---

[11] As other courts within this Circuit have recognized, "*AseraCare*'s procedural posture was unique" in that, "[f]ollowing a partial trial on the merits, the district court granted summary judgment in favor of the defendant on the basis of falsity." *United States v. Cross Garden Care Ctr., LLC*, No. 8:16-CV-961-T-27AEP, 2019 WL 6493972, at *5 n.5 (M.D. Fla. Dec. 3, 2019); *see also AseraCare*, 938 F.3d at 1289–90; *State Farm Mut. Auto. Ins. Co. v. Lewin*, No. 8:20-CV-2428-VMC-TGW, 2021 WL 1541087, at *9 (M.D. Fla. Apr. 20, 2021) (citing *Aseracare*, 938 F.3d at 1281) ("[T]he Court begins by noting that *AseraCare* dealt with review of a determination of objective falsehood following a jury trial . . . ."). Moreover, "the language in *AseraCare* limited its application to the context of Medicare reimbursement for hospice services, which requires a provider's claim certifying that a patient is terminally ill 'based on the physician's or medical director's clinical judgment regarding the normal course of the individual's illness.'" *Cross Garden Care Ctr.*, 2019 WL 6493972, at *5 n.5 (quoting *AseraCare*, 938 F.3d at 1282).

*Id.*  Indeed, the defendants do not offer any evidence showing—or even argue—that their failure to report was reasonable.   Rather, they simply state that "many subjective judgments [] go into a reporting decision under FAR [§] 52.203-13," doc. 190 at 21, and that "subjective determinations are not proper bases on which to bring an FCA claim," doc. 178 at 53.

*AseraCare* does not render defendants immune from FCA liability whenever they must make subjective determinations.   Indeed, as the Ninth Circuit has observed, *AseraCare* did not answer "whether a medical opinion could ever be false or fraudulent, but whether a reasonable disagreement between physicians, *without more*, was sufficient to prove falsity at summary judgment."   *Winter ex rel. United States v. Gardens Reg'l Hosp. & Med. Ctr., Inc.*, 953 F.3d 1108, 1118-19 (9th Cir. 2020) (citing *Aseracare*, 938 F.3d at 1297-98) (emphasis in original).   Therefore, absent evidence showing that the defendants' so-called "many subjective judgments" were reasonable, the relators have raised an issue of fact regarding falsity as to the El Salvador, Saudi Arabia, and Costa Rica contracts.[12]   *Cf. U.S. ex*

---

[12] Allegedly, the defendants also failed to disclose their own crimes—i.e., their alleged aiding and abetting of Col. Vergez's criminal conflict of interest conviction.  Doc. 191-1 at 57–59.  FAR § 52.203-13(b)(3)(i) requires disclosure of credible evidence of a criminal violation "involving fraud, conflict of interest, bribery, or gratuity violations found in Title 18."  Even if that reporting obligation extends to aiding and abetting under 18 U.S.C. § 2, record evidence does not support the relators' theory.  For starters, although the relators identify alleged aiding and abetting related to the Afghanistan primary trainer and CLS contracts occurring between June and September 2011, that evidence is irrelevant.   Col. Vergez's conviction stemmed from conduct related to his involvement in the Saudi Arabia contract after he had accepted an offer with PPMG.  *Marsteller*, 880 F.3d at 1306 n.12.  Tilton did not initiate steps to hire Col. Vergez until October 2011, at the

*rel. Walker v. R&F Properties of Lake Cty., Inc.*, 433 F.3d 1349, 1358 (11th Cir. 2005) (holding that a relator in an FCA case presented enough evidence to "raise an issue of fact as to [] falsity" despite ambiguous regulatory language).

Similarly, although the presence of ambiguous regulatory language "may be relevant to the scienter analysis, it does not foreclose a finding of scienter. Instead, a court must determine whether the defendant actually knew or should have known that its conduct violated a regulation in light of any ambiguity at the time of the alleged violation." *U.S. ex rel. Phalp v. Lincare Holdings, Inc.*, 857 F.3d 1148, 1155 (11th Cir. 2017). Otherwise, "a defendant could avoid liability by relying on a 'reasonable' interpretation of an ambiguous regulation manufactured *post hoc*, despite having actual knowledge of a different authoritative interpretation." *Id.* Therefore, to the extent the defendants argue that their purportedly reasonable interpretation of what constituted "credible evidence" of an enumerated criminal violation under FAR § 52.203-13 protects them from FCA liability, the court

---

earliest. Docs. 191-31 at 2; 191-32 at 41–44. And she extended Col. Vergez an offer in April 2012, doc. 177-44, roughly a week after Col. Vergez recused himself from taking official actions on behalf of MD Helicopters, Patriarch Partners, and other potential employers, doc. 177-42. Thus, any alleged aiding and abetting must have occurred after April 2012. As to that time, the relators cite evidence that, despite Col. Vergez's recusal letter, Tilton repeatedly asked Col. Vergez for assistance with contracts. Doc. 191-1 at 58–59. But Tilton's requests would not have alone established credible evidence of a criminal violation. In any event, the court agrees with the defendants that they were entitled to rely on Col. Vergez to know the scope of his recusal. Doc. 178 at 54. The relators do not offer any evidence to show that this reliance was unreasonable. *See* doc. 191-1 at 59.

disagrees because scienter "can exist even if a defendant's interpretation is reasonable." *Id.*

**ii.**

The defendants are correct, however, that summary judgment is due on this claim as to the Afghanistan primary trainer contract and CLS modification. Notably, the relators do not argue that the defendants' alleged violation of bribery and gratuity laws extended to the Afghanistan contracts. *See* doc. 191-1 at 56–57. Nor do they point to any allegedly unlawful conduct related to these contracts that warranted disclosure. Instead, the relators contend that the defendants' alleged "continual, willful non-compliance with FAR § 52.203-13" constitutes "evidence that [the defendants] did not intend to comply with *any* of its FMS contracts, including the Afghanistan FMS Contract and modifications." *Id.* at 57 (emphasis in original).

But FAR § 52.203-13 requires disclosure only where a covered individual commits an enumerated criminal violation "in connection with the award, performance, or closeout of [the] contract" in which the provision is inserted. For that reason, the relators cannot point broadly to crimes allegedly committed in connection with other contracts to show that the Afghanistan contracts were also fraudulently induced. Moreover, even assuming the defendants intended not to comply with FAR § 52.203-13 when they entered the Afghanistan contracts, the relators' failure to proffer evidence showing a subsequent violation regarding those

30

contracts precludes liability. "It would be illogical to find fraud where a party secretly did not intend to perform the contract when it was signed, but in actuality did perform, as the civil law generally regulates actions, not thoughts alone." *Willard*, 336 F.3d at 386. Accordingly, as to the Afghanistan primary trainer contract and CLS modification, summary judgment is warranted on the relators' FAR-based theory of fraudulent inducement.

### c.

In sum, as to Counts III, IV, and V, genuine issues of material fact exist regarding whether, as to the El Salvador, Costa Rica, and Saudi Arabia contracts, the defendants' prospective promises to comply with the reporting obligation contained in FAR § 52.203-13 were false when made. Summary judgment based on this theory is therefore due to be denied as to those contracts, but granted as to the Afghanistan primary trainer contract and CLS modification in Counts I and II.

### 2.

The court next considers the relators' theory in Counts I, II, III, IV, and V that the defendants fraudulently induced the Army into paying inflated prices by providing it with incomplete pricing data.[13] In their amended complaint, the relators

---

[13] Although the defendants frame this issue as concerning only whether they provided false pricing data, the court noted at the motion to dismiss stage that the issue was whether the defendants misleadingly omitted relevant information, causing the Army to pay inflated prices for MD Helicopters' products and services. Doc. 120 at 25–26; *see also Marsteller*, 880 F.3d at 1315 ("The allegations also support the view that, on at least some occasions, MD provided incomplete

plead that the defendants omitted material facts from their pricing proposals to induce the Army into entering the Afghanistan primary trainer, El Salvador, Saudi Arabia, and Costa Rica contracts on terms unduly favorable to the defendants.[14] Allegedly, MD Helicopters quoted the Army a "base commercial price" for the Afghanistan primary trainer contract that was "hundreds of thousands of dollars" higher than it should have been.  Doc. 57 at ¶ 24.  Regarding the El Salvador contract, MD Helicopters allegedly responded to the Army's request for its commercial sales history by omitting some of its lower priced prior sales.  *Id.* at ¶ 33.  Similarly, the relators alleged that MD Helicopters "cherry-picked" prior sales to induce the Costa Rica contract's alleged inflated price.  *Id.* at ¶ 63.  And, as to the Saudi Arabia contract, MD Helicopters allegedly increased its already inflated Army bid by $122,000 after Tilton demanded that it charge "Army pricing[.]"  *Id.* at ¶ 50.  The court will consider each contract separately.

### a.

The defendants argue that the relators have failed to show a genuine issue of material fact as to whether the Afghanistan primary trainer contract was fraudulently induced.  They emphasize that MD Helicopters received this contract through a

---

pricing data to the Government. This incomplete data induced the Government to enter contracts on terms more favorable to MD than it would have had the pricing data been complete.").

[14] The relators did not plead a pricing-based fraudulent inducement theory in Count II—the Afghanistan CLS modification.  *See* doc. 57 at ¶¶ 29–31, 81–89.

competitive, lowest-price-technically-acceptable procurement; that MD Helicopters did not make any misrepresentations in its proposal; and that Col. Vergez could not have awarded this contract because he lacked authority to do so.  Doc. 178 at 43-44.

The relators do not offer much to defend this claim (or the other pricing-based claims, for that matter), opting instead to argue broadly that scienter, materiality, and reliance are jury questions.  *See* doc. 191-1 at 60, 63–65.  Indeed, the relators do not make any substantive arguments supporting their theory that the defendants submitted misleading pricing information to secure the Afghanistan primary trainer contract.  *See id.* at 60.  The relators do, however, note that "[t]he record evidence establishes multiple occasions in which Defendants recognized they were charging the U.S. Army a higher price than their commercial price."  Doc. 191-1 at 60. Pertinently, they cite evidence showing that soon after MD Helicopters secured the Afghanistan CLS modification, Tilton approved the commercial sale of an MD 530F helicopter for $500,000 less than the price MD Helicopters had charged the Army under the Afghanistan primary trainer contract.  Doc. 191-1 at 18–19 (citing doc. 191-33).  In her email approving the sale, Tilton also mentioned that MD Helicopters "need[ed] to re-evaluate the commercial price in light of the military pricing on a go forward basis."  Doc. 191-33 at 2.

Although the relators again make no substantive arguments concerning this evidence, they apparently contend that it demonstrates that the defendants

knowingly submitted inflated prices to the Army relative to their commercial pricing.  *See* doc. 191-1 at 60.  But the relators' pricing theory, according to their own brief, is premised on the defendants' alleged submission of incomplete pricing data to induce the acceptance of the Afghanistan primary trainer contract under inflated pricing.[15]  Evidence showing that the defendants subsequently approved a commercial sale at a lower price than what they charged the Army does not establish that they initially submitted incomplete or misleading pricing data to the Army.  Of course, this evidence may show that the defendants in fact overcharged the Army. But it does not demonstrate that the defendants are subject to FCA liability for the Afghanistan primary trainer contract absent evidence of an "original fraud that influenced the Government's decision to enter into a particular contract at a particular price."  *Marsteller*, 880 F.3d at 1314.

In their fact statement, the relators identify an email chain that, at first glance, arguably supports this claim.  *See* doc. 191-1 at 14–15.  In December 2010, MD Helicopters' Chief Financial Officer sent Tilton an email about their planned proposal for the Afghanistan primary trainer contract.  Doc. 191-22 at 2–3. Apparently, the defendants planned to present their financial information to the

---

[15] *See* doc. 191-1 at 7 (stating that the "proper analysis" in this case "centers upon . . . whether Defendants' conduct amounts to fraud, including misrepresentations by omission" and arguing that "Relators can prove that MDHI 'provided incomplete pricing data to the Government' that 'induced the Government to enter contracts on terms more favorable to [MDHI] than it would have had the pricing data been complete'") (quoting *Marsteller*, 880 F.3d at 1315).

Army so that MD Helicopters falsely appeared profitable and capable of complying with the Army's request for proposals. *See id.* The email explained that MD Helicopters' income statement, and the helicopter prices contained therein, could be manipulated to "show whatever picture we want to paint." *Id.* at 3. Tilton replied a few days later, stating that the "[p]ricing on aircraft looks way too low" because it "assume[s] no options." *Id.* at 2. She further specified that the listed price for MD Helicopters' 500 series helicopters was "way too low," explaining that "[w]e are charging $2.5 [million] to the army. This is a red flag." *Id.* at 2. Although the relators do not cite this evidence in their argument, the court considers it because the defendants address it in their reply. Doc. 190 at 18.

These internal emails do not establish that the defendants knowingly made a false statement that was material and caused the Government to pay a claim. *See Hendow*, 461 F.3d at 1174. For starters, to the extent that the emails can be understood to show that the defendants planned to submit inflated helicopter prices to the Army, it appears that such price inflation concerned only the MD 500E model. *See* doc. 191-22 at 2 ("On the 500s—you have the [price] way too low."). The Afghanistan primary trainer contract, however, was for the procurement of MD 530F model, doc. 177-1 at 134, which has a larger engine, longer rotor blades, and a larger generator than the MD 500E model, among other differences, *see* doc. 177-15 at 3. It follows that any price inflation related to the MD 500E model is immaterial to this

claim for inducement of a contract for the MD 530F model.  Moreover, even if Tilton's reference to the 500 series included both the MD 500E and the MD 530F models, Tilton explained in her email that the higher price accounted for assumed options.  Doc. 191-22 at 2.  For that reason, it does not appear that the higher price was false.  At any rate, the relators do not offer any evidence showing that the defendants ultimately submitted misleading pricing data to the Army while jockeying for the Afghanistan primary trainer contract or that the Army found such data material.

Finally, the court addresses the relators' argument that "materiality, scienter, and reliance are jury questions."  Doc. 191-1 at 63.  Even assuming the relators are correct, the court need not address those issues here because the relators failed to show that the defendants made a false statement to the Army before they secured the Afghanistan primary trainer contract.  Putting that aside, however, courts can indeed resolve issues such as materiality, scienter, and reliance at the summary judgment stage when, as here, the nonmovant fails to produce evidence raising a genuine issue of material fact as to them.  *See, e.g.*, *Phalp*, 857 F.3d at 1156 (affirming grant of summary judgment "because Relators did not provide sufficient evidence of scienter").  Indeed, the Supreme Court in *Escobar* explicitly rejected the "assertion that materiality is too fact intensive for courts to dismiss False Claims Act cases on a motion to dismiss or at summary judgment" and noted that "[t]he standard for

materiality . . . is a familiar and rigorous one."  136 S. Ct. at 2004 n.6.  Accordingly, because the relators failed to produce any evidence showing that MD Helicopters fraudulently induced the Afghanistan primary trainer contract, their claim fails.

### b.

Next, the court considers if any disputed facts remain as to whether the defendants' alleged pricing omissions induced the Army to pay an inflated price under the El Salvador contract.  The defendants argue that they could not have induced this contract because (1) the El Salvadorian government specifically requested to buy helicopters from them and (2) they did not make any false statements during contract negotiations.  Doc. 178 at 45–46.

Their first argument is unavailing.  True, El Salvador directed the purchase of MD 500E helicopters from the defendants because MD Helicopters was the only manufacturer capable of producing that aircraft.  Docs. 177-16 at 3; 177-1 at 316; 177-3 at 190.  But the issue is not whether the defendants "induced the Army to award a contract."  Doc. 178 at 45.  Rather, as the Eleventh Circuit explained while reviewing this case on appeal, the issue is whether the relators can prove that "MD provided incomplete pricing data to the Government" that "induced the Government to enter contracts on terms more favorable to MD than it would have had the pricing data been complete."  *Marsteller*, 880 F.3d at 1315.

37

The defendants' second argument, however, has merit.  The relators contend that MD Helicopters "had numerous prior sales" that it "opted not to send to the Government in the lead up to the execution of the El Salvador FMS Contract."  Doc. 191-1 at 60.  In their amended complaint, the relators alleged that the defendants failed to disclose the $1,550,000 sale of a new MD 500E helicopter to Fuch's Helikopter in May 2011.  Doc. 57 at ¶ 33.  As evidence, the relators identify several emails from December 2011, *see* doc. 191-1 at 60, beginning with a message from MD Helicopters' General Counsel and Secretary, advising that the Army "want[ed] to see commercial sales history information" so that it could determine a reasonable price for the El Salvador contract.  Doc. 191-40 at 3.  Relator Swisher replied that he had assembled a list of their "last 10 E model sales."  *Id.* at 2.  Carl Schopfer, MD Helicopters' Chief Operating Officer, responded to Swisher, advising that they should only list a sale to the Columbus, Ohio Police Department.  *Id.*  Of the ten prior sales that Swisher listed, the Columbus sale was the only one from 2011.  *See id.* at 2, 4.  Schopfer explained that any other potential sales from 2011 were dissimilar to the pending El Salvador sale because they "did not go through," involved "older aircraft," and "were . . . fire sales [of] existing aircraft that were not picked up."  *Id.* at 2.  Swisher agreed, replying that the Columbus sale was "the only comparable sale" and suggesting that they could "just send the Columbus PD one and state that other sales were from too long ago to be relevant."  *Id.*

A few hours later, Schopfer emailed the Army, copying Swisher and others. Doc. 177-15 at 2. In that email, Schopfer listed only the Columbus sale, explaining that "[s]ales of MD 500E's have been limit[ed]" and that the Columbus sale was "a good comparison" because it was recent. *Id.* At no point in the email did Schopfer state that the Columbus sale was the only prior commercial sale of the MD 500E helicopter. Doc. 177-6 at 202.

These emails are not enough for this claim to survive summary judgment. At the outset, the court notes that the relators do not offer any substantive argument to support this claim, apart from the single sentence about "numerous prior sales" quoted above. *See* doc. 191-1 at 60. In any event, the emails bolster the defendants' position, not the relators'. At this stage, the relators cannot show falsity because the defendants did not describe the Columbus sale as their only prior sale. Rather, the defendants told the Army that the Columbus sale was the only comparable sale, and there is no evidence showing that this statement was false or that the defendants were required to disclose any additional information.

As for the Fuch's sale described in the amended complaint, evidence confirms that it was not comparable. Schopfer attested that Fuch's ordered that aircraft in 2009, not 2011. Doc. 172-23 at ¶ 11. Moreover, in an email (which was shared with Government investigators and has been filed publicly) from Swisher to his counsel in this matter, Swisher clarified that "Fuch's got a deeply discounted price from our

39

standard offer" at the time of $1,700,000 because Fuch's was MD Helicopters' distributor in Switzerland.  Doc. 172-24 at 2-3.

To be sure, there is evidence that Swisher intended to persuade MD Helicopters to disclose other sales to the Army.  Doc. 177-1 at 334–336. Specifically, Swisher testified that when he agreed that the Columbus sale was the only relevant comparator, he was subtly hinting that MD Helicopters should submit a full sales history.  *Id.*  But that evidence, even considered in the light most favorable to the relators, does not rebut Swisher's own admissions—in his emails, doc. 191-40 at 2, and in his deposition, doc. 177-1 at 337–338—that the Columbus sale was the only comparable sale.  Relatedly, because the other sales were not comparable, their omission could not have had "a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property."  31 U.S.C. § 3729(b)(4). In other words, the omission was not material.  For these reasons, summary judgment is also due as to the relators' pricing theory of fraudulent inducement in Count III related to the El Salvador contract.

### c.

The court now turns to the Saudi Arabia contract.  As with the other price-based theories discussed above, the relators do not offer much argument to support this claim.  *See* doc. 191-1 at 60.  They do cite, however, several of the defendants' internal emails as evidence that the defendants knowingly overcharged the Army.

*See id.*  In April 2012, Schopfer emailed Tilton proposing to offer the Army an "[a]ircraft base price" of $2,178,638 for the contract.  Doc. 191-62 at 2.  Tilton replied, "Why is this not Army pricing?"  *Id.*  A few days later, Schopfer sent Tilton an updated proposed aircraft base price of $2,300,000, which Tilton approved.  Doc. 191-141 at 2.  Meanwhile, one of MD Helicopters' executive vice presidents learned of the price increase and emailed Tilton, asking her to "reconsider" because the new price was $150,000 more than the commercial list price that MD Helicopters had recently published.  Doc. 191-63 at 2–3.  Tilton responded that it was her decision and that she could not "be selling to Foreign militaries at multiple prices."  *Id.* at 2.  This evidence apparently supports the relators' allegation that MD Helicopters "misrepresented . . . its basic commercial price," causing the Army to pay inflated prices under the Saudi Arabia contract.  Doc. 57 at ¶¶ 53–54.

In response, the defendants argue that MD Helicopters never represented to the Army that $2,300,000 was its "base commercial, usual, customary, or lowest price."  Doc. 178 at 49 (quotation marks omitted).  As evidence, they point to MD Helicopters' final proposal for the Saudi Arabia procurement, which Swisher submitted in 2012.  Doc. 177-22 at 2.  In that document, MD Helicopters proposed charging the Army $27,600,000 for twelve "MD 530F Basic Aircraft," or $2,300,000 per helicopter, without reference to commercial pricing.  Doc. 177-24 at 44.  The document also specified that this price accounted for markup and costs, and

it noted that MD Helicopters did not provide a "pricing substantiation for the aircraft." *Id.* at 16, 18.

The defendants also identify evidence showing that MD Helicopters did not need to submit further pricing data for the Saudi Arabia procurement. Doc. 178 at 49–50. An Army contracting officer who had authority over several of MD Helicopters' FMS contracts, doc. 177-6 at 38–39, 59, testified that the Army did not require certified cost and pricing data from MD Helicopters for the Saudi Arabia procurement, *id.* at 104–105. The Army had already determined that MD Helicopters' pricing was fair and reasonable given that it was consistent with the pricing of MD 350F helicopters under the Afghanistan primary trainer contract. *Id.* at 103–104, 109.

The relators have not offered any evidence of their own to rebut the defendants' evidence. *See* doc. 191-1 at 60. Based on what the parties have presented, the court agrees with the defendants that MD Helicopters did not make a false statement when it submitted its proposal for the Saudi Arabia contract to the Army. Accordingly, regarding their pricing theory, the relators have not raised a genuine issue of material fact as to whether the defendants fraudulently induced the Army into paying inflated prices under the Saudi Arabia contract. Summary judgment is thus due to be granted as to this claim.

**d.**

The relators also assert a price-based theory of fraudulent inducement against the defendants for purportedly "cherry-pick[ing]" sales to disclose leading up to the Costa Rica contract.  Doc. 57 at ¶ 63.  For support, the relators point to email evidence allegedly proving that the defendants (1) disclosed to the Army that they offered MD 600N helicopters to a commercial buyer, Helicentro, for a base price of $2,350,00 despite a more recent agreement with Helicentro to charge $1,800,000 and (2) falsely told the Army that the $2,350,000 base price was available to "any interested customer."  Doc. 191-1 at 60.

As background, in November 2012, Col. Vergez wrote to Tilton that the Army needed "supporting commercial pricing documents," such as "previous invoices or purchase agreements," for the MD 600N helicopter before the Costa Rica contract could proceed.  Doc. 191-117 at 2.  An Army contract specialist then "requested additional information to determine Commerciality" for the contract including, among other things, an invoice showing proof of service to an entity called Kibo and Associates.  Doc. 191-118 at 2.  After receiving the requested information, the contract specialist asked MD Helicopters to clarify why, on a 2012 invoice for Helicentro, the listed price for the MD 600N was $2,315,000 while a quote for Kibo and Associates from the same year was $2,350,000.  Doc. 191-120 at 2.  John Celigoy, who was then MD Helicopters' Director of Military Programs, responded

43

that the disparity accounted for the fact that they offered Helicentro a helicopter that was already "complete and ready," resulting in minimal labor costs.  Doc. 191-122 at 2.  Celigoy added that increased labor costs associated with unexpected delays caused MD Helicopters to raise the price back to $2,350,000 for the Costa Rica contract and that "we would have offered this base price to any interested customer." *Id.*

In support of their motion, the defendants offer evidence from Schopfer, who attested that Helicentro received a 10 percent discount because it was a distributor that intended to buy two aircraft.  Doc. 189-1 at ¶ 5.  Schopfer added that MD Helicopters first negotiated the Helicentro purchase agreement in 2009, then offering it a base price of $2,000,000, and that the contract negotiations lasted for several years, with Helicentro receiving multiple offers at varying prices.  *See id.* at ¶ 5, 7–9.  In May 2012, MD Helicopters offered Helicentro an MD 600N helicopter for $2,315,200.  *Id.* at ¶ 7.  After Helicentro declined that offer, and because Helicentro deposited $385,000 on the aircraft in 2009, MD Helicopters made the aircraft available for 2009 pricing—i.e., $2,000,000—in September 2012.  *Id.* at ¶ 8.  This pricing also reflected that Helicentro agreed to accept a helicopter with a different serial number than the one it had planned to purchase.  *Id.*  With the 10 percent discount applied, the purchase price was $1,800,000.  *Id.*  When Helicentro did not purchase a helicopter in 2012, MD Helicopters prepared another purchase agreement

in 2013 that retained the same $2,000,000 base price. *Id.* at ¶ 9. That agreement noted that "special pricing" from 2009 applied and that discounts totaling $200,000 also applied based on anticipated commission and special considerations. *Id.* at 22. Notwithstanding the retroactive pricing and discounts, Helicentro never purchased an MD 600N helicopter. *Id.* at ¶ 11.

This evidence shows that MD Helicopters may have indeed disclosed to the Army a Helicentro purchase agreement featuring a higher price for the MD 600N helicopters—i.e., the May 2012 agreement charging $2,315,200—than what it later offered Helicentro—i.e., the September 2012 agreement charging $2,000,000.[16] But the relators have not offered any evidence to show that this omission was made knowingly or was material. To the contrary, as to knowledge, Schopfer attested that "[a]t no time did [he] believe that more information beyond" what MD Helicopters disclosed "was required or requested" and that he believes that MD Helicopters provided "responsive and accurate" information. *Id.* at ¶ 13.

Regarding materiality, the relators observed in their own brief that an Army contract specialist requested additional information from MD Helicopters to establish "commerciality" for the Costa Rica contract. Doc. 191-1 at 44 (quoting

---

[16] The relators have not offered any evidence to support their specific claim that MD Helicopters "represented a false base price of *$2,350,000* for the Helicentro sale." Doc. 191-1 at 60 (emphasis added). Rather, as discussed above, the evidence shows that the defendants disclosed the May 2012 Helicentro purchase agreement, which offered a base price of $2,315,200. *See* docs. 191-120 at 2; 191-122 at 2; 189-1 ¶ 7.

doc. 191-118 at 2). Likewise, Schopfer attested that the inquiries concerning Helicentro and Kibo & Associates arose "in the context of questions the Army raised related to commerciality, that is whether a particular item had been offered for sale to the general public." Doc. 189-1 at ¶ 13. An Army contracting officer similarly testified that the Army requested—and MD Helicopters submitted—additional pricing information to determine commerciality. Doc. 177-6 at 218, 222–223. She also testified that, in her experience, which is consistent with federal regulations, "commerciality" refers to whether something is a commercial item—i.e., offered for sale to the public. *Id.* at 100–101, 393.[17] Accordingly, the failure to disclose the September 2012 Helicentro purchase agreement with a base price of $2,000,000 was immaterial to the Army's pricing determination because the Army did not use that information to determine the price of an MD 600N helicopter.

Finally, as for Celigoy's statement that MD Helicopters "would have offered [the] base price [of $2,350,000] to any interested customer," doc. 191-122 at 2, the omission of the lower-priced September 2012 Helicentro purchase agreement does not render that statement false. Reading the statement in full shows that Celigoy was referring to "any interested customer" who was similarly situated to the Army

---

[17] *See also* 48 C.F.R. § 2.101 (defining "commercial item" to include, among other things, "any item, other than real property, that is of a type customarily used by the general public" and "[h]as been sold, leased, or licensed to the general public" or "[h]as been offered for sale, lease, or license to the general public").

during the negotiation of the Costa Rica contract, as evidenced by, for example, his reference to the "delivery delay of this particular helicopter." *Id.* Helicentro was not an interested customer who was similarly situated because it had been negotiating a helicopter purchase for three years and had already paid a deposit, thereby qualifying for special 2009 pricing.

### e.

To close, as to the claims in Counts I, II, III, IV, and V that the defendants fraudulently induced the Army into paying inflated prices, based on the record before the court, summary judgment is due.

### B.

The relators also allege in Count VI that the defendants conspired with Col. Vergez to violate the FCA. To succeed on this claim, the relators must show "(1) an unlawful agreement between [the] defendants to commit a violation of [the FCA]; (2) an act performed in furtherance of the conspiracy; and (3) that the United States suffered damages as a result." *United States v. HPC Healthcare, Inc.*, 723 F. App'x 783, 791 (11th Cir. 2018) (citing *Corsello v. Lincare, Inc.*, 428 F.3d 1008, 1014 (11th Cir. 2005)). The Supreme Court has similarly explained that for conspiratorial liability under the FCA to attach, "it must be shown that the conspirators intended 'to defraud the Government.'" *Allison Engine Co. v. U.S. ex rel. Sanders*, 553 U.S. 662, 672 (2008). And although "circumstantial evidence of a conspiracy may be

enough to withstand summary judgment, the evidence must reasonably support an inference that [the defendants] shared [a] conspiratorial objective." *U.S. ex rel. Bane v. Breathe Easy Pulmonary Servs., Inc.*, 597 F. Supp. 2d 1280, 1289 (M.D. Fla. 2009) (citing *U.S. ex rel. Durcholz v. FKW, Inc.*, 189 F.3d 542, 545-46 (7th Cir. 1999)).

The defendants argue that the conspiracy claim fails for three reasons: (1) the relators have not shown an underlying FCA violation; (2) record evidence refutes the relators' conspiracy allegations; and (3) the defendants did not intentionally agree to defraud the Government. Doc. 178 at 60–65. In response, the relators restate their allegations that the defendants and other conspirators planned to "promise compliance with FMS contract requirements while (1) knowing that non-compliance was continuing and (2) hiding material information from the Government." Doc. 191-1 at 61. Allegedly, "evidence shows a continuous effort to induce the award of FMS contracts while making false promises and misrepresentations" and "multiple acts in furtherance of the conspiracy, including the offer and acceptance of bribes or gratuities and the willful concealment from the Government of relevant information." *Id.*

As for the defendants' first argument, the court agrees that there was no conspiracy to fraudulently induce FMS contracts by submitting misleading pricing information to the Army because, as explained above in subsection A(2), the

defendants did not commit an underlying FCA violation: "[s]econdary liability for conspiracy [to violate the FCA] cannot exist without a viable underlying claim." *U.S. ex rel. Headen v. Adams & Assocs., Inc.*, No. 4:16-CV-1164-VEH, 2017 WL 6017775, at *13 n.22 (N.D. Ala. Dec. 5, 2017) (quoting *U.S. ex rel. Coppock v. Northrup Grumman Corp.*, No. CIV.A. 3:98-CV-2143, 2003 WL 21730668, at *14 (N.D. Tex. July 22, 2003)).[18] But this argument fails as to the relators' FAR-based fraudulent inducement theory because genuine issues of material fact remain regarding that theory.

Even so, the relators' conspiracy claim independently fails because they have not presented evidence of a conspiratorial agreement to defraud the Government. Although the relators identify in their brief the terms and members of an alleged conspiratorial agreement, they largely fail to support their allegations with citations to any specific record evidence. *See* doc. 191-1 at 61. Indeed, the only specific evidence they cite refers to emails and testimony in which Tilton and Randy Jones, Patriarch Partners' Managing Director, allegedly admitted to operating "behind the scenes" and employing "workarounds" to skirt legal obligations. *Id.*

---

[18] *See also U.S. ex rel. Potra v. Jacobson Companies, Inc.*, No. 1:12-CV-01600-WSD, 2014 WL 1275501, at *4 (N.D. Ga. Mar. 27, 2014) (citing *Vigil v. Nelnet, Inc.*, 639 F.3d 791, 801 (8th Cir. 2011)) ("Because the Relators have failed to state an FCA claim, their claim that the Defendants allegedly conspired to violate the FCA necessarily fails.").

That evidence is taken out of context.  Jones made the "behind the scenes" comment while relaying a message to Tilton from Col. Vergez, who had recently met with Army officials about his upcoming retirement and transition into civilian employment.  Doc. 191-78 at 2.  The Army told Col. Vergez that he could not manage Army contracts on MD Helicopters' behalf for a year after his retirement. *Id.*  Even so, Col. Vergez assured Jones that, "behind the scenes," he could do "whatever [Tilton] wish[ed]" if he received an offer from a Patriarch-affiliated entity, as opposed to MD Helicopters.[19]  *Id.*  Tilton responded to the email by stating that Col. Vergez "must be an MD employee and he will need to live to the exclusion."  Doc. 191-79 at 2.  Tilton later clarified that she "insisted" that Col. Vergez work for MD Helicopters, not a Patriarch affiliate, "[b]ecause it seemed like a workaround."  Doc. 177-2 at 278–279.  She did not approve of the arrangement until after she read the Army's ethics opinion and Col. Vergez received "specific clearance . . . from the Army" to work for an affiliated entity.  *Id.* at 275–276.  This evidence does not support the relators' conspiracy theory.  If anything, it shows that the defendants were hesitant to engage in activity that was or could be perceived as unlawful.

---

[19] Although the relators emphasize the "behind the scenes" language, an Army ethics letter addressed to Col. Vergez used similar language.  The Army advised Col. Vergez that "[b]ehind-the-scenes or in-house assistance to a private employer is legally permissible."  Doc. 177-45 at 5.

Finally, although the relators cite their entire statement of facts as proof that the defendants, Col. Vergez, Patriarch Partners, and PPMG conspired to defraud the Government, doc. 191-1 at 61, that is not enough to survive summary judgment. "A party asserting that a fact . . . is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record." Fed. R. Civ. P. 56(c). Moreover, the Eleventh Circuit "has consistently held that conclusory allegations without specific supporting facts have no probative value" and that, therefore, "[o]ne who resists summary judgment must meet the movant's affidavits with opposing affidavits setting forth specific facts to show why there is an issue for trial." *Leigh v. Warner Bros.*, 212 F.3d 1210, 1217 (11th Cir. 2000) (quotation omitted). Because the relators do not cite specific facts supporting their allegations, the court need not consider the defendants' other arguments against this claim.[20] *See, e.g., U.S. ex rel. Vargas v. Lackmann Food Serv., Inc.*, 510 F. Supp. 2d 957, 965 (M.D. Fla. 2007) (finding "it unnecessary to consider" other arguments "because Plaintiff fails to cite any facts to controvert Defendant's contention that there is insufficient evidence of a conspiracy").

---

[20] To the extent the relators intend to place the onus on the court to find the specific facts in the statement of facts section that support their claim, judges "are not like pigs, hunting for truffles buried in briefs," and district courts "are not required to ferret out delectable facts buried in a massive record, like the one in this case." *Chavez v. Sec'y Fla. Dep't of Corr.*, 647 F.3d 1057, 1061 (11th Cir. 2011) (quoting *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991)).

### III.

To close, the defendants' motion for summary judgment, doc. 171, is **GRANTED** solely as to the relators' pricing-based fraudulent inducement theory, FAR-based fraudulent inducement theory regarding the Afghanistan primary trainer contract and CLS modification, and conspiracy claim. Accordingly, the claims in Counts I-V related to a price-based fraudulent inducement theory, the FAR-based fraudulent inducement theory pleaded in Counts I and II, and the conspiracy claim in Count VI, are **DISMISSED WITH PREJUDICE**. The motion is **DENIED** as to the relators' FAR-based theory of fraudulent inducement regarding the El Salvador (Count III), Saudi Arabia (Count IV), and Costa Rica (Count V) contracts. This matter will proceed to trial solely as to the FAR-based theory on these three contracts.

**DONE** the 23rd day of August, 2021.

**ABDUL K. KALLON**
UNITED STATES DISTRICT JUDGE