FILED

2021 Sep-27  PM 02:17
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ALABAMA
# NORTHEASTERN DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| **ex rel. PHILIP MARSTELLER and** | ) | |
| **ROBERT SWISHER,** | ) | |
| | ) | |
| **Plaintiffs/Relators,** | ) | **Civil Action No.** |
| | ) | **5:13-cv-00830-AKK** |
| **vs.** | ) | |
| | ) | |
| **MD HELICOPTERS, INC.,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION

This matter came before the court for a jury trial.  One of the issues of

contention was whether the court should send the damages issue to the jury, and, if

so, the content of the charge.  The court considered the parties' trial briefs regarding

the appropriate calculation of damages, *see* docs. 222, 257–58, 279, 283, 286, and

the instructions the jury should receive in order to reach a damages verdict, *see id.*;

*see also* doc. 254.  The court also considered the parties' proposed jury charges and

heard arguments the parties made during the charge conferences.  The relators

claimed the U.S. government was entitled to the full amount of the payments made

to MD Helicopters ("MDHI") on each of the three FMS contracts at issue.  *See* doc.

257 at 7 (stating that "the appropriate measure of damages for the Court to apply is

'all payments made'").  Essentially, they contended that the court should not send

the damages issue to the jury.  By contrast, MDHI argued that, should the jury find

MDHI liable for any or all of the three FMS contracts, it should calculate damages

as the difference in value, if any, between what the U.S. government received from

MDHI and the amount it lost, if any, as a result of MDHI's false claims.  Doc. 254

at 43.

The court carefully reviewed this issue, these filings, and the evidence and

arguments presented at trial in great depth.  As explained below, the court concluded

a hybrid approach was most appropriate: to the extent the jury found MDHI's false

claims about its compliance with the Federal Acquisition Regulations completely

compromised the purpose of its FMS contracts with the U.S. government, and thus

the FMS program was compromised, the U.S. government was likely entitled to the

full value of the contracts at issue.  However, to the extent the jury found MD

Helicopters nevertheless conferred benefits of value to the U.S. government, this

value would be subtracted from the FMS contract prices to find the actual damages

amount.  The court charged the jury accordingly and provided a verdict form

capturing these possibilities.  *See* docs. 296–97.  The court now issues this opinion

to explain in detail its analysis supporting the instructions adopted.

## I.

The court walks through each party's arguments before explaining that a

hybrid approach was and is most supported by the case law.

A.

The court begins with the parties' arguments and the case law they marshaled in support of their conclusions.  The relators maintained that the government "received nothing of value in its bargain with MDHI and [that] the fraud subverted the integrity and purpose of the FMS program," the latter of which constituted "an intangible benefit" that was "incapable of valuation and therefore incapable of reducing the Government's damages."  Docs. 257 at 7; 263 at 5.  Put differently, the relators contended that MDHI must return the full amount of the contracts (subject to statutory trebling) because the government was fraudulently induced into entering contracts it would not have signed had it known of MDHI's false statements.  *See id.*  And because this conduct so undermined the purpose of the FMS program—to "effectuate 'foreign policy and national security' by assisting third-party countries"—MDHI conferred no value that could mitigate these losses.  *See id.*

For its part, MDHI characterized the exchange between itself and the U.S. government differently.  It argued the government "bargained for MDHI to supply helicopters and associated services to [U.S.] allies" and subsequently "received precisely the value for which it bargained."  Doc. 258 at 5.  And MDHI noted that this bargain "[was] valuable to the government," as evidenced by a U.S. press release stating that the Saudi Arabia contract "[would] contribute to the foreign policy and national security of the United States."  *Id.*  MDHI thus asked the court to instruct

the jury that, should it find MDHI liable for any or all of the three FMS contracts, it should calculate damages as the difference in value, if any, between what the U.S. government received from MDHI and the amount it lost, if any, as a result of MDHI's false claims. *Id.* at 3–4; doc. 254 at 43 ("Damages are measured by the difference, if any, in the value of what the government received as compared to the value of what the government would have received through the contract and related transactions in the absence of the false promise made in connection with that contract.").

### 1.

The relators first argued that, "[h]ad MDHI been truthful that it would not comply with material regulatory requirements, the U.S. Army would not (indeed, could not) [have] enter[ed] into the FMS contracts at issue," and so the government was entitled to all of its payments under those contracts. Doc. 263 at 3–4. In support of this argument, the relators principally cited *United States ex rel. Longhi v. Lithium Power Techs., Inc.*, 575 F.3d 458 (5th Cir. 2009); *United States v. Anghaie*, 633 F. App'x 514 (11th Cir. 2015); *United States ex rel. Barko v. Halliburton Co.*, 241 F. Supp. 3d 37 (D.D.C.), *aff'd*, 709 F. App'x 23 (D.C. Cir. 2017); *United States v. Mackby*, 339 F.3d 1013 (9th Cir. 2003); and *United States ex rel. Feldman v. van Gorp*, 697 F.3d 78 (2d Cir. 2012).

4

In *Longhi*, the Fifth Circuit held, where "there [was] no tangible benefit to the government and the intangible benefit [was] impossible to calculate," the appropriate measure of damages in an FCA action involving a fraudulent research scheme was the amount the government actually paid to the defendant-researchers. 575 F.3d at 473. The fraudulent research scheme targeted the government's Small Business Innovation Research (SBIR) program, the goal of which "is to provide research assistance to small businesses in order to maintain and strengthen the competitive free enterprise system and the national economy." *Id.* at 462 (citing 15 U.S.C. § 638(a)). The relator sued Lithium Power Technologies and its president, alleging that four submissions for SBIR grants contained false statements and that the company doubled billed or billed the government for research it never performed. *Id.* at 463. The district court determined that one proposal falsely stated the company was incorporated in 1992, three proposals misrepresented the key personnel who would conduct the research, the company falsified statements regarding its facilities and equipment, the defendants acted with reckless disregard as to the falsity of statements that the company had cooperative arrangements with the University of Houston and Polyhedron Laboratories, and several proposals failed to disclose that the company had previously undertaken related work in connection with another SBIR grant. *Id.* at 464.

5

The district court rejected the defendants' contention that the damages should be reduced by the benefit the government received from the research Lithium Power actually performed.  *Id.*  Instead, the district court held that the government suffered damages in the entire amount of the grants it paid in connection to the defendants' deceptive SBIR proposals, agreeing with the government that the defendants' false statements "caused more than $1.6 million of DoD SBIR funding to be siphoned off by a company with 'dubious qualifications' and that the funding should have gone to a better-qualified candidate." *Id.* at 472.  Affirming the district court, the Fifth Circuit explained:

> The contracts entered into between the government and the Defendants did not produce a tangible benefit to the [Ballistic Missile Defense Office] or the Air Force. These were not, for example, standard procurement contracts where the government ordered a specific product or good. The end product did not belong to the BMDO or the Air Force. Instead, the purpose of the SBIR grant program was to enable small businesses to reach Phase III where they could commercially market their products. The Government's benefit of the bargain was to award money to eligible deserving small businesses. The BMDO and the Air Force's intangible benefit of providing an 'eligible deserving' business with the grants was lost as a result of the Defendants' fraud. Finally, a direct causal relationship existed between the funds received by the Defendants and their false statements.  In a case such as this, where there is no tangible benefit to the government and the intangible benefit is impossible to calculate, it is appropriate to value damages in the amount the government actually paid to the Defendants.

*Id.* at 473.

Likewise, in *Anghaie*, the Eleventh Circuit affirmed the district court's damages award that constituted the entirety of the grants the U.S. government paid

6

to two researchers who lied in their SBIR and Small Business Technology Transfer

(STTR) applications in order to secure funding.  633 F. App'x at 519.  The Eleventh

Circuit reasoned:

> The evidence shows that the government would not have paid the Anghaies at all but for their fraud. Therefore, the difference between what the government paid and what it would have paid in open, fair, and competitive bidding was the full amount of the contract payments. Although this loss amount must be offset by any benefit conferred to government, the district court did not err in finding that the government received no benefit. The purpose of SBIR and STTR funding is to 'assist small-business concerns to obtain the benefits of research and development performed under Government contracts or at Government expense.' 15 U.S.C. § 638(a), (b)(2). The Anghaies lied about why they deserved this funding. Their fraud deprived the government of the benefit of funding deserving and eligible research. The government is entitled to damages for this harm.

*Id.*  Noting the district court's findings that the Anghaies were not entitled to receive

this funding at all, and that the government lost opportunities to enter into SBIR and

STTR contracts with qualified small businesses,[1] the Eleventh Circuit concluded it

was within the district court's discretion to impose damages in the full amount the

government paid.  *Id.*

In *Barko*, the U.S. District Court for the District of Columbia determined that

government contractor Kellogg, Brown & Root (KBR) was entitled to judgment as

a matter of law after the relator alleged that KBR violated the FCA through

---

[1] Like the Fifth Circuit in *Longhi*, the Eleventh Circuit underscored the district court's finding that "the government received no tangible benefit and suffered a clear intangible harm."  *Id.*

fraudulent inducement, kickbacks from a subcontractor, anticompetitive activity, performance defects, and double billing.  241 F. Supp. 3d at 52–53.  The district court noted that FCA liability "attaches for later claims submitted" under a fraudulent-inducement theory because "had the government known about the fraud in the inducement, it never would have entered the contract, and no payments would have been made."  *Id.* at 52 (citing *United States ex rel. Hockett v. Columbia/HCA Healthcare Corp.*, 498 F. Supp. 2d 25, 70 (D.D.C. 2007)).[2]

In *Mackby*, the Ninth Circuit upheld the district court's determinations of liability and civil penalties after the U.S. government brought an FCA action against Mackby, who used his father's personal identification number to submit false claims to Medicare for reimbursement of services at his physical-therapy clinic.  339 F.3d at 1014–15.  The government sought damages only for those claims that exceeded Medicare's annual payment limit per beneficiary, which came to 1,459 claims totaling $58,151.64.  *Id.* at 1015.  The district court awarded treble damages of $174,454.92 plus the minimum FCA statutory fines per claim ($550,000), bringing the total judgment to $729,454.92.  *Id.*  Concluding that this award did not violate the Eighth Amendment's Excessive Fines Clause, the Ninth Circuit remarked:

> Mackby's false claims also harmed the government, in the form of both monetary damages and harm to the administration and integrity of Medicare.  The fact that Mackby's clinic actually performed the

---

[2] The district court found that the relator failed to demonstrate that KBR fraudulently induced the government to enter any contract, *id.* at 61; the D.C. Circuit affirmed, *Barko*, 709 F. App'x at 23.

physical therapy for which he claimed reimbursement does not eliminate the government's injury. Damages under the FCA flow from the false statement. Ordinarily the measure of the government's damages [under the FCA] would be the amount that it paid out by reason of the false statements over and above what it would have paid if the claims had been truthful. The falsity here was not Mackby's representation that patients had received physical therapy, but the use of his father's PIN to obtain payments to which he was not entitled. Had Mackby been truthful, the government would have known that he was entitled to nothing because he was neither a doctor nor a physical therapist in private practice.

*Id.* at 1018–19 (citing *United States v. Woodbury,* 359 F.2d 370, 379 (9th Cir. 1966)) (internal quotation marks and citations omitted).

Finally, in *Feldman*, the Second Circuit held, where the government provided funds for certain research and a contractor substituted a nonconforming proposal on the basis of materially false statements, the district court could award the full amount of the government's payments after the statements were made under the FCA. 697 F.3d at 79–80. Cornell University Medical College and a professor, van Gorp, applied and subsequently renewed applications for federal funding of a research program; the relator alleged that the program deviated from that described in the applications and that Cornell and van Gorp failed to tell the government about these changes. *Id.* at 82–83. The district court awarded the full amount of the grant the government paid for the years for which the defendants made materially false statements to the government. *Id.* at 88. On appeal, Cornell and van Gorp argued that a "benefit-of-the-bargain" calculation was the appropriate measure—that

9

damages should have equaled the difference between the value the government received from the program and the amount it paid to fund it. *Id.* at 87–88. By contrast, the relator argued that the government received nothing of measurable value, because the defendants sought payments for participating in a program designed to benefit third parties, not the government, and the government subsequently lost an opportunity to fund eligible programs. *See id.*

Agreeing with the relator, and affirming the district court's ruling, the Second Circuit stated that, "[a]s a result of the fraudulent renewals, the government was paying for a program that was not at all as specified," and so the appropriate measure of damages was "the full amount the government paid based on materially false statements." *Id.* at 90–91.[3]  Cornell and van Gorp protested that this measure of damages stemmed from fraudulent-inducement cases, not nonconforming-services cases, but the Second Circuit rejected this argument. *See id.* at 91. The court explained that it saw no distinction "between fraudulently inducing payment initially, thereby requiring all payments produced from that initial fraud to be returned to the government (trebled and with certain fees and costs added as provided

---

[3] The Second Circuit distinguished this from cases in which the government "paid for a contracted service with a tangible benefit—whether it be medical care, security on mortgages, or subsidized housing—but paid too much." *Id.*  In these cases, the Second Circuit explained, the government "got what it bargained for, but it did not get *all* that it bargained for. Thus, courts treated the difference between what the government bargained for and what it actually received as the measure of damages. Here, by contrast, the government bargained for something qualitatively, but not quantifiably, different from what it received." *Id.*

10

by statute), and requiring payments based on false statements to be returned to the

government when those false statements were made after an initial contractual

relationship based on truthful statements had been established." *Id.*

2.

MDHI attempted to rebut the argument that contracts "allegedly tainted from

their inception" must result in damages equaling the full value of the contracts. Doc.

258 at 5. In support, MDHI cited primarily the cases *United States ex rel. Harrison*

*v. Westinghouse Savannah River Co.*, 352 F.3d 908 (4th Cir. 2003) and *United States*

*v. Sci. Applications Int'l Corp.*, 626 F.3d 1257 (D.C. Cir. 2010), and contended that

the relators' reliance on *Longhi*, 575 F.3d 458, and *Anghaie*, 633 F. App'x 514, was

misguided.[4]  *See* doc. 258 at 3–5.

In *Harrison*, the Fourth Circuit concluded that the district court properly

required the plaintiff to prove the damages the government suffered by

demonstrating how much more the government had paid a subcontractor, General

Physics Corporation (GPC), to perform the subcontract than it would have paid

another firm absent GPC's false certification. 352 F.3d at 923. The relator alleged

that Westinghouse Savannah River Company falsely certified to the Department of

---

[4] MDHI largely suggested that *Longhi* and *Anghaie* were unique to the nature and purpose of the SBIR and STTR programs at issue in those cases—programs designed to benefit small businesses—and so the relators' case "[was] not comparable." *See* doc. 258 at 4–5 ("Because the defendants [in those cases] were not actually small businesses, the government did not receive the intangible benefit for which it bargained.").

Energy that it had no organizational conflicts of interest with GPC in connection

with the contract. *Id.* at 910–11. The relator argued this entitled the government to

recover all $9 million that the government paid for the work. *Id.* However, because

the relator presented "no evidence that the government did not get what it paid for

or that another firm could have performed the work for less," the Fourth Circuit

concluded that he failed to demonstrate that the government did not receive the

benefit of the work performed, even though the government probably would not

have allowed GPC to bid on the contract had it known of the conflict.[5] *See id.* at

917, 922. Accordingly, the Fourth Circuit held that the district court correctly found

the relator failed to prove actual damages suffered by the government and thus could

not seek "disgorgement of all monies paid by DOE to Westinghouse" as damages.

*Id.* at 922.

In *Science Applications*, the D.C. Circuit agreed with Science Applications

International Corporation (SAIC) that the district court's damages instruction to the

jury was "flawed" in that it automatically equated damages with the actual payments

the government made to SAIC. 626 F.3d at 1278. The U.S. government alleged that

---

[5] Westinghouse was required to submit this certification as a prerequisite to GPC receiving the contract. The Fourth Circuit explained: "GPC would have been disqualified from bidding on the subcontract had it not provided a no-OCI certification. The master contract between Westinghouse and DOE required Westinghouse to submit no-OCI certifications to DOE when Westinghouse submit[ted] subcontracts for approval. If Westinghouse had not included the no-OCI certification in its PUR package, DOE would not have approved the GPC subcontract." *Id.* at 916–17.

SAIC failed to properly disclose conflicts of interest while working with the Nuclear Regulatory Commission, in violation of contractual provisions governing such conflicts.[6] *Id.* at 1261–62. The government contended, and the district court agreed, that SAIC's contract "obligated the company to provide 'advice and assistance that was both technically sound and free from potential bias," and so the value of the contract to the government was compromised by the appearance of bias even if SAIC's performance was otherwise technically proficient. *Id.* at 1278. As a result, after the jury found against SAIC, the district court "requir[ed] the jury to limit its calculation of damages to the government's payments" rather than instructing the jury to "determin[e] the amount of money the government paid due to SAIC's false claims over and above what the services the company actually delivered were worth to the government." *Id.* at 1279.

Holding that the district court should have done the latter, the D.C. Circuit acknowledged that the government "remain[ed] free to argue that the value of SAIC's advice and assistance was completely compromised by the existence of undisclosed conflicts, making the full amount paid to SAIC the proper measure of

---

[6] Specifically, SAIC agreed to "forego entering into consulting or other contractual arrangements with any firm or organization, the result of which may give rise to a conflict of interest with respect to the work being performed under [the] contract" and to "obtain the NRC's prior written approval" with regard to potential conflicts of interest. *Id.* at 1262. The contract also required SAIC to verify that it had no "organizational conflicts of interest" and would make "an immediate and full disclosure in writing" if it discovered conflicts after the contract award. *Id.* "In the event SAIC disclosed a conflict, the contract required it to provide a mitigation strategy, but the NRC retained the right to terminate the contract if doing so was 'in the best interest of the government.'" *Id.*

damages." *Id.* at 1280.  However, the court also stated that SAIC had to be allowed to offer contrary evidence, including "evidence about the technical quality of its work, the fact that [the government] continued to use SAIC's work product after the potential conflicts were identified and [the contract] was terminated, and testimony . . . that SAIC's actual work product 'constituted the opposite of a conflict,' . . . due to its transparency and fairly conservative results."  *Id.* Recognizing "the difficulty the jury [would] face in calculating the value of services tainted by potential conflict," the D.C. Circuit nonetheless remanded the case for further consideration of liability and damages and noted that the government bore the burden of proving damages.  *See id.*

B.

The court turns next to the proper instructions as to damages in this case.  As an initial matter, "[t]here is no set formula for determining the government's actual damages for an FCA claim."  *Anghaie*, 633 F. App'x at 518 (citing *United States v. Killough*, 848 F.2d 1523, 1532 (11th Cir. 1998)) (internal quotation marks omitted). The case law suggests, however, that whether actual damages should constitute the government's payments in full or its payments less the value of the benefits MDHI conferred rests on whether the government "bargained for something qualitatively, but not quantifiably, different from what it received" from MDHI.  *See, e.g., Feldman*, 697 F.3d at 91.

14

More specifically, the issue is whether, due to MDHI's allegedly material, false statements regarding its intended compliance with FAR, the government paid for goods or services that were not as specified, the purpose of the FMS contracts (and, thus, FMS program) were compromised, and the government lost the intangible benefit of contracting with an "eligible," regulatory-compliant supplier instead of MDHI.  *See id.*; *Harrison*, 352 F.3d at 922–23; *Sci. Applications*, 626 F.3d at 1278; *Longhi*, 575 F.3d at 472–73; *Anghaie*, 633 F. App'x at 519.  In cases such as this one, this is the crux of the issue that the jury must determine in deciding damages, should it find FCA liability.   If MDHI's statements regarding its compliance with FAR caused the government to bargain for something qualitatively different than it received, as with the research applications in *Feldman*, *Longhi*, and *Anghaie*, the government was likely entitled to the entirety of its payments to MDHI under the FMS contracts.

However, if the relators could not establish that the FMS contracts were entirely tainted by MDHI's fraudulent inducement, the government was likely entitled to actual damages equal to the difference between the amount of money the government paid due to MDHI's false claims beyond what the benefits MDHI actually delivered were worth to the government, as described in *Science Applications*.  Though this amount may have been difficult to quantify, the parties were able to present evidence to aid the jury in determining what the government

15

may have lost or gained given MDHI's false statements regarding its FAR compliance. The jury also heard evidence regarding the value of the helicopters, support services, or other benefits MDHI delivered to or through the U.S. government, which did not retain the helicopters because it resold them to Saudi Arabia, Costa Rica, and El Salvador. In this scenario, it was possible but not mandatory for the jury to find the value MDHI provided to the government through the FMS contracts was nearly entirely defeated by MDHI's misconduct, meaning actual damages would have been close but not equal to the full value of the contracts as a matter of fact, not law.

## C.

The court discusses finally MDHI's assertion that the U.S. government did not sustain any losses on the Saudi Arabia or Costa Rica contracts because foreign governments "fully funded" the U.S. government's purchases. Doc. 258 at 6. Though it does not appear that the Eleventh Circuit has addressed this issue, courts outside this Circuit have dealt with variations of the argument that the reimbursement of the U.S. government by foreign governments through FMS means that the U.S. government can suffer "no loss" in the face of FCA violations. In particular, defendant-contractors have cited the "no loss" provision in the Arms Export Control Act, 22 U.S.C. § 2751, in support of this position, as MDHI did, which district courts have rejected. *See* doc. 258 at 6–7; *United States ex rel.*

16

*Campbell v. Lockheed Martin Corp.*, 282 F. Supp. 2d 1324 (M.D. Fla. 2003); *United States ex rel. Hayes v. CMC Elecs., Inc.*, 297 F. Supp. 2d 734 (D.N.J. 2003).[7]  The court has found these cases persuasive, and they weigh against MDHI's similar argument regarding the Saudi Arabia and Costa Rica contracts.[8]

In addition, these cases support the hybrid approach to the damages-related jury instructions that the court adopted here.  In *Campbell*, in addition to rejecting Lockheed's argument regarding the AECA's "no loss" provision, the Middle District of Florida dismissed Lockheed's contention that it had not submitted "claims" within

---

[7] In *Campbell* and *Hayes*, the two district courts rejected defendant-contractors' arguments to this effect, albeit on slightly different postures.  *See Campbell*, 282 F. Supp. 2d at 1340–41 (finding "no loss" provision in AECA did not insulate Lockheed Martin from liability because "that the Government might, by some unrelated means, ultimately be protected against loss [did] not mean that no claim [was] made against the U.S. Treasury in the first instance"); *Hayes*, 297 F. Supp. 2d at 737, 739 (rejecting argument that government's damages were limited to FCA statutory penalties due to AECA's "no loss" provision because government still sustained monetary losses). Of particular relevance, in *Hayes*, the District of New Jersey explained that, assuming the allegations were true, the government sustained losses due to the contractor's false invoices because (1) the U.S. government paid more money than it otherwise would have absent the fraud; (2) the U.S. government was likely to be required to reimburse the Saudi government, which had paid the U.S. government for the radios at issue; (3) the U.S. government suffered "damage to the integrity of the contracting process"; and (4) it was possible that Saudi Arabia "[would] have less money to spend on other defense needs, thereby forcing the U.S. to increase its expenditures by a like amount to obtain the same level of global security."  297 F. Supp. 2d at 737.

[8] Those amounts, if proven, may address the offsetting of the damages award; they did not dictate a finding of zero actual damages to the U.S. government on these contracts.  *See United States v. Bornstein*, 423 U.S. 303, 316 (1976) (holding, in action against subcontractor where U.S. government already recovered damages from general contractor due to subcontractor's fraud, actual damages were to be doubled before subtractions were made for compensatory payments previously received by the government from general contractor); *United States v. Anchor Mortgage Corp.*, 711 F.3d 745, 749–50 (7th Cir. 2013) (explaining that "*Bornstein* held that third-party payments are subtracted after doubling, rather than before," but that this rule did not apply to "whether the market price should be subtracted from the contract price before doubling").

17

the meaning of the FCA with respect to its FMS contracts with the U.S. government, which resold Lockheed's night-navigation pods to Saudi Arabia, Greece, Bahrain, and South Korea.  282 F. Supp. 2d at 1337–38.  In particular, Lockheed claimed the FCA applied only to claims threatening "financial loss" to the U.S. government, and in FMS contracts, the U.S. "acts merely as a fiduciary to disburse third-party property and its own funds are not at risk."  *Id.* at 1338.[9]  Disagreeing, the district court explained that, in FMS arrangements, there is "no privity of contract" between the contractor and the foreign countries; rather, the contractor must deliver the contract items to the U.S., which must pay the contractor and then decide whether to resell to the foreign government.[10]  *Id.* at 1341.  The U.S. government therefore experienced the risk of loss of U.S. Treasury funds when Lockheed withheld pricing data in violation of the FCA, and "Lockheed [could not] escape FCA liability based on the mere fortuity that these pods were later to be resold by the United States to the foreign countries through an entirely separate transaction."  *Id.* at 1342.

---

[9] Lockheed argued that "because its requests for payment under the SGB and Peace Nightlight II Contracts were to be satisfied from 'foreign funds' held in the foreign countries' accounts in the FMS Trust Fund—money that [was] merely in the temporary possession of United States officials—these requests for funds did not threaten U.S. funds. Thus, Lockheed argue[d], even if the invoices were 'false' there [was] no False Claims Act liability because only foreign government funds were at a risk of loss." *Id.*

[10] The government in that case explained: "In the FMS scheme, there [were] two separate transactions involved and the Government [was] a party to both. In the first transaction, the Government enter[ed] into an agreement (an 'LOA') with a foreign government to sell pods to the foreign government, and in the second transaction the Government contract[ed] with Lockheed for the purchase of the pods, which [were] then resold to the foreign government. Lockheed [was] not a party to the first transaction, and the foreign government [was] not a party to the second." *Id.*

Similarly, the District of New Jersey in *Hayes* held that CMC Electronics' (CMCE) alleged false claims fell under the FCA and that a question of fact existed as to the damages suffered by the U.S. government where CMCE purportedly sold used radio sets as "new" through the FMS program to the U.S. government, which resold the radios to Saudi Arabia.  297 F. Supp. 2d at 735–36.  The district court held that "[t]he fact that the U.S. used funds obtained from Saudi Arabia to pay for the radios [did] not mean that [CMCE's] false or fraudulent claim was not a demand for payment from U.S. funds."  *Id.* at 736-37.  Given that it was possible for the U.S. government to sustain actual damages despite funding from Saudi Arabia, and the relator indeed alleged damages of at least $14,600,000, the district court found a ruling limiting the government to the FCA statutory penalties inappropriate because "an issue of fact exist[ed] as to the damages that the Government sustained."  *Id.* at 739.

These cases together suggest that, though MDHI was incorrect that reimbursement from third-party governments generally and automatically mandates a finding of zero actual damages, the U.S. government also *can* receive benefits where contracted goods are resold through the FMS program.  An FMS contract entails two separate transactions—one between the contractor and the U.S. government, and another between the U.S. government and a third-party government—and each independently involves an exchange of goods or services for

19

payment. It was therefore inappropriate to limit the jury to the full amount of the FMS contracts at issue in the instant case, where it was possible for the jury to find MDHI did confer tangible and/or intangible benefits to the U.S. government, which ostensibly transferred all or part of these benefits to the foreign governments in the three contracts at issue. Whether and to what extent value was actually conferred was not for the court to decide. The court therefore determined that instructions capturing these possibilities were warranted.

## II.

A hybrid approach to the issue of damages, which instructed the jury to evaluate first whether MDHI's allegedly fraudulent conduct completely compromised the purpose of the FMS contracts at issue, was warranted in this case.

**DONE** the 27th day of September, 2021.

**ABDUL K. KALLON**
UNITED STATES DISTRICT JUDGE